Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
360.534.9900; nlawrence@nrdc.org

Garett R. Rose (D.C. Bar No. 1023909) (*pro hac vice pending*)
Jared E. Knicley (D.C. Bar No. 1027257) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St. NW
Washington DC 20005
202.289.6868; grose@nrdc.org; jknicley@nrdc.org

Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
907.792.7102; egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
Katharine Glover (Alaska Bar No. 0606033)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
907.586.2751; ejorgensen@earthjustice.org; kglover@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, NATURAL RESOURCES DEFENSE COUNCIL, CENTER FOR BIOLOGICAL DIVERSITY, and FRIENDS OF THE EARTH,<br><br>            Plaintiffs,<br>      v.<br><br>DAVID BERNHARDT, in his official capacity as Secretary of the Interior, BUREAU OF LAND MANAGEMENT, and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>            Defendants. | )<br>)<br>)<br>)<br>) Case No. 3:20-cv-<br>) 00205-TMB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. §§ 701-706; 16 U.S.C. § 668dd-ee; 42 U.S.C. § 4332; 16 U.S.C. § 1536)**

**INTRODUCTION**

1.      The Secretary of Interior has impermissibly authorized a broad oil and gas leasing program (the Program) in the Coastal Plain of the Arctic National Wildlife Refuge (Plain or Coastal Plain).  The Program violates multiple statutes governing management of the Coastal Plain and is arbitrary and capricious.  The final environmental impact statement (FEIS), prepared by the Bureau of Land Management (BLM) and the Secretary of the Interior, does not meet foundational requirements of the National Environmental Policy Act (NEPA).  The Program relies on a biological opinion issued by the United States Fish and Wildlife Service (Fish and Wildlife Service) in derogation of its legal obligations under the Endangered Species Act.

2.      The Arctic National Wildlife Refuge (Refuge or Arctic Refuge) is our nation's largest wildlife refuge and the largest preserve of any sort, where the natural environment still exists undisturbed by industrial development.

3.      The Coastal Plain is the biological heart of the Refuge:  1.56-million acres of tundra ecosystem that provide essential breeding, birthing, foraging, and/or over-wintering habitat to countless animals, including polar bears, caribou, and birds from all fifty states.  The Coastal Plain comprises vast expanses of tundra, braided rivers, slopes, foothills, and shallow lakes and ponds. It is also exceedingly sensitive to change, with a short growing season, soils and waterbodies perched on permafrost and ice, and a thin, protective layer of productive vegetation vulnerable to disturbance and slow to recover.

*National Audubon Society et al. v. Bernhardt et al.*,                                                          1
Case No. 3:20-cv-00205-TMB

Increasingly, its ecological processes and species—and even the frozen ground that supports all its surface features—are stressed by climate change.

4. Since its creation, the Refuge has been governed by a highly protective statutory and regulatory scheme. In 2017, while leaving these laws almost entirely in place, Congress instructed BLM to develop and administer a limited program of oil and gas leasing in the Coastal Plain.

5. The Program that Defendants Bernhardt and BLM adopted or approved opens essentially the entire Coastal Plain to leasing for intensive exploration and industrial development attendant on oil and gas production. Through their Record of Decision (ROD) adopting the Program, Defendant Bernhardt and BLM exceeded Congress's limited authorization, needlessly and unlawfully failing to protect the Refuge from damage within their control. They failed to develop and disclose to the public Program options that would have minimized such damage. They failed, as well, to disclose the actual nature and extent of potentially significant environmental damage associated with choices made in adopting the Program. And Defendant Fish and Wildlife Service issued a biological opinion for the Program without ensuring that its implementation would protect threatened species and their critical habitat, as required by law.

6. Plaintiffs ask this Court to enforce the statutory obligations and commands protecting the Coastal Plain environment that the Defendants have ignored and set aside

their unlawful ROD, FEIS, and biological opinion and any actions taken in reliance upon them.

## JURISDICTION, RIGHT OF ACTION, AND VENUE

7.      This court has jurisdiction under 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201-02.  Judicial review and vacatur of illegal agency actions is available under the Administrative Procedure Act, 5 U.S.C. §§ 701-06.

8.      Venue is proper under 28 U.S.C. § 1391(e) because the Refuge is located within this District.

## THE PARTIES

### The Plaintiffs

9.      The National Audubon Society (Audubon) is a national nonprofit conservation organization dedicated to protecting birds and the places they need, now and in the future, throughout the Americas, using science, advocacy, education, and on-the-ground conservation.  Founded in 1905, Audubon has approximately 1.9 million members nationwide, including over 4,800 in Alaska.  Among its many activities, Audubon operates 41 nature centers, and has 23 state programs, including a state office in Anchorage, Alaska, and over 450 local chapters throughout the country, including five chapters in Alaska.  Audubon has long advocated for preserving the Arctic Refuge free from development.

*National Audubon Society et al. v. Bernhardt et al.*,                                                3
Case No. 3:20-cv-00205-TMB

10.     The Natural Resources Defense Council (NRDC) is a membership organization that works to protect wildlife and wild places and to ensure a healthy environment for all life on earth.  NRDC has more than 3.5 million members and online activists, including 375,000 dues-paying members, nearly 1,000 of them in the State of Alaska.  NRDC's advocacy to protect the Refuge and keep it free from development dates back decades.

11.     Plaintiff Center for Biological Diversity (the Center) is a national non-profit organization, with offices across the country and in La Paz, Mexico.  The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health.  The Center has more than 81,800 members.  The Center is actively involved in species and habitat protection issues throughout the United States, including protection of the Arctic and wildlife threatened by oil and gas leasing, exploration, and development.  It has long advocated keeping the Arctic Refuge off limits to oil drilling.

12.     Plaintiff Friends of the Earth is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation.  Friends of the Earth is a membership organization consisting of nearly 178,000 members and more than 1.7 million activists nationwide, including more than 400 members who live in Alaska.  It is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide.  Its mission is to protect our natural environment, including air, water, and land, to create a

more healthy and just world, using public education, advocacy, legislative processes, and litigation. Friends of the Earth is concerned about the adverse impacts that fossil fuel exploration and development in the Arctic Refuge have on the climate and people, fish, birds, and other species that depend on this region. Therefore, on behalf of its members and activists, Friends of the Earth actively engages in advocacy to influence U.S. energy and environmental policies affecting the Arctic Refuge.

13.     Members of the plaintiff organizations reside near, visit, or otherwise use and enjoy the Arctic Refuge, including the Coastal Plain. Members of the plaintiff organizations use these lands for recreation, research, subsistence practices, wildlife viewing, photography, education, and aesthetic and spiritual purposes. The plaintiffs and their members derive scientific, recreational, aesthetic, and conservation benefits and enjoyment from their use of the area and from wildlife that use the Coastal Plain. The activities authorized by Defendant Bernhardt's and Defendant BLM's adoption of the Program will directly and irreparably injure these interests.

14.     The plaintiff organizations monitor the use of Arctic Refuge ecosystems and compliance with the laws respecting these ecosystems, including the Coastal Plain, educate their members and the public concerning management of the ecosystems, and advocate policies and practices that conserve the natural values of the ecosystems. Plaintiffs cannot achieve these organizational purposes fully without adequate information and public participation in the processes required by law. The interests and

organizational purposes of the plaintiffs are directly and irreparably injured by Defendants' violations of the laws as described in this complaint.

15.     Plaintiffs participate actively in the administrative processes established for management of the Arctic Refuge and Coastal Plain, and did so for the Program. Plaintiff groups submitted comments on scoping and on the draft environmental impact statement for the Program. Plaintiffs have exhausted administrative remedies for the decision challenged in this complaint.

**The Defendants**

16.     Defendant David Bernhardt is sued in his official capacity as Secretary of the Interior. Secretary of the Interior is the highest position within the Department of the Interior, has ultimate responsibility for overseeing the Department and its agencies and ensuring their compliance with all applicable federal laws, and specific responsibilities related to the administration of the Arctic Refuge. Defendant Bernhardt signed the ROD challenged herein.

17.     Defendant BLM is the federal agency within the Department of the Interior that issued the FEIS and ROD challenged in this action.

18.     Defendant Fish and Wildlife Service is the federal agency within the Department of the Interior responsible for administration of the Endangered Species Act (ESA) as it relates to terrestrial animals and some marine mammals, most relevantly here including polar bears.

*National Audubon Society et al. v. Bernhardt et al.*,                                      6
Case No. 3:20-cv-00205-TMB

## FACTUAL BACKGROUND

### The Coastal Plain of the Arctic National Wildlife Refuge

19. Bounded on the east by Ivvavik National Park and Vuntut National Park in Canada, and on the west by State lands already developed for oil and gas production, the Arctic Refuge is a uniquely undisturbed region of America's Arctic.

20. The Refuge's Coastal Plain is a dynamic and sensitive tundra environment. Its unique biodiversity includes primary calving grounds for the Porcupine caribou herd, a distinct population that annually undertakes the longest terrestrial migration on Earth. As Defendants Bernhardt and BLM acknowledge in the FEIS, even with low levels of human activity in calving areas, oil and gas development could displace calving caribou, result in decreased calf survival, and lead to a decline in caribou body condition.

21. The Plain is also home to the United States' highest density of onshore dens for maternal polar bears, listed as threatened under the federal Endangered Species Act. Polar bears in the Refuge belong to the species' highly imperiled and declining Southern Beaufort Sea population. They are increasingly being driven onto land as climate change reduces their sea ice habitat and are increasingly dependent on onshore denning habitat in the Coastal Plain.

22. The Coastal Plain's gravel bars, lagoons, tussocks, cliffs, and wetlands provide irreplaceable nesting, foraging, and staging grounds for more than 150 bird

*National Audubon Society et al. v. Bernhardt et al.*,                                    7
Case No. 3:20-cv-00205-TMB

Case 3:20-cv-00205-TMB   Document 1   Filed 08/24/20   Page 8 of 33

species, including tundra and trumpeter swans, gyrfalcons and peregrines, cranes, phalaropes, king and common eiders, and snowy owls.

23.     The Coastal Plain also serves as essential habitat for many terrestrial and aquatic species (including many with disturbance averse or imperiled populations), such as muskoxen, wolves, brown bears, wolverines, Arctic foxes, salmon, char, grayling, and Dolly Varden.

24.     The Coastal Plain is vital to customary and traditional Indigenous practices, including subsistence hunting.  Indigenous peoples of the U.S. and Canadian Arctic depend heavily on the Porcupine caribou herd that uses the Coastal Plain for calving and post-calving activities, migrates south in the fall, and travels up the Porcupine River in the spring.  This 200,000-strong herd is essential to the cultural practices and way of life of the Gwich'in villages along the herd's migration route and provides them a principal food source.

25.     The Coastal Plain, like the rest of America's Arctic, is already profoundly stressed by the effects of climate change.  During recent decades, the Arctic has warmed more rapidly than any other region on Earth.  In Alaska, average Arctic winter temperatures have increased by more than five degrees Fahrenheit during the past 50 years and are predicted to continue rising at a faster rate than elsewhere.  Consumption of fossil fuels—encouraged by expanded oil and gas development, such as that proposed by Defendants Bernhardt and BLM in the Program—is the main cause of climate change.

*National Audubon Society et al. v. Bernhardt et al.*,                                      8
Case No. 3:20-cv-00205-TMB

26. The Mollie Beattie Wilderness Area, directly adjacent to and overlooking the Coastal Plain, offers vast and undisturbed natural areas rich with opportunities for solitude, self-discovery, self-reliance, remoteness, and unconfined recreation. The Coastal Plain, though not statutorily designated Wilderness, shares many of these characteristics. Poorly mitigated oil development would seriously erode these characteristics across vast areas of the Refuge, including the Mollie Beattie Wilderness.

27. The Coastal Plain, due to its unique topography and geomorphology, is ecologically distinct from other parts of America's Arctic. Notably, unlike the flatter coastal regions of the National Petroleum Reserve-Alaska (NPR-A) further to the west, two-thirds of the Refuge's Coastal Plain is hilly terrain or foothills, fundamentally influencing water flow, vegetation distribution, and habitat. Ice-rich permafrost is the foundation of this ecosystem. This ice is vulnerable to thawing, especially if the overlying—and insulating—vegetation or soil is compacted or stripped off by vehicles. Such thawing causes depressions in the tundra, diverts groundwater, and leads to formation of gullies, ponds, and lakes, permanently changing the topography and hydrological regimes, with cascading effects on surrounding landforms and vegetation.

**Congressional Activity Controlling Development of the Coastal Plain**

28. Lands that later became the Arctic Refuge, including the Coastal Plain, were set aside almost sixty years ago as the Arctic National Wildlife Range, for "preserving unique wildlife, wilderness and recreational values." Public Land Order

*National Audubon Society et al. v. Bernhardt et al.*,                                    9
Case No. 3:20-cv-00205-TMB

2214, Alaska - Establishing the Arctic National Wildlife Range, 25 Fed. Reg. 12598, 12598-99 (Dec. 9, 1960). In 1980, Congress gave statutory protection to these and adjacent lands by creating the Arctic Refuge as part of the Alaska National Interest Lands Conservation Act (ANILCA). Pub. L. No. 96-487, § 303(2) (1980) (codified at 16 U.S.C. § 668dd note).

29.     ANILCA supplemented the three Public Land Order purposes, mandating that the entire Refuge, including the Coastal Plain, be managed for four additional, specific, protective purposes:

(i)     to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, the Porcupine caribou herd (including participation in coordinated ecological studies and management of this herd and the Western Arctic caribou herd), polar bears, grizzly bears, muskox, Dall sheep, wolves, wolverines, snow geese, peregrine falcons and other migratory birds and Arctic char and grayling;

(ii)     to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

(iii)     to provide, in a manner consistent with the purposes set forth in subparagraphs (i) and (ii), the opportunity for continued subsistence uses by local residents; and

Case 3:20-cv-00205-TMB   Document 1   Filed 08/24/20   Page 11 of 33

(iv)    to ensure, to the maximum extent practicable and in a manner consistent

with the purposes set forth in paragraph (i), water quality and necessary water

quantity within the refuge.

ANILCA § 303(2)(B).

30.    In ANILCA, Congress also banned the leasing of oil and gas resources

within the Refuge, including the Coastal Plain, and any development leading to oil or gas

production there.  *See* ANILCA § 1003, 16 U.S.C. § 3143.

31.    And, in ANILCA, Congress originally designated as Wilderness the current

Mollie Beattie Wilderness.  ANILCA § 702(3).

32.    In addition to these organic authorities, the Coastal Plain is protected by a

highly proscriptive web of federal environmental preservation laws and regulations.  As

part of a national wildlife refuge, the Secretary of the Interior's management of the

Coastal Plain is governed by the National Wildlife Refuge System Administration Act

(Refuge Act).  The Refuge Act directs that, as a matter of national policy, every refuge

"shall be managed to fulfill the mission of the System, as well as the specific purposes for

which that refuge was established." 16 U.S.C. § 668dd(a)(3)(A).  To that end, the

Secretary is directed to:

 (A) provide for the conservation of fish, wildlife, and plants, and their habitats

within the System;

*National Audubon Society et al. v. Bernhardt et al.*,                                    11
Case No. 3:20-cv-00205-TMB

(B) ensure that the biological integrity, diversity, and environmental health of the

System are maintained for the benefit of present and future generations of

Americans;

[and]

(D) ensure that the mission of the System described in paragraph (2) and the

purposes of each refuge are carried out, except that if a conflict exists between the

purposes of a refuge and the mission of the System, the conflict shall be resolved

in a manner that first protects the purposes of the refuge, and, to the extent

practicable, that also achieves the mission of the System.

*Id.* § 668dd(a)(4).

33.     Similarly, federal agency action affecting the Coastal Plain is fully subject

to the National Environmental Policy Act (NEPA), "our basic national charter for

protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA establishes

comprehensive procedures to ensure that, before irreversibly committing resources to a

project or program, federal agencies "encourage productive and enjoyable harmony

between man and his environment," "promote efforts which will prevent or eliminate

damage to the environment," and "enrich the understanding of the ecological systems and

natural resources important to the Nation."  42 U.S.C. § 4321.  To those ends, agencies

must consider and disclose any potentially significant environmental consequences of

their proposals, as well as less-damaging alternatives to them, and solicit input from other

agencies, Tribes, and the public, before reaching decisions on major federal actions. *See, e.g.*, 40 C.F.R. §§ 1502.1; 1503.1.

34.     Much of the Arctic Refuge is also subject to the stringent provisions of the Wilderness Act, adopted by Congress to preserve certain lands "in their natural condition" and thus "secure for the American people of present and future generations the benefits of and enduring resource of wilderness."  11 U.S.C. § 1131(a).  It makes Defendants "responsible for preserving the wilderness character of the" Mollie Beattie Wilderness, directly adjacent to the Coastal Plain, 16 U.S.C. § 1133(b), including from activities on the Coastal Plain.

35.     A number of wildlife species found either on or alongshore the Coastal Plain are protected by the Endangered Species Act.  Congress enacted the ESA in part out of recognition that threatened or endangered species are of "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," 16 U.S.C. § 1531(a), and deserving of the highest protection.  Agencies that authorize, fund, or carry out actions that may affect such species must consult with either the Fish and Wildlife Service or the National Marine Fisheries Service, depending on the affected species, using the best available scientific and commercial data to ensure against likely jeopardizing their continued existence or adversely modifying habitat determined to be critical for them.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b) (delegating authority for

consultations from the Secretaries of Interior and Commerce to the Fish and Wildlife Service and National Marine Fisheries Service).

36.     In December 2017, Congress repealed ANILCA section 1003 as to the Coastal Plain and directed BLM to establish and administer a program for the leasing, development, production, and transportation of oil and gas in some portion of the Plain. Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, §§ 20001(b)(1) & (b)(2)(A), 131 Stat. 2054, 2236 (2017) ("Tax Act").

37.     The Tax Act left all other provisions of ANILCA in effect but added for the Refuge an additional purpose: "to provide for an oil and gas program on the Coastal Plain."  Tax Act § 20001(b)(2)(B).

38.     The Tax Act gave BLM four years from December 2017 to hold an initial lease sale of at least 400,000 acres and seven years to hold a second sale of at least 400,000 acres.  *Id.* § 20001(c)(1)(B).

39.     The Tax Act did not waive the Refuge Act, NEPA, the Wilderness Act, or any other environmental laws.  *See generally id.* § 20001.  It also specifically limited surface coverage by production and support facilities on federal land in the Coastal Plain to no more than 2,000 acres during the term of the leases under the Program.  *Id.* § 20001(c)(3).

40.     During Congressional consideration of the Tax Act, Alaska Senator Murkowski explained that protection of the environment of the Coastal Plain would

*National Audubon Society et al. v. Bernhardt et al.*,                                      14
Case No. 3:20-cv-00205-TMB

remain a statutory priority: She agreed that "the environment and local wildlife will always be a concern, always be a priority. That is why we did not waive NEPA or any other environmental laws. That is why the consultation requirements with our Alaska Native people still apply. That is why surface development will cover up to, but no more, than 2,000 Federal acres." 163 Cong. Rec. S7539-40 (daily ed. Nov. 30, 2017) (statement of Sen. Murkowski).

### Environmental Documentation and Leasing Program Decision

41.     In December 2018, BLM released a draft environmental impact statement analyzing some environmental impacts of, and alternatives for, the Program. Plaintiffs timely submitted comments explaining and documenting numerous deficiencies in that draft statement.

42.     In September 2019, BLM released an FEIS analyzing some environmental impacts of, and alternatives for, the Program.

43.     In its FEIS, BLM rejected alternatives that would have caused less environmental harm to the Coastal Plain and elsewhere. Instead, BLM designated as its preferred alternative a Program making essentially the entire Plain available for leasing and seismic exploration. This alternative has the most acreage available for construction of oil and gas infrastructure. It includes the fewest protections for biological and ecological resources. It permits, and as described in the FEIS exceeds, the maximum surface infrastructure allowed by the Tax Act. And it has the greatest projected impacts

*National Audubon Society et al. v. Bernhardt et al.*,                    15
Case No. 3:20-cv-00205-TMB

on wilderness values, recreation, permafrost and tundra, water quantity and quality, customary and traditional subsistence practices, wildlife, and climate change of all the alternatives considered in the FEIS. The FEIS acknowledges that implementation of the Program would interfere with and detract from the Refuge's conservation purposes. For example, it concludes that the Program has the potential to harm recreation throughout the entire Coastal Plain and cause the displacement or decline of sensitive species such as polar bears. It also acknowledges that the Program, which would allow surface occupancy and seismic surveying right up to the wilderness boundary, would degrade the wilderness characteristics of the Mollie Beattie Wilderness.

44. The FEIS fails to include accurate and available information about the potential adverse impacts of Program alternatives, in isolation and combination with other industrial activity in northern Alaska. The FEIS ignores or obscures potential harm to tundra, permafrost, and other landscape features, water quantity and quality, air quality, the climate, wilderness characteristics, and wildlife. In numerous instances, the FEIS explicitly fails to disclose potential impacts in favor of study at some later time, or relies on studies of other, significantly different, parts of America's Arctic rather than analyzing potential impacts from development of the Coastal Plain. Throughout, it fails to describe potential cumulative impacts of the Program and its alternatives, together with other past, present, and reasonably foreseeable activities or describes them so cursorily as to defeat informed public comment and agency decisionmaking.

*National Audubon Society et al. v. Bernhardt et al.*, 16
Case No. 3:20-cv-00205-TMB

45.     The FEIS also includes a misleadingly narrow range of alternatives, none of which even purports to minimize risk and harms to natural and related values in and beyond the Coastal Plain.  No alternative assures leasing would be kept to the minimum required by the Tax Act.  None reduces roads, drill pads, and other surface infrastructure below the maximum permitted by the Tax Act.  None limits ice roads, pipelines, and other connectors by restricting dispersal of processing facilities.  None reduces impacts to wilderness values to the minimum feasible.  None eliminates harmful seismic exploration or even significantly restricts where the seismic exploration it incorporates into the leasing program can occur.

46.     On March 13, 2020, the Fish and Wildlife Service issued a biological opinion for the Program, covering ESA-listed species within its area of responsibility and based on its consultation with, and receipt of a biological assessment from, BLM.

47.     On August 17, 2020, BLM released a ROD authorizing the Program, signed by Secretary Bernhardt.  In the ROD, BLM adopted, with minimal changes, its preferred alternative from the FEIS and formalized its decision to zone essentially the entire Coastal Plain for oil and gas leasing and development.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of the APA and NEPA)

48.     Plaintiffs incorporate by reference all preceding paragraphs.

*National Audubon Society et al. v. Bernhardt et al.*,                    17
Case No. 3:20-cv-00205-TMB

49.     The Refuge Act mandates that each national wildlife refuge "shall be managed to fulfill the mission of the [National Wildlife Refuge] System, as well as the specific purposes for which that refuge was established."  16 U.S.C. § 668dd(a)(3)(A).  A refuge's purposes include "purposes specified in or derived from the . . . public land order . . . establishing . . . a refuge."  16 U.S.C. § 668ee(10).  Similarly, ANILCA requires the national wildlife refuges it created to be managed in accordance with the laws governing the administration of the National Wildlife Refuge System and pursuant to all consistent provisions of previously applicable public land orders.  ANILCA §§ 304(a), 305.

50.     Public Land Order 2214 established the original management purposes for much of the Arctic Refuge—including all of the Coastal Plain—as preserving the area's unique wildlife, wilderness, and recreational values.

51.     ANILCA § 303(2)(B) added four detailed conservation purposes for which the Arctic Refuge "shall be managed," including maintenance of wildlife populations and habitats in their natural diversity, fulfillment of wildlife-related treaties, provision of continued opportunities for subsistence practices, and ensuring water quality and quantity.

52.     ANILCA also designated much of the Refuge as Wilderness, including what is now known as the Mollie Beattie Wilderness, which adjoins the Coastal Plain. The Wilderness Act makes Defendants Bernhardt and BLM "responsible for preserving

the wilderness character" of congressionally designated Wilderness, including the Mollie Beattie Wilderness.  16 U.S.C. § 1133(b).

53.     The Tax Act added a purpose to ANILCA § 303(2)(B) "to provide for an oil and gas program on the Coastal Plain," but did not otherwise alter that section or the Refuge Act, and left in force the Wilderness Act and other laws applicable to management of the Arctic Refuge.

54.     The Administrative Procedure Act (APA) bars an agency from arbitrary and capricious decisionmaking, including misinterpreting the agency's legal obligations, failure to consider relevant factors, reliance on factors that Congress did not intend it to consider, and failure to analyze compliance with governing legal requirements.  5 U.S.C. § 706(2)(A).

55.     The NEPA regulations require that a federal agency, in an environmental impact statement, "state how alternatives considered in it and decisions based on it will or will not achieve the requirements of . . . environmental laws and policies."  40 C.F.R. §1502.2(d).

56.     In their FEIS for the Program, Defendants Bernhardt and BLM developed alternatives that would bar oil and gas leasing from parts of the Coastal Plain.  These alternatives would impose conditions designed to help fulfill the purposes for which the Refuge was created and preserve the wilderness values of the Mollie Beattie Wilderness,

beyond those included in these Defendants' preferred and subsequently chosen
alternative of offering essentially the entire Coastal Plain for leasing.

57. Defendants Bernhardt and BLM based their ROD in part on their assertion
that Congress "mandated that the 1.56 million acre Coastal Plain be managed for an oil
and gas program" just as it mandated that other portions of the Refuge be managed as
Wilderness. In so doing, they misinterpreted the Tax Act as overriding their other legal
obligations, including those under the Refuge Act, ANILCA, and the Wilderness Act,
beyond the minimal extent required by the Tax Act.

58. In neither the FEIS nor the ROD did Defendants Bernhardt and BLM
consider or analyze their actual legal obligations under the Refuge Act, ANILCA, and the
Wilderness Act or state how they would achieve those requirements. With respect to the
Wilderness Act, they expressly found that operations under the Program would adversely
affect wilderness characteristics of the Mollie Beattie Wilderness and considered
measures to mitigate those impacts, but did not either adopt them or explain in the FEIS
or the ROD how and why their decision not to adopt them or other measures to protect
the wilderness characteristics of the Mollie Beattie Wilderness will achieve the
requirements of the Wilderness Act.

59. By basing their ROD in part on a misinterpretation of their legal obligation
to fulfill all the Refuge's purposes and to preserve the wilderness values of the Mollie
Beattie Wilderness, and by failing to consider or analyze their actual obligations and

*National Audubon Society et al. v. Bernhardt et al.*,                    20
Case No. 3:20-cv-00205-TMB

decide and state how they would achieve compliance with them, Defendants Bernhardt and BLM violated 5 U.S.C. § 706(2)(A) and 40 C.F.R. § 1502.2(d).

60. Defendants Bernhardt and BLM also acted arbitrarily and not in accordance with law, by neither mitigating adverse impacts they acknowledged the Program would have on the wilderness characteristics of the Mollie Beattie Wilderness nor explaining that failure, in violation of 5 U.S.C. § 706(2)(A) and 40 C.F.R. § 1502.2(d).

## COUNT II
### (Violation of the Refuge Act)

61. Plaintiffs incorporate by reference all preceding paragraphs.

62. The Refuge Act provides, in part, that "the Secretary shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use." 16 U.S.C. § 668dd(d)(3)(A)(i).

63. Uses of a refuge include management economic activities, such as oil and gas leasing activities. ANILCA 304(b); 50 C.F.R. § 25.12.

64. A "compatible use" is a "use of a refuge that, in the sound professional judgment of the Director, will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. 668ee(1). "[S]ound professional judgment," in turn, "means a finding, determination, or decision that is consistent with principles of sound fish and wildlife management and

*National Audubon Society et al. v. Bernhardt et al.*,                                  21
Case No. 3:20-cv-00205-TMB

administration, available science and resources, and adherence to the requirements of this Act and other applicable laws." 16 U.S.C. § 668ee(3). A compatibility determination must be made in writing and provide adequate opportunity for public comment. 16 U.S.C. § 668dd(d)(3)(B); 50 C.F.R. § 26.41.

65.     Although Defendants Bernhardt and BLM, in adopting the Program concluded that Congress "included a Coastal Plain oil and gas program as a refuge purpose on equal footing with the other refuge purposes," ROD at 1, they chose to open Refuge lands to oil and gas leasing activities in ways that give dominant effect to the oil and gas purpose across the Coastal Plain. The Program opens to leasing far more of the Coastal Plain than Congress required, it maximizes the surface area disturbed by permanent development, it contains no provision limiting the location or extent of destructive activities such as seismic testing and ice road construction, it fails to limit the dispersal of drill pads and pipelines across the landscape, and it foregoes numerous lease and operating restrictions that would protect natural values. The FEIS acknowledges that the Program would interfere with or detract from the fulfillment of the Refuge's conservation-oriented purposes.

66.     By adopting the Program, Defendant Bernhardt initiated a new use of the Refuge. Because he failed to make a determination that the Program is compatible with the purposes of the Refuge, Defendant Bernhardt's adoption of the Program violates 16 U.S.C. § 668dd(d)(3)(A)(i). Or, if he made such a determination it is arbitrary and

*National Audubon Society et al. v. Bernhardt et al.*,                    22
Case No. 3:20-cv-00205-TMB

capricious, violating 5 U.S.C. § 706(2)(A), because the Program materially interferes with and detracts from the fulfillment of all other established purposes of the Refuge.

## COUNT III
### (Failure to Consider a Reasonable Range of Alternatives, NEPA)

67.     Plaintiffs incorporate by reference all preceding paragraphs.

68.     NEPA establishes a national policy that federal agencies "use all practicable means and measures . . . to create and maintain conditions in which man and nature can exist in productive harmony," 42 U.S.C. § 4331(a), and makes it their responsibility to "attain the widest range of beneficial uses of the environment without degradation . . . ." *Id.* § 4331(b)(3).  NEPA directs that "to the fullest extent possible" all public laws of the United States "be interpreted and administered in accordance" with these policies.  *Id*. § 4332(1).

69.     In furtherance of these national policies, NEPA directs that federal agencies—including the BLM—study alternatives to their proposed actions.  *Id.* §§ 4332(2)(C)(iii) & (E); *see also* 40 C.F.R. § 1502.14.  For an environmental impact statement (EIS), NEPA requires that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives . . . ."  40 C.F.R. § 1502.14(a).  These must, to the fullest extent possible, include "reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."  *Id*. § 1500.2(e).

70. The Refuge was created, and by law must be managed, for several stringent conservation-oriented purposes, relating to diversity of fish and wildlife and their habitats, preservation of wilderness qualities, unique recreational values, water quality and quantity, and traditional subsistence practices. These purposes remain in effect and binding, notwithstanding congressional adoption through the Tax Act of an eighth purpose, related to oil and gas leasing in the Coastal Plain.

71. Because of the full set of purposes for which the Refuge must be managed, and in light of the requirements of NEPA, it was reasonable to include and study in the FEIS a Program alternative that, among other things and to the extent permitted by the Tax Act, minimized:

(i)     the acreage leased;

(ii)    the area where surface disturbance is necessary and allowed;

(iii)   the number and dispersion of well pads and miles of pipeline;

(iv)    the extent or location of gravel mines, ice roads, desalination plants, and other support facilities;

(v)     the seismic surveys permitted;

(vi)    the seasons during which surface and aerial activity is allowed in and above calving, denning, and other sensitive wildlife habitat;

(vii)   the water withdrawn from Refuge rivers and lakes; and

*National Audubon Society et al. v. Bernhardt et al.*,                                    24
Case No. 3:20-cv-00205-TMB

otherwise included measures to reduce damage to the Refuge's natural values and the human activities that depend upon them, to the extent allowed by the Tax Act.

72.     In the FEIS, however, Defendants Bernhardt and BLM did not develop or study any alternative that would fulfill, to the extent consistent with Tax Act obligations, the conservation-oriented purposes for which the Refuge must be managed or minimize adverse effects to the environment.

73.     By failing to consider any alternative in the FEIS that would implement the Tax Act in a manner that minimizes the risk of damage to the natural values and related human activities associated with the Coastal Plain, Defendants Bernhardt and BLM violated NEPA, 42 U.S.C. § 4332.

## COUNT IV
### (Failure to Discuss Potentially Significant Environmental Impacts from the Program, per NEPA)

74.     Plaintiffs incorporate by reference all preceding paragraphs.

75.     In an EIS, federal agencies must discuss the potentially significant "environmental impacts of the alternatives, including the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented."  40 C.F.R. § 1502.16.  This includes discussions of "direct effects and their significance," "indirect effects and their significance," *id.*, and "cumulative" impacts.  40 C.F.R. §§ 1508.8, 1508.25(a)(2).  Indirect effects include effects that "are

*National Audubon Society et al. v. Bernhardt et al.*,                                              25
Case No. 3:20-cv-00205-TMB

caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8.

76.     Defendants Bernhardt and BLM failed, in their FEIS, to discuss the actual magnitude and nature of potential direct, indirect, and cumulative impacts that the Program may have on the Coastal Plain and elsewhere. Specifically, they did not provide important objective data and other scientific information concerning the Program's potential impacts on—among other resources—permafrost, tundra, overall greenhouse gas emissions and their social costs, air quality, wilderness, and multiple wildlife species. Nor did they provide information about the potential extent of surface development and associated damage under the Program they adopted in the ROD, damage which Congress and numerous scientific studies identified as particularly severe and significant. They thereby obscured from the public, decisionmakers, and other officials both the potential environmental costs of different development alternatives and the need and opportunity for additional programmatic measures to mitigate those consequences.

77.     The failure of Defendants Bernhardt and BLM to discuss potentially significant direct, indirect, and cumulative environmental and economic impacts from the Program renders their FEIS and ROD in violation of NEPA, 42 U.S.C. § 4332.

## COUNT V
## (Violation of the ESA and APA)

78.     Plaintiffs incorporate by reference all preceding paragraphs.

*National Audubon Society et al. v. Bernhardt et al.*,                                    26
Case No. 3:20-cv-00205-TMB

79.     Under section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), the Secretary of the Interior and/or Commerce—depending on the species involved—must consult with any agency authorizing an action that may affect threatened or endangered species or their critical habitat, in order to ensure that the action is not likely to jeopardize the continued existence of the species or adversely modify their critical habitat.  To accomplish this, the agency and the Secretary must use the best scientific and commercial information available.  After consultation and before initiation of the agency action, the Secretary must, pursuant to 16 U.S.C. § 1536(b)(3)(A), issue a biological opinion detailing how the action affects the listed species and critical habitat.

80.     When the action being authorized has multiple implementing phases, the consultation must ensure against prohibited impacts from all phases of the entire action. The Secretary's biological opinion must be comprehensive, detailing the effects of all implementing phases.  And where the specifics of future phases will be determined later, the Secretary and the agency must still use the best available scientific and commercial information to make impact projections during the initial consultation based on potential locations and levels of implementing activities and potential conflicts with protected species and their critical habitat.

81.     The Secretary of the Interior is the relevant Secretary for potential impacts to polar bears, which are listed as threatened under the ESA, and their critical habitat, and

*National Audubon Society et al. v. Bernhardt et al.*,                                      27
Case No. 3:20-cv-00205-TMB

conducts consultations and issues biological opinions by and through the Fish and Wildlife Service.

82.     For the Program described above, Defendant BLM and Defendant Fish and Wildlife Service engaged in ESA consultation in part because they agreed that the Program is an action that may affect polar bears.  Defendant Fish and Wildlife Service concedes that this consultation had to demonstrate that the aggregate effect of activities implementing the Program will not jeopardize the continued existence of polar bears or adversely modify their designated critical habitat.

83.     The polar bears of the Southern Beaufort Sea (SBS) population are declining and projected to decline even more in the future.  As Defendant Fish and Wildlife Service acknowledges, these declines are due in part to loss of the bears' preferred sea ice habitat.  As the sea ice has decreased, SBS bears have concentrated a disproportionate amount of foraging and maternal denning in the Coastal Plain, a trend that Fish and Wildlife Service scientists predict will continue.  The area is thus especially important to the continued survival of this population of bears.  Accordingly, 77 percent of the Coastal Plain is designated as critical habitat for polar bears.

84.     Fish and Wildlife Service biologists predict that, because of the declining and precarious state of the SBS population of polar bears and mortality due to other causes, loss of even a single SBS bear to human disturbance could have population level effects.

*National Audubon Society et al. v. Bernhardt et al.*,                                    28
Case No. 3:20-cv-00205-TMB

85.     Polar bears are particularly vulnerable to seismic exploration when they are denning with cubs.  Defendant Fish and Wildlife Service acknowledges that disturbance from such activities conducted pursuant to the Program could lead to den abandonment by maternal polar bears and the death of their cubs.

86.     Both Defendant Fish and Wildlife Service and Defendant BLM acknowledge that avoiding such adverse impacts on polar bears and their denning habitat from Program activities would require application of mitigation measures.  During their ESA consultation, however, they did not agree on what measures would mitigate seismic impacts to polar bears and their habitat from the Program sufficiently to comply with section 7(a)(2) of the ESA or be required for Program activities.  As a result, they could not accurately analyze how seismic exploration would likely affect polar bears and their critical habitat.

87.     Despite these failures, Defendant Fish and Wildlife Service, issued a biological opinion for the Program concluding that it is not likely to jeopardize polar bears or adversely modify their critical habitat.  In making that conclusion, Defendant Fish and Wildlife Service expressly relied on a promise of future, site-specific consultations under the ESA and the Marine Mammal Protection Act, rather than on a comprehensive analysis of all phases of the Program based on the best scientific and commercial information available at the time of the initial consultation.

88.     Defendant Fish and Wildlife Service violated 16 U.S.C. § 1536(b)(3)(A) by failing to provide BLM, after consultation, with a biological opinion that included a comprehensive, predictive analysis detailing how all phases of the entire Program could affect, and potentially conflict with, polar bears and their critical habitat.

89.     Defendant Fish and Wildlife Service violated 16 U.S.C. 1536(a)(2) when consulting with BLM by failing to use the best scientific and commercial information available to ensure that the Program is not likely to jeopardize the continued existence of polar bears or adversely modify their critical habitat.

90.     Defendant Fish and Wildlife Service violated 5 U.S.C. § 706(2)(A) by arbitrarily concluding that the Program is not likely to jeopardize the continued existence of any threatened or endangered species or adversely modify its critical habitat, despite not determining what mitigation would accomplish that.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment providing the following relief:

A.     Declare that Defendants have violated NEPA, the National Wildlife Refuge Administration Act, and the ESA, and further declare that the actions set forth above are arbitrary, capricious, and not in accordance with law and procedure required by law;

*National Audubon Society et al. v. Bernhardt et al.*,                                    30
Case No. 3:20-cv-00205-TMB

B.     Set aside the ROD and FEIS for the oil and gas leasing program for the Coastal Plain of the Arctic National Wildlife Refuge and any actions taken by Defendants in reliance on either document as void;

C.     Set aside the biological opinion for the oil and gas leasing program for the Coastal Plain of the Arctic National Wildlife Refuge and any actions taken by Defendants in reliance on the biological opinion as void;

D.     Enter preliminary and permanent injunctive relief as needed to prevent irreparable harm from implementation of the oil and gas leasing program for the Coastal Plain of the Arctic National Wildlife Refuge until Defendants comply with NEPA, the National Wildlife Refuge Administration Act, the APA, and the ESA; and

E.     Grant such other relief as the Court considers just and proper, including plaintiffs' costs of this action and such reasonable attorneys' fees as they are entitled to.

Respectfully submitted this 24th day of August, 2020,

*s/ Nathaniel SW Lawrence*
Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*pro hac vice pending*)
Garett R. Rose (D.C. Bar No. 1023909) (*pro hac vice pending*)
Jared E. Knicley (D.C. Bar No. 1027257) (*pro hac vice pending*)
NATURAL RESOURCES DEFENSE COUNCIL

*s/ Erik Grafe*
Erik Grafe (Alaska Bar No. 0804010)
Eric P. Jorgensen (Alaska Bar No. 8904010)
Katharine Glover (Alaska Bar No. 0606033)
EARTHJUSTICE

*Attorneys for Plaintiffs National Audubon Society,*
*Natural Resources Defense Council, Center for*
*Biological Diversity, and Friends of the Earth*

Case 3:20-cv-00205-TMB   Document 1   Filed 08/24/20   Page 33 of 33