JEAN E. WILLIAMS
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
MARK ARTHUR BROWN (Florida Bar No. 0999504)
Senior Trial Attorney, Wildlife and Marine Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-305-0204 || 202-305-0275 (fax)
mark.brown@usdoj.gov

PAUL E. SALAMANCA
Deputy Assistant Attorney General
PAUL A. TURCKE (Idaho Bar No. 4759)
Trial Attorney, Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-353-1389 || 202-305-0506 (fax)
paul.turcke@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GWICH'IN STEERING COMMITTEE, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>DAVID BERNHARDT, in his official capacity as Secretary of the United States Department of the Interior, *et al.*,<br><br>　　　　　Defendants,<br>　　and<br><br>NORTH SLOPE BOROUGH, *et al.*, ALASKA OIL & GAS ASSOCIATION, *et al.*,<br><br>　　　　　Intervenor-Defendants. | Case No. 3:20-cv-00204-SLG |

*Gwich'in Steering Committee v. Bernhardt; et al.*　　　Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 1 of 67

NATIONAL AUDUBON SOCIETY, *et al.*,

                    Plaintiffs,
          v.

DAVID BERNHARDT, in his official
capacity as Secretary of the United States          Case No. 3:20-cv-00205-SLG
Department of the Interior, *et al.*,

                    Defendants,
     and

NORTH SLOPE BOROUGH, *et al.*,
ALASKA OIL & GAS ASSOCIATION, *et
al.*,

Intervenor-Defendants.
_____

NATIVE VILLAGE OF VENETIE TRIBAL
GOVERNMENT, *et al.*,

                    Plaintiffs,
          v.

DAVID BERNHARDT, in his official
capacity as Secretary of the United States          Case No. 3:20-cv-00223-SLG
Department of the Interior, *et al.*,

                    Defendants,
     and

NORTH SLOPE BOROUGH, *et al.*,
ALASKA OIL & GAS ASSOCIATION, *et
al.*,

                    Intervenor-Defendants.


# FEDERAL DEFENDANTS' COMBINED MEMORANDUM
# IN OPPOSITION TO PLAINTIFFS' MOTIONS
# FOR PRELIMINARY INJUNCTION

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 2 of 67

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND .................................................................................................... 3

I.    Congress Directed the Secretary to Act in the Coastal Plain ........................ 4

II.    The ROD Implements a Congressional Mandate ........................................ 7

III.    Steps to Implement the Program's First Required Lease Sale ................... 10

IV.    Kaktovik Iñupiat Corporation Seismic Survey Application ...................... 12

LEGAL STANDARDS ........................................................................................ 13

I.    A Preliminary Injunction is an Extraordinary Remedy .............................. 13

II.    Administrative Procedure Act Review of Agency Action ......................... 14

ARGUMENT ........................................................................................................ 14

I.    Plaintiffs Ignore Fundamental Jurisdictional Requirements ...................... 15

II.    Plaintiffs Cannot Demonstrate Imminent, Irreparable Harm ..................... 18

    A.    Plaintiffs Cannot Show Imminent, Irreparable Harm from the Mere    Issuance of Leases ........................................................... 20

        1.    Leases Do Not Authorize Ground Disturbance ................... 20

        2.    Bureaucratic Momentum Does Not Support Injunctive Relief ................................................................................. 25

    B.    Alleged Harms from Seismic Surveys Are Not Properly before the Court .......................................................................... 27

III.    Plaintiffs Are Not Likely to Succeed on the Merits ................................... 28

    A.    Defendants Properly Addressed Their Duties under the Refuge Act ................................................................................ 29

    B.    Defendants Complied with NEPA's Procedural Requirements ....... 32

        1.    The Tax Act 2,000-Acre Limitation ..................................... 34

*Gwich'in Steering Committee v. Bernhardt; et al.*      Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION      i

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 3 of 67

2. Failure to Consider an Alternative Closing Areas to Seismic Exploration ............................................................ 38

3. Failure to Adequately Analyze Cultural Resource Impacts. .................................................................... 40

4. Greenhouse Gas Emissions Analysis .................................. 42

5. Failure to Explain Compliance with Refuge Act and ANILCA........................................................................ 46

C. Defendants Properly Interpreted and Applied ANILCA ................ 49

IV. The Public Interest and Balance of Equities Favor Defendants.................. 53

CONCLUSION ............................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ...................................................................................... 35

*All. for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ...................................................................... 13

*Am. Wild Horse Pres. Campaign v. Zinke,*
  No. 16-cv-00001-EJL, 2017 WL 4349012 (D. Idaho Sept. 29, 2017) ........................ 48

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ............................................................................... 21, 26

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
  462 U.S. 87 (1983) ....................................................................................... 14

*Bennett v. Spear,*
  520 U.S. 154 (1997) ...................................................................................... 15

*Blanco v. Burton,*
  No. Civ.A. 06-3813, 2006 WL 2366046 (E.D. La. Aug. 14, 2006) ........................ 22, 26

*California v. Block,*
  690 F.2d 753 (9th Cir. 1982) ................................................................... 33, 34

*Caribbean Marine Servs. Co. v. Baldrige,*
  844 F.2d 668 (9th Cir. 1988) ...................................................................... 18

*Cheyenne Tribe v. Hodel,*
  851 F.2d 1152 (9th Cir. 1988) .................................................................... 27

*City of Sausalito v. O'Neill,*
  386 F.3d 1186 (9th Cir. 2004) .................................................................... 14

*Columbia Riverkeeper v. U.S. Coast Guard,*
  761 F.3d 1084 (9th Cir. 2014) .................................................................... 16

*Conner v. Burford,*
  848 F.2d 1441 (9th Cir. 1988) .......................................................... 23, 24, 27

*Conservation Cong. v. U.S. Forest Serv.,*
  720 F.3d 1048 (9th Cir. 2013) .................................................................... 13

*Ctr. for Biological Diversity v. Bernhardt* (*CBD*),
  No. 18-73400, 2020 WL 7135484 (9th Cir. Dec. 7, 2020) .................... 43, 44, 45, 47

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                                    iii

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 5 of 67

*Dep't of Fish & Game v. Fed. Subsistence Bd.*,
   No. 3:20-cv-00195-SLG, 2020 WL 6786899 (D. Alaska Nov. 18, 2020) .................... 13

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ...................................................................................... 55

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ......................................................................................... 55

*Earth Island Inst. v. Nash*,
   No. 1:19-cv-01420-DAD, 2020 WL 1936701 (E.D. Cal. Apr. 21, 2020) ........................ 3

*Earth Island Inst. v. Ruthenbeck*,
   490 F.3d 687 (9th Cir. 2007) ......................................................................................... 35

*Earth Island Inst. v. U.S. Forest Serv.*,
   351 F.3d 1291 (9th Cir. 2003) ....................................................................................... 15

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ....................................................................................................... 55

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
   681 F.2d 1172 (9th Cir. 1982) ....................................................................................... 24

*Fund For Animals v. Clark*,
   27 F. Supp. 2d 8 (D.D.C. 1998) ..................................................................................... 30

*Gen. Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy*,
   764 F.2d 896 (D.C. Cir. 1985) ....................................................................................... 31

*Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*,
   857 F.2d 505 (9th Cir. 1988) ......................................................................................... 37

*Indigenous Envtl. Network v. U.S. Dep't of State*,
   347 F. Supp. 3d 561 (D. Mont. 2018) ............................................................................ 41

*Kleppe v. New Mexico*,
   426 U.S. 529 (1976) ......................................................................................................... 4

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ....................................................................................................... 33

*Kunaknana v. Clark*,
   742 F.2d 1145 (9th Cir. 1984) ....................................................................... 51, 52, 53, 54

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ......................................................................................... 14

*League of Wilderness Defs. v. U.S. Forest Serv.*,
   585 F. App'x 613 (9th Cir. 2014) .................................................................................. 48

*Gwich'in Steering Committee v. Bernhardt; et al.*                Nos. 3:20-cv-00024; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                                    iv

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 6 of 67

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
689 F.3d 1060 (9th Cir. 2012) ........................................................................ 39

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................................................ 35

*Massachusetts v. Watt*,
716 F.2d 946 (1st Cir. 1983) ........................................................................... 26

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ........................................................................................ 13

*Mont. Wilderness Ass'n v. Fry*,
408 F. Supp. 2d 1032 (D. Mont. 2006) ........................................................... 27

*Mont. Wilderness Ass'n v. McAllister*,
658 F. Supp. 2d 1249 (D. Mont. 2009) ........................................................... 48

*Morongo Band of Mission Indians v. F.A.A.*,
161 F.3d 569 (9th Cir. 1998) .......................................................................... 39

*Motor Vehicle Mfrs. Ass'n., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................. 14, 44

*N. Alaska Envtl. Ctr. v. Kempthorne* (*NAEC I*),
457 F.3d 969 (9th Cir. 2006) ................................................................ 7, 22, 24

*N. Alaska Envtl. Ctr. v. U.S. Dep't of the Interior* (*NAEC II*),
No. 3:18-cv-0030-SLG, 2018 WL 6424680 (D. Alaska Dec. 6, 2018) ......... 7, 17, 22, 34

*N. Slope Borough v. Andrus*,
486 F. Supp. 326 (D.D.C. 1979) ........................................................... 27, 55, 56

*N. Slope Borough v. Minerals Mgmt. Serv.*,
No. 3:07-cv-0045-RRB, 2007 WL 1106110 (D. Alaska Apr. 12, 2007) ..................... 22

*Nat. Res. Def. Council, Inc. v. EPA*,
822 F.2d 104 (D.C. Cir. 1987) ........................................................................ 33

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ........................................................................................ 35

*Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) .......................................................................... 14

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
779 F.3d 1036 (9th Cir. 2015) ........................................................................ 17

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
117 F.3d 1520 (9th Cir. 1997) ........................................................................ 39

*Gwich'in Steering Committee v. Bernhardt; et al.*     Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION     v

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 7 of 67

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ................................................................................... 36

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006) .............................................................. 15, 16

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ...................................................................... 28

*Rettig v. Pension Benefit Guaranty Corp.*,
    744 F.2d 133 (D.C. Cir. 1984) ................................................................... 31

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ................................................................................... 33

*Rocky Mountain Oil & Gas Ass'n v. Watt*,
    696 F.2d 734 (10th Cir. 1982) ................................................................... 32

*Russell Country Sportsmen et al. v. U.S. Forest Serv.*,
    668 F. 3d 1037 (9th Cir. 2011) .................................................................. 37

*S. Utah Wilderness All. v. Allred*,
    No. 08-cv-02187, 2009 WL 765882 (D.D.C. Jan. 17, 2009) ....................... 24

*S. Utah Wilderness All. v. Palma*,
    707 F.3d 1143 (10th Cir. 2013) ................................................................. 36

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
    413 F. Supp. 3d 973 (D. Alaska 2019) ................................................. 24, 25

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
    443 F. Supp. 3d 995 (D. Alaska 2020) ...................................... 25, 33, 50, 51

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
    No. 3:15-cv-000054-SLG, 2015 WL 3508068 (D. Alaska June 4, 2015) ...... 3

*Sierra Club v. Fed. Energy Regulatory Comm'n*,
    867 F.3d 1357 (D.C. Cir. 2017) ............................................................ 44, 47

*Sierra Club v. Marsh*,
    872 F.2d 497 (1st Cir. 1989) ...................................................................... 26

*Stratman v. Leisnoi, Inc.*,
    545 F.3d 1161 (9th Cir. 2008) ...................................................................... 4

*Texas v. United States*,
    523 U.S. 296 (1998) ................................................................................... 36

*Toilet Goods Ass'n v. Gardner*,
    387 U.S. 158 (1967) ................................................................................... 35

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00024; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    vi

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 8 of 67

*Town of Superior v. U.S. Fish & Wildlife Serv.*,
913 F. Supp. 2d 1087 (D. Colo. 2012) .................................................. 30, 32

*Tribal Vill. of Akutan v. Hodel*,
859 F.2d 662 (9th Cir. 1988) ........................................................ 21

*Truckers United for Safety v. Fed. Highway Admin.*,
139 F.3d 934 (D.C. Cir. 1998) ...................................................... 35

*United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*,
837 F.3d 1055 (9th Cir. 2016) ....................................................... 7

*W. Watersheds Project v. Schneider*,
417 F. Supp. 3d 1319 (D. Idaho 2019) ............................................ 24

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) ................................................... 38, 39

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
870 F.3d 1222 (10th Cir. 2017) .................................................... 27

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ......................................................... 13, 14, 18

**Statutes**

16 U.S.C. § 1132 ........................................................................ 4

16 U.S.C. § 3112(1) .................................................................... 50

16 U.S.C. § 3142(a) ..................................................................... 5

16 U.S.C. § 410hh ....................................................................... 4

16 U.S.C. § 410hh(b)-(e) ................................................................ 4

16 U.S.C. § 410hh-1(3)(a)-(b) ........................................................... 5

16 U.S.C. § 668dd ....................................................................... 4

16 U.S.C. § 668dd(c) ................................................................... 29

16 U.S.C. §§ 3141-50 .................................................................... 5

16 U.S.C. §§ 668dd-ee .................................................................. 29

42 U.S.C. § 4332(2)(C) ................................................................. 33

42 U.S.C. § 6501 ........................................................................ 7

42 U.S.C. §§ 4321-4370j ................................................................. 8

*Gwich'in Steering Committee v. Bernhardt; et al.*       Nos. 3:20-cv-00204; -205; -223-SLG
Defs.' Opposition to ANWR Motions for Preliminary Injunction                    vii

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 9 of 67

43 U.S.C. § 1601 ........................................................................................... 31

5 U.S.C. § 706(2) .......................................................................................... 14

5 U.S.C. §§ 701-706 ..................................................................................... 14

Pub. L. 115-97, 131 Stat. 2054 (2017) ........................................................... 1

Pub. L. No. 96-487, 94 Stat. 2371 (1980) ....................................................... 4

**Regulations**

40 C.F.R. § 1501.3 ....................................................................................... 33

40 C.F.R. § 1502.14(a) (2109) .................................................................... 38

40 C.F.R. § 1502.2(d) ................................................................................... 47

40 C.F.R. § 1508.28(a) ................................................................................. 34

40 C.F.R. §§ 1502.20, 1508.28 .................................................................... 34

40 C.F.R. pt. 1500 (2018) ............................................................................ 33

43 C.F.R. pt. 3130 ...................................................................................... 7, 11

43 Fed. Reg. 55,978 (Nov. 29, 1978) ........................................................... 33

46 Fed. Reg. 55,494 (Nov. 9, 1981) ............................................................... 7

51 Fed. Reg. 15,618 (Apr. 25, 1986) ............................................................ 33

85 Fed. Reg. 73,292, (Nov. 17, 2020) .......................................................... 10

85 Fed. Reg. 78,865 (Dec 7, 2020) .............................................................. 10

85 Fed. Reg. 79,082 (Dec. 8, 2020) ......................................................... 12, 17

**Constitutions**

U.S. Const. art IV

**Other Authorities**

H.R. REP. NO. 115-466 (2017) ........................................................................ 1

*Gwich'in Steering Committee v. Bernhardt; et al.*      Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION      viii

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 10 of 67

# INTRODUCTION

The Arctic National Wildlife Refuge (ANWR) Coastal Plain Oil and Gas Leasing Program represents a milestone achievement along a statutory arc forty years in the making. Through the Tax Cuts and Jobs Act of 2017, Congress mandated that the Secretary implement an oil and gas leasing program for this area. Tax Cuts and Jobs Act, Pub. L. 115-97, § 20001, 131 Stat. 2054, 2235-37 (2017) (Tax Act). *See also* H.R. Rep. No. 115-466, at 675 (2017). After years of detailed environmental review, Defendants responded to Congress's command by developing a program, established through a Record of Decision (ROD) signed on August 17, 2020.

One week later, Plaintiffs filed the first of four lawsuits in this Court. Meanwhile, Defendants have methodically continued to address the Congressional directive to administer and implement the Program, by proceeding to the next logical step of any oil and gas leasing program, the November 17, 2020, publication of a Call for Nominations and Comment on the first oil and gas lease sale. Defendants then took the next sequential step in the process by issuing a Notice of Oil and Gas Lease Sale, which identified tracts available for lease and indicated that any bids received from December 21-31, 2020, will be opened on January 6, 2021.

Plaintiffs, in three separate motions, seek to enjoin the mandated lease sale, but do not meet their heavy burden to enjoin the issuance of any oil and gas leases that might issue under the ROD. Issuance of a lease authorizes no ground disturbing activity, making it impossible for Plaintiffs to meet their burden of showing a likelihood of

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION          1

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 11 of 67

imminent, irreparable injury. Perhaps realizing this, Plaintiffs expend considerable effort describing harms associated with seismic exploration, which does involve on-the-ground activity. But seismic exploration activity requires formal agency approval through an independent permitting process. An application for such a permit was submitted in 2018, but never granted. A different application submitted in September 2020 is now pending, but it too has not been granted. Until final agency action occurs to approve that application, the Court lacks jurisdiction to consider Plaintiffs' claims against the seismic activity. Put simply, whether attacking oil and gas leases or the ongoing seismic permitting process, Plaintiffs cannot demonstrate any on-the-ground harm until the agency engages in additional consideration and permitting determinations.

Plaintiffs' motions reflect passion for their positions. They do not want any step to be taken that might eventually lead to oil and gas exploration, production and development on the Coastal Plain. But Plaintiffs are not the only well-meaning community participants impacted by Plaintiffs' requested emergency injunction. Strong opinions are held on all sides of these issues. The Indigenous people living within the Coastal Plain, the Alaska North Slope governing authority, the State of Alaska, and industry leaders most familiar with the long history of responsible development in the region support the Program. Judicial authority is often most effectively wielded with caution. As such, because Plaintiffs prematurely invite the Court's involvement in these matters, the Court should deny their requests for extraordinary relief.

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    2

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 12 of 67

## BACKGROUND

No one disputes that ANWR is one of Alaska's special places.[1]  Plaintiffs detail their own perspectives, experiences, and fears should oil and gas production someday happen on the Coastal Plain.[2]  But BLM and the Department simply did as Congress directed and did so after lengthy review and consideration, in compliance with all applicable laws.  Finally, and perhaps most importantly for purposes of these motions, Plaintiffs' dire predictions of harm are in no way imminent or irreparable.



---

1       The map depicts Alaska north of the Brooks Range, adjacent to the Arctic Ocean. *See* https://pubs.usgs.gov/fs/2002/fs045-02/fs045-02.pdf (last visited Dec. 23, 2020).  The Coastal Plain at issue in this litigation is noted as the "1002 Area" the northern edge of ANWR.  The 1002 area is approximately 1.56 million acres of the 19-million acre refuge.

2       While Defendants' administrative records exceed 38 gigabytes of information, Plaintiffs have filed with their motions voluminous extra-record materials.  Defendants do not concede that these materials are properly before the Court.  Any consideration of the extra-record submissions should be limited to evaluating allegations of irreparable harm in the present motions.  *See Earth Island Inst. v. Nash*, No. 1:19-cv-01420-DAD, 2020 WL 1936701, at *6 (E.D. Cal. Apr. 21, 2020); *Shell Offshore, Inc. v. Greenpeace, Inc.*, No. 3:15-cv-0054-SLG, 2015 WL 3508068, at *2-3 (D. Alaska June 4, 2015).

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    3

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 13 of 67

## I. Congress Directed the Secretary to Act in the Coastal Plain.

Congress has exercised its plenary authority over public lands and directed the Secretary to take certain actions in the Coastal Plain. The Property Clause gives Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]" U.S. Const. art IV, § 3, cl. 2. "The Supreme Court has 'repeatedly observed that the power over the public land thus entrusted to Congress is without limitations.'" *Stratman v. Leisnoi, Inc.*, 545 F.3d 1161, 1171 (9th Cir. 2008) (quoting *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976)). Congress has worked over decades creating and refining its mandate here.

The Alaska National Interest Lands Conservation Act (ANILCA) reflects legislative policy and compromise of unique complexity and physical magnitude, commensurate with Alaska itself. *See* Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371, 2371-2551 (1980). The Wilderness designations in Title VII of ANILCA total over 54 million acres. *See* 16 U.S.C. § 1132. The Title III additions (16 U.S.C. § 668dd) to the National Wildlife Refuge System total over 53 million acres, and the Title II additions (16 U.S.C. § 410hh) to the National Park System total over 35 million acres. There are provisions addressing continuing uses or development otherwise inconsistent with these reservations, such as for a road across the Gates of the Arctic National Park and Preserve to provide access to the Ambler Mining District (16 U.S.C. § 410hh(b)-(e)), and to designate the Kantishna Hills/Dunkle Mine

*Gwich'in Steering Committee v. Bernhardt; et al.*     Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION     4

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 14 of 67

Study Area, to evaluate fish and wildlife, recreation, and wilderness along with mineral potential within the additions to what is now the Denali National Park and Preserve (16 U.S.C. § 410hh-1(3)(a)-(b)).

ANWR reflects similar unique designations and forward-looking Congressional intent. ANILCA established ANWR, expanding the prior Arctic National Wildlife Range by approximately 9.2 million acres to include a total of approximately 19.3 million acres, of which approximately 8 million acres were designated as Wilderness. AR 205961 (summarizing ANILCA provisions). However, Congress excluded the 1.56 million acre Coastal Plain from the Wilderness designation and specifically addressed the area in Title X of ANILCA (16 U.S.C. §§ 3141-50). AR 205961. Plaintiffs characterize ANILCA Section 1003 as protecting the area against future development, but it actually created only a "hold" on development in anticipation of further analysis. Specifically, Congress tasked the Secretary with evaluating and making recommendations for oil and gas development, wilderness designation, and protection of wildlife resources. 16 U.S.C. § 3142(a). The Secretary has expended regular effort along this pathway, as reflected in publication of the 1987 Report and Recommendation to Congress and Final Legislative EIS directed by ANILCA Title X. *See* AR 95452-95682. In that Report, Secretary of the Interior Donald Hodel concluded:

> Based on the analyses conducted, public comment on the draft report, the national need for domestic sources of oil and gas, and the Nation's ability to develop such resources in an environmentally sensitive manner as demonstrated by two decades of success at Prudhoe Bay and elsewhere, I have selected as my preferred alternative, making available for consideration the entire Arctic Refuge coastal plain for oil and gas leasing. Although the entire area should be considered for

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                              5

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 15 of 67

leasing, only a percentage would actually be leased, an even smaller percentage would be explored, and if oil is discovered a still smaller percentage would be developed.

AR95458.

The Tax Act was not the impulsive or aberrational occurrence that Plaintiffs suggest, but an extension of this broader legal framework and history. The Act starts by removing the ANILCA Section 1003 hold for the Coastal Plain. Tax Act § 20001(b)(1). Congress then mandates that "[t]he Secretary shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain." *Id*. § (b)(2)(A). Congress explicitly elevates "provid[ing] for an oil and gas program on the Coastal Plain" to be an ANWR statutory purpose. *Id*. § (b)(2)(B)(v).

The Act devotes a subsection to more specific directives for leasing, starting with a "general" command that "the Secretary shall conduct not fewer than 2 lease sales area-wide under the oil and gas program under this section by not later than 10 years after" the Tax Act's enactment on December 22, 2017. *Id*. § (c)(1)(A). The Secretary "shall offer" "not fewer than 400,000 acres area-wide in each lease sale" and shall offer "those areas that have the highest potential for the discovery of hydrocarbons." *Id*. § (c)(1)(B)(i). The Secretary "shall offer" the initial lease sale not later than December 22, 2021, and second lease sale not later than December 22, 2024. *Id*. § (c)(1)(B)(ii). Further, the Secretary "shall issue any rights-of-way or easements across the Coastal Plain for the exploration, development, production, or transportation necessary to carry out this

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                                6

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 16 of 67

section." *Id.* § (c)(2).  Finally, the Secretary "shall authorize up to 2,000 surface acres of Federal land on the Coastal Plain to be covered by production and support facilities (including airstrips and any area covered by gravel berms or piers for support of pipelines) during the term of the leases[.]"  *Id.* § (c)(3).

Of course, shall means shall.  *United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837 F.3d 1055, 1064 (9th Cir. 2016).  Therefore, in response to this mandatory direction from Congress, the Secretary established the Program and is purposefully implementing each step of an otherwise unremarkable oil and gas leasing program.

## II.    The ROD Implements a Congressional Mandate.

The ROD is an essential first step in effectuating the Tax Act's mandate.  The Act provides that BLM shall manage the oil and gas program on the Coastal Plain "in a manner similar to the administration of lease sales under the Naval Petroleum Reserves Production Act of 1976 (42 U.S.C. [§] 6501 *et seq.*) (including regulations)."  Tax Act § 20001(b)(3).  BLM's regulations governing lease sales in the National Petroleum Reserve in Alaska (NPR-A), implementing the Naval Petroleum Reserves Production Act, are codified at 43 C.F.R. Part 3130.  46 Fed. Reg. 55,494, 55,497 (Nov. 9, 1981).  This Court is generally familiar with both the historical background of the nearly 23-million acres that comprise the NPR-A, as well as BLM's structure and past efforts administering NPR-A oil and gas leasing, production, and development.  *See N. Alaska Envtl. Ctr. v. Kempthorne* (*NAEC I*), 457 F.3d 969, 973 (9th Cir. 2006); *N. Alaska Envtl. Ctr. v. U.S.*

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                              7

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 17 of 67

*Dep't of the Interior* (*NAEC II*), No. 3:18-cv-0030-SLG, 2018 WL 6424680 (D. Alaska Dec. 6, 2018), *aff'd*, 965 F.3d 705 (9th Cir. 2020).

In order to analyze the environmental effects of leasing, BLM prepared an environmental impact statement (EIS) under the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370j (NEPA) which included robust public involvement. BLM released a Draft EIS on December 28, 2018, took public comments and held seven public meetings. BLM issued a Final EIS on September 12, 2019 after consideration of over 1.8 million comments received during the NEPA process, and consultation with cooperating agencies, Tribes, Alaska Native Claims Settlement Act corporations, and Alaska's State Historic Preservation Officer, among others. AR 90190. The EIS makes clear that the decisions evaluated therein do not authorize any on-the-ground activity (AR 91080) and, in particular, that issuance of a lease does not authorize any such activity:

> Issuance of an oil and gas lease does not have any direct effects on the environment since it does not authorize drilling or any other ground disturbing activities; however, a lease does grant the lessee certain rights to drill for and extract oil and gas subject to reasonable regulation, including applicable laws, terms, conditions, and stipulations of the lease.

AR90187.

On August 17, 2020, the Secretary of the Interior signed the ROD, which (1) approves a program to carry out the statutory directive in the Tax Act, and (2) determines where (but not whether) and under what terms and conditions leasing will occur. *See* AR205958. Both the ROD and the EIS make clear that the decision is to adopt the program, issue subsequent leases, and determine what terms and conditions will apply to

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    8

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 18 of 67

the development of subsequent activities. AR90188 ("BLM's decisions will include which tracts of land will be offered for lease and the terms and conditions to be applied to such leases and subsequent authorizations for oil and gas activities").

As the EIS describes, oil and gas development in the Coastal Plain generally consists of three phases: (1) leasing, (2) exploration, and (3) development. AR90780-90. As noted above, the leasing phase, which BLM is currently implementing, does not authorize any on-the-ground activity. The exploration and development phases, which can include seismic activity, drilling of wells (exploration first, then potentially production) and construction of other facilities for exploration, production, and access, all require subsequent permitting at each phase by the BLM, including project-specific NEPA analysis. AR90188. And, those future project-specific analyses could result in additional site-specific terms and conditions. As noted in the ROD:

> [T]here is tremendous uncertainty regarding potential exploration and development on the Coastal Plain, due in part to the remoteness and lack of previous exploration and development as well as its harsh environment and potentially challenging engineering considerations, along with the extended time it has taken to go from leasing to development in other regions of the North Slope of Alaska including in the NPR-A.

AR205970.

The NPR-A post-lease development history is likely predictive of similar activity in the Coastal Plain, as NPR-A is a frontier basin geographically separated from road and pipeline infrastructure by significant distances, including a large river. Decl. of Chad Padgett ¶ 17 (Padgett Decl.) (Exhibit 1 hereto). The first four NPR-A lease sales took place between 1981 and 1984 with one exploratory well drilled on a lease in 1985,

*Gwich'in Steering Committee v. Bernhardt; et al.*     Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    9

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 19 of 67

without any discovery of oil. *Id.* Additional lease sales began again in 1999, with the first such leases issued in August 1999. These leases followed significant existing government legacy well information, as well as multiple 2-D seismic surveys and a 3-D seismic survey in 1998, and became effective on September 1, 1999. *Id.* The first four exploratory wells under those NPR-A leases were not drilled for at least another four months, with the first discovery of oil occurring in 2001. *Id.*

### III.   Steps to Implement the Program's First Required Lease Sale.

On November 17, 2020, BLM took the typical next step to implement leasing under the Program established by the ROD by publishing a Call for Nominations and Comments in the *Federal Register* for the first lease sale. 85 Fed. Reg. 73,292, 73,293 (Nov. 17, 2020). That notice requested, by December 17, 2020, nominations of tracts for leasing, as well as comments on tracts that should receive special concern and analysis, the size of the tracts and, specifically, whether the sizes of any tracts should be reduced. On December 6, 2020, BLM published a notice of sale announcing that an oil and gas lease sale bid opening will occur on January 6, 2021, at 10:00 a.m. AKST. 85 Fed. Reg. 78,865, 78,865-66 (Dec 7, 2020). Pursuant to that notice and its accompanying Detailed Statement of Sale,[3] BLM began accepting bids on December 21, 2020, and will do so until December 31, 2020. After the close of the nominations and comment period on December 17, BLM published an Amendment to the Detailed Statement of Sale

---

[3]    The Detailed Statement of Sale provides additional information and is available at https://www.blm.gov/sites/blm.gov/files/docs/2020-12/2021_BLM-AK-Coastal-Plain-Detailed-Statement-of-Sale-AMENDMENT-12-18-2020.pdf (last visited Dec. 23, 2020).

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION          10

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 20 of 67

withdrawing 10 of 32 tracts from the lease sale, consisting of about 475,000 acres.  *See*

Padgett Decl. Ex. A.  The Amendment addressed comments received, recognizing a

number of substantive comments on tracts of special concern received from Tribal

organizations, Canadian governmental entities, and non-governmental organizations

focused on the core calving areas of the Porcupine Caribou Herd.  Padgett Decl. ¶ 9-11.

BLM intends to open any sealed bids received by December 31 on the 22 remaining

available tracts on January 6, 2021.

BLM will go through a number of steps based on the results of the bid opening on

January 6 as it follows its statutory mandate to manage the Coastal Plain Program "in a

manner similar to" the NPR-A.  Tax Act § 20001(b)(3); Padgett Decl. ¶ 13.  Procedures

for NPR-A lease sales are set forth in regulations at 43 C.F.R. Part 3130.  AR205964.

These steps could vary based on specific information or circumstances following bid

opening, as described by the BLM Alaska State Director.  *See* Padgett Decl. ¶ 13.  If

BLM decides as a result of this process to accept a bid on a tract, it will issue a bid

acceptance letter and transmit two copies of the lease for that tract to the successful

bidder for execution. *Id*.  The successful bidder shall, not later than 15 days after receipt

of the lease, sign both copies of the lease and return them, together with the first year's

rental and the balance of the bonus bid and application fee, unless deferred, and shall file

a bond, if required.  *Id*.  When the executed lease is returned to the authorized officer at

BLM, he or she will, within 15 days of receipt of the material required to be returned by

the successful bidder, execute the lease on behalf of the United States.  *Id*.  Transmittal of

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    11

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 21 of 67

that fully executed copy to the lessee constitutes issuance of the lease.  *Id.*

## IV.    Kaktovik Iñupiat Corporation Seismic Survey Application.

Kaktovik Iñupiat Corporation (KIC) submitted an application to BLM to conduct 3-D seismic and associated activities on the Coastal Plain.  BLM is currently considering that application but has not yet determined whether, and if so under what terms and conditions, to issue a permit to KIC.  Padgett Decl. ¶ 2.  BLM initiated public notification of the application and development of an Environmental Assessment (EA) on October 23, 2020.  *Id.* ¶ 3.  BLM accepted public scoping comments for 14 days, closing the comment period on November 6, 2020, with over 100,000 comments.  *Id.*  On December 16, 2020, BLM published an environmental assessment and draft Finding of No New Significant Impact (FONNSI) in the Federal Register, the public comment period for which will close on December 30, 2020.  *Id.*

BLM will consider all public comments received and re-evaluate the environmental assessment.  BLM will determine at that time whether a FONNSI is appropriate or that an EIS is required.  *Id.* ¶ 4.  At the request of KIC in support of the same seismic survey, the U.S. Fish and Wildlife Service has also prepared a proposed Incidental Harassment Authorization under the Marine Mammal Protection Act that is available for public comment for a period that ends on January 7, 2021.  *Id.* ¶ 5; *see also* 85 Fed. Reg. 79,082, 79,082 (Dec. 8, 2020).

Approval of KIC's Seismic Permit Application is not dependent on a lease sale or lease issuance to KIC or any other potential bidder, and a lease sale and lease issuance is

not dependent on approval of KIC's Seismic Permit Application. Padgett Decl. ¶ 6. Indeed, the issuance of a seismic permit is in no way authorized by the ROD, which simply establishes the program and only authorizes lease sales. *See* AR205960.

## LEGAL STANDARDS

### I.      A Preliminary Injunction is an Extraordinary Remedy.

A plaintiff seeking a preliminary injunction must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) the balance of equities tips in its favor; and (4) an injunction is in the public's interest." *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Alternatively, the Ninth Circuit has found "'serious questions going to the merits' [rather than a likelihood of success on the merits] and a hardship balance that tips sharply toward the plaintiff can support issuance of a preliminary injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). Under either test, the plaintiff must "establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction[,]" *id.* at 1131, and a deficiency in any one of the required elements precludes extraordinary relief. *Winter*, 555 U.S. at 24; *see also Dep't of Fish & Game v. Fed. Subsistence Bd*., No. 3:20-cv-00195-SLG, 2020 WL 6786899, at *4 (D. Alaska Nov. 18, 2020). Because a "preliminary injunction is an extraordinary and drastic remedy," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted), the party seeking such an injunction must

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    13

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 23 of 67

make "a clear showing that the plaintiff is entitled to such relief." *Winter,* 555 U.S. at 22.[4]

## II.    Administrative Procedure Act Review of Agency Action.

Review on the merits is governed by the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (APA); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004). Under the APA, final agency action is reviewed under 5 U.S.C. § 706(2), and such review is highly deferential. *Lands Council v. McNair*, 537 F.3d 981, 992-94 (9th Cir. 2008), *overruled in part on other grounds*, *Winter*, 555 U.S. at 22. Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citation omitted). An agency action will be upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and choice made. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

Plaintiffs fail to meet their burden in seeking preliminary injunctive relief. Issuance of oil and gas leases under the ROD cannot support a finding of imminent, irreparable injury. Nor have Plaintiffs shown a likelihood of success, or even raised

---

4    Defendants concur in the observation that the temporary restraining order standard is "substantially identical" to the preliminary injunction standard. *See* Pls.' Mem. in Supp. of Mot. for TRO & Prelim. Inj. 8, ECF No. 47-1 (Case No. 20-cv-204-SLG) ("Gwich'in Pls.' Mem.").

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00024; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                      14

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 24 of 67

serious questions, on the merits of their claims against the ROD. Additionally, the balance of harms and public interest favor withholding injunctive relief. Seismic exploration activities are not authorized by the ROD and not properly before the Court. The agency is still considering what action, if any, to take on the KIC application. Plaintiffs have failed to show they are entitled to any relief, and certainly not the imposition of a preliminary injunction before BLM even opens any bids received on January 6, 2021.

## I.    Plaintiffs Ignore Fundamental Jurisdictional Requirements.

Despite Plaintiffs' significant focus on the alleged imminent harms associated with seismic survey activities, there is no final agency action on the KIC permit. As such, Plaintiffs attempt a jurisdictionally deficient effort at anticipatory review of an agency action that has not yet occurred.

The statutes at issue in these motions do not provide a private right of action, and therefore Plaintiffs' claims are only judicially reviewable under the APA. *See Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003). When a plaintiff challenges agency action, the APA requires that it be final agency action. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006). Agency action is "final" if (1) it "mark[s] the 'consummation' of the agency's decisionmaking process," and (2) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). In determining whether an action is a final agency action, courts

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
Defs.' Opposition to ANWR Motions for Preliminary Injunction                              15

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 25 of 67

should consider whether the agency has issued a decision or other document that "has the status of law or comparable legal force." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1095 (9th Cir. 2014) (quoting *Or. Nat. Desert Ass'n*, 465 F.3d at 987).

There can be no dispute that BLM has not yet taken final action on the seismic permit application. The process is ongoing, and any challenge involving the seismic permit fails both elements under *Bennett* – the agency's process has not been consummated and no decision exists from which legal consequence will flow. Ultimately, should application processing be completed, there will be a formal document with status of law plainly constituting final agency action. Padgett Decl. ¶ 4 ("BLM's final decision will be reflected in a Decision Record"). Until that decision is made – which could be to approve, deny, or approve with modifications or stipulations – Plaintiffs' allegations of harm are rank speculation.

To be sure, the ROD challenged in Plaintiffs' complaints sets forth certain programmatic required operating procedures that will generally constrain any future seismic work. *See* AR206013-16, 206025. However, the ROD does not authorize any seismic surveys. Any seismic exploration will require further review, analysis under NEPA and other applicable law, and a formal agency decision. Padgett Decl. ¶ 4; *see also*, AR 205961, 205974, 205977, 205983, 205987.

The Court evaluated a finality argument in *NAEC II*, and that analysis illuminates the flaws of Plaintiffs' effort to challenge seismic activity here. In that case, defendants argued that finality requirements precluded plaintiffs' attempt to challenge oil and gas

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    16

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 26 of 67

leases that had not yet issued. *NAEC II*, 2018 WL 6424680, at *2. The Court in *NAEC II* addressed the jurisdictional issue by relying on *Northstar Financial Advisors Inc. v. Schwab Investments*, 779 F.3d 1036 (9th Cir. 2015) to conclude that "a court may rely on an amended complaint that satisfies the jurisdictional defects of the previous complaint." *Id*. But this holding cannot aid Plaintiffs here, as a defect in jurisdiction cannot be cured by amending the complaint when the agency action at issue has not yet issued. Any challenge to seismic exploration activity under any KIC permit will require, at a minimum, an amended complaint as in *NAEC II*, or be the subject of an independent action once a permit is actually issued.

In the future, BLM may take action on the KIC application that meets the final agency action standard and is therefore subject to possible challenge under the APA. Only then would Plaintiffs be permitted to challenge any approved seismic surveys under an amended complaint or a new action, or KIC might then challenge a denial of its application. These hypothetical scenarios will not materialize until after January 6, 2021.[5] Nor does the seismic application rely upon or otherwise relate to issuance of leases. Padgett Decl. ¶ 6. Thus, aside from there being no jurisdiction in the absence of a final agency action, there is no practical need for the Court to consider the KIC

---

5    Through its permit application KIC proposes to commence operations on January 21, 2021, which will initially consist of staging equipment outside ANWR at Deadhorse, Alaska. *See* 85 Fed. Reg. 79,082, 79,083 (Dec. 8, 2020). Mobilization "is contingent on the accumulation of sufficient snow cover along the access route" but "cannot commence prior to January 26, 2021[.]" *Id*. Seismic operations could "commence as soon as February 1, 2021[.]" *Id*. at 79,084.

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    17

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 27 of 67

application or seismic exploration in the currently framed motions.

For these reasons, the lack of a final agency action on KIC's application for a seismic permit deprives this Court of jurisdiction to consider Plaintiffs' allegations of harm allegedly flowing from such a permit. In any event, as explained further below, even if the Court has jurisdiction to consider the harms from that unmade decision, those alleged harms in no way flow from the Program ROD that Plaintiffs have challenged. Seismic exploration activity simply cannot provide a basis for entry of preliminary injunction.

## II. Plaintiffs Cannot Demonstrate Imminent, Irreparable Harm.

To obtain a preliminary injunction, Plaintiffs must show a "likelihood of irreparable injury." *Winter*, 555 U.S. at 21. Plaintiffs bear the burden of "*demonstrat[ing]* immediate threatened injury[,]" and mere "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (italics in original) (citations omitted). None of Plaintiffs' alleged harms meet this burden.

Plaintiffs cite only two possible sources of harm that they allege require a preliminary injunction: (1) those allegedly resulting from exploration or development on issued leases, and (2) those from the seismic exploration permit application currently under BLM consideration. Thus, they argue, an injunction is required to prevent issuance of leases and the authorization of such a permit. Even assuming Plaintiffs' assertions about the impacts of those activities and harm to those interests are true, that alleged

harm is neither imminent nor irreparable.  Moreover, in the case of the seismic permit, it is not even a result of the ROD challenged in Plaintiffs' complaints.

In particular, and described in more detail below, the issuance of a lease authorizes *no on-the-ground activity*.  Any such activity can only occur after subsequent decisionmaking process(es) that themselves are many months, if not years, away. Plaintiffs' alleged environmental harms flow not from the paperwork exercise of issuing a lease, but from any eventual activities authorized by those subsequent decisions. Moreover, to the extent that Plaintiffs claim their harm from the issuance of leases results from the inability of BLM to deny or unreasonably regulate possible future development once they are issued, that argument fails to account for the fact that the Court is empowered to enter appropriate injunctive relief even after a lease is issued.  In other words, Plaintiffs completely fail to explain how there is imminent, irreparable harm resulting from the mere issuance of a lease that cannot be addressed by the Court when it rules on the merits.

The legal deficiencies in Plaintiffs' claims as to harm from the possible future authorization of a seismic permit are more fundamental.  As discussed above, Plaintiffs' attempt to enjoin harm from a decision that has not yet been made.  Fundamental principles of administrative law – and the strict waiver of sovereign immunity found in the APA – require Plaintiffs to await a final agency action.  Moreover, whereas the ROD for the Program does authorize the lease sale, it does not authorize any seismic exploration at all.  There is a disconnect between the ROD that Plaintiffs challenge and

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    19

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 29 of 67

their assertions of harm that would flow from some yet-unmade seismic exploration permit decision that is still under review by the agency.

None of Plaintiffs' arguments demonstrate a likelihood of irreparable injury. Plaintiffs raise speculative assertions about far distant impacts. Defendants certainly dispute Plaintiffs' assertions about future impacts, but even if there was truth to any of them, they are not imminent and can be addressed by the Court in reaching the merits. The Court need not issue a preliminary injunction to address any of Plaintiffs' alleged injuries.

A. Plaintiffs Cannot Show Imminent, Irreparable Harm from the Mere Issuance of Leases.

All three motions allege harm from leasing that boils down to the possibility that BLM will issue leases after opening bids on January 6, 2021. While Plaintiffs warn of the dire consequences that might follow, lease issuance in the Coastal Plain is not connected to any imminent, irreparable injury that would support entry of a preliminary injunction.

1. Leases Do Not Authorize Ground Disturbance.

Here, no harm to the environment is imminent because a lease sale, and subsequent issuance of a lease, is merely a preliminary first step in the approval of oil and gas development and does not authorize any ground disturbance. This fact is repeatedly addressed in the agency's description and approval of the Program. See AR 90187 ("[i]ssuance of an oil and gas lease does not have any direct effects on the environment since it does not authorize drilling or any other ground disturbing activities" (EIS)).

Similarly, the ROD states:

> Indeed, the issuance of an oil and gas lease does not have any direct effects on the environment since it does not authorize drilling or any other ground disturbing activities; however, a lease does grant the lessee certain rights to drill for and extract oil and gas subject to reasonable regulation, including applicable laws, terms, conditions, and stipulations of the lease.

AR 205970. These regulations, laws, terms, conditions and stipulations require additional efforts and agency approvals:

> Future on-the-ground actions requiring BLM approval, including potential exploration and development proposals, would require further NEPA analysis based on the site-specific proposal. For example, before drilling on any lease, an operator would be required to submit an application for permit to drill, which would require appropriate NEPA analysis (as well as compliance with other applicable laws) before any drilling could be authorized. Potential applicants would be subject to the terms of the lease; however, the BLM Authorized Officer may require additional site-specific terms and conditions before authorizing any oil and gas activity based on the project level NEPA analysis.

AR 90188; *see also* ROD, Appx. A, AR 205996-206033.

Because the lease issuance does not authorize ground disturbing activity, courts in similar circumstances have frequently held that merely holding an oil and gas lease sale does not result in the irreparable harm to the environment necessary for granting a preliminary injunction. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987) (reversing a preliminary injunction regarding oil and gas leases because "injury to subsistence resources from exploration was not at all probable"); *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 664 (9th Cir. 1988) (dissolving a preliminary injunction regarding an oil and gas lease sale and finding that "none of the activities of the lease sale stage results in harm to the environment"); *Blanco v. Burton*, No. Civ.A. 06-3813, 2006 WL

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    21

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 31 of 67

2366046, at *15-19 (E.D. La. Aug. 14, 2006) (denying an injunction and finding that holding an offshore oil and gas lease sale did not result in imminent environmental harm); *N. Slope Borough v. Minerals Mgmt. Serv.*, No. 3:07-cv-0045-RRB, 2007 WL 1106110, at *4 (D. Alaska Apr. 12, 2007) (denying a preliminary injunction regarding an oil and gas lease sale).

These principles are well recognized in the context of oil and gas leasing in North Alaska. *See NAEC I*, 457 F.3d at 976. In rejecting a challenge that BLM failed to conduct sufficient site-specific analysis at the leasing stage, the court noted "such projects generally entail separate stages of leasing, exploration and development. At the earliest stage, the leasing stage we have before us, there is no way of knowing what plans for development, if any, may eventually materialize." *Id.* at 977. This Court later applied *NAEC I* in considering a similar NEPA challenge:

> The *Kempthorne* Court recognized that a parcel-specific EIS analysis would be required before any actual exploration or development activity could occur on a leased parcel. It emphasized that "[a]ny later plan for actual exploration by lessees will be subject to a period of review before being accepted, rejected or modified by the Secretary." And the Court recognized that "Plaintiffs will have an opportunity to comment on any later EIS. In addition, before any activity for exploration or development occurs, permits from several agencies may be required and additional permit conditions imposed for the protection of land, water and wildlife resources."

*NAEC II*, 2018 WL 6424680, at *4 (quoting *NAEC I*, 457 F.3d at 977).

Plaintiffs offer no credible rebuttal that could support a finding of imminent, irreparable harm. Notwithstanding the ROD's repeated provisions clarifying the distinction between lease issuance and future project-level activities, Plaintiffs point to

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    22

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 32 of 67

statements that Coastal Plain leases are "extraordinary" and "broadly grant the right to develop" while relinquishing any "BLM . . . authority to fully preclude development and impacts once leases are issued."  Gwich'in Pls.' Mem. 17-18, ECF 47-1; *see also*, Pls.' Mem. in Supp. of Mot. for TRO & Prelim. Inj. 12, ECF 36-1 (Case No. 20-cv-223-SLG) ("Venetie Pls.' Mem.") 12, (proposed leases contain "unusual language" which "mandate[s]" BLM "to allow <u>future</u> oil and gas development activities under the leases") (emphasis added).  These characterizations do not demonstrate immediate, irreparable harm in light of the ROD's repeated statements that leases do not authorize ground disturbing activity.  Plaintiffs' arguments only address *whether* BLM might allow certain future activities on the leases, rather than *when* these activities will occur.  Plaintiffs fail to show how they are likely to suffer irreparable injury now in the absence of a preliminary injunction.

Plaintiffs' cited cases do not change this analysis.  Central to their irreparable injury argument is invocation of *Conner v. Burford*, 848 F.2d 1441, 1447 (9th Cir. 1988), for the proposition that lease issuance represents an "irretrievable commitment" with environmental consequences.  *See* Gwich'in Pls.' Mem. 18 n.91, ECF 47-1; Venetie Pls.' Mem. 36, ECF 36-1.  Beyond any phonetic resemblance between the words *irretrievable* and *irreparable*, *Conner* is inapposite.  It is a case about NEPA, not a preliminary injunction, primarily holding that an EIS is required prior to issuing leases which fail to prohibit surface occupancy, which the court referred to as "non NSO" leases.  The "irretrievable commitment" in *Conner* was relevant to show there was a possibility in

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                    23

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 33 of 67

such leases of a significant effect on the human environment sufficient to trigger NEPA's EIS requirement. *Conner*, 848 F.2d at 1448, 1450; *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1178 (9th Cir. 1982) ("[i]f substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared") (citations omitted)). Under NEPA, such effects might be possible far into the future, but still require an EIS. Thus, "*Conner* is of no assistance to plaintiffs" in meeting the burden for showing imminent irreparable injury. *See NAEC I*, 457 F.3d at 976 (rejecting argument that NPR-A Plan lacked required site-specificity, observing "[a]n EIS is undeniably required, and, indeed one has been prepared").[6]

Plaintiffs' citation to caselaw regarding timber harvest in Southeast Alaska only highlights this point. *See* Venetie Pls.' Mem. 36, ECF 36-1 (citing *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 413 F. Supp. 3d 973, 977 (D. Alaska 2019)). As the record makes clear, issuance of an oil and gas lease is months, maybe years, distant from ground disturbing activity or other alleged environmental harm, which would require additional, formal steps by government agencies. Unlike an oil and gas

---

6      Plaintiffs additionally claim that *W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1334 (D. Idaho 2019) supports their claim of irreparable injury. Venetie Pls.' Mem. 37 n.186, ECF 36-1. However, that decision found irreparable injury because "[n]umerous site-specific applications of the [challenged] 2019 Plan Amendments . . . are upcoming (or have already occurred)." *Schneider*, 417 F. Supp. 3d at 1134. Additionally, *S. Utah Wilderness All. v. Allred*, No. 08-cv-02187, 2009 WL 765882, at *2 (D.D.C. Jan. 17, 2009), relied on a finding of a "threat of irreparable harm to public land if the leases are issued" insufficient to satisfy *Winter*'s core holding that a preliminary injunction requires showing a *likelihood* of irreparable injury. *See* Venetie Pls.' Mem. 36 n.184, ECF 36-1.

*Gwich'in Steering Committee v. Bernhardt; et al.*            Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION            24

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 34 of 67

lease, the timber sale at issue in *Southeast Alaska* itself authorized ground-disturbing activity, and the time between bid opening and harvesting trees was measured in days. 413 F. Supp. 3d at 980 (Forest Service "plans to review the bids on the sale on September 24, 2019, and intends to award a contract soon thereafter. The parties have stipulated that ground-disturbing activities could begin as early as September 27, 2019."). These facts were pivotal, and "[g]iven this immediacy, the Court [found] that injury to Plaintiffs is not speculative." *Id*. at 980-981.[7]

        2.    *Bureaucratic Momentum Does Not Support Injunctive Relief.*

Plaintiffs cannot rely on the theory of bureaucratic momentum to demonstrate irreparable harm. Regardless of any dynamic that may exist within the agency as these cases develop, the Court retains a broad array of options to take appropriate action vis-à-vis any leases. Even if there such a thing as a bureaucratic steamroller, it doesn't interfere with the remedial powers the Court might deem appropriate after reaching the merits.

---

[7]    *Southeast Alaska* further illustrates the significant differences between the Tongass National Forest agency action and the Program ROD and EIS. 413 F. Supp. 3d at 976-77. The Tongass approach sought to authorize timber harvest and road construction which the Court found deficient because "the selected alternative did not identify the specific sites where the harvest or road construction would occur." *Id*. at 977; *see also Se. Alaska Conservation Council v. United States Forest Serv.*, 443 F. Supp. 3d 995, 1007 (D. Alaska 2020), *appeal dismissed*, No. 20-35738, 2020 WL 6882569 (9th Cir. Oct. 22, 2020) (rather than conducting project-level analyses tiering to a programmatic plan "the agency compressed its NEPA review for the entire 15-year Project into a single document"). The ROD and EIS differ and follow the already-recognized sufficiency of BLM's approach to NEPA compliance for oil and gas leasing in North Alaska.

*Gwich'in Steering Committee v. Bernhardt; et al.*        Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION    25

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 35 of 67

The bureaucratic momentum theory was espoused in *Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983). Then-Judge Breyer enjoined a lease sale on the outer continental shelf off the coast of Massachusetts based, in part, on the theory that, if the lease sale were allowed to go forward, it would engender a "bureaucratic commitment" to the lease sale, which he found was a type of irreparable harm. *Id.* at 952-53. However, four years later, the Supreme Court issued its decision in *Village of Gambell*, in which it refuted the notion that harm to the environment may be presumed and reversed the preliminary injunction of an offshore oil and gas lease sale. *See* 480 U.S. at544-45. Following that Supreme Court decision, the First Circuit revisited *Watt* in *Sierra Club v. Marsh*, 872 F.2d 497, 499 (1st Cir. 1989), explaining that it did not mean that procedural harm alone would constitute irreparable harm:

> Rather, the harm at stake is a harm to the *environment*, but the harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment.

*Id.* at 500 (italics in original). Plaintiffs must show a likelihood of irreparable harm to the environment to obtain a preliminary injunction. Bureaucratic momentum alone cannot satisfy their burden of demonstrating irreparable harm. *See id.*; *see also Blanco*, 2006 WL 2366046, at *18-19 (discussing *Watt*, *Village of Gambell*, and *Marsh* and rejecting the bureaucratic momentum argument). The Ninth Circuit has similarly been critical of the bureaucratic momentum argument. *See N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1154-57 (9th Cir. 1988).

*Gwich'in Steering Committee v. Bernhardt; et al.*      Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                          26

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 36 of 67

Even if the agency might feel some sense of commitment to a project, this constrains neither the Court's review nor its remedial power. Courts conducting APA review "have done all of the following" upon finding an agency action to violate the arbitrary and capricious standard: "(1) reversed and remanded without instructions, (2) reversed and remanded with instructions to vacate, and (3) vacated agency decisions." *WildEarth Guardians v. U.S. Bureau of Land Mgmt*., 870 F.3d 1222, 1239 (10th Cir. 2017) (considering BLM coal mining leases); *Conner*, 848 F. 2d at 1461 (enjoining the federal defendants from permitting surface disturbing activity on issued leases pending compliance with NEPA and the ESA); *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1038 (D. Mont. 2006) (enjoining surface disturbing activities relating to gas leases following a summary judgment decision). In essence, "the filing of this suit acts as a lis pendens on the lease sale." *N. Slope Borough v. Andrus*, 486 F. Supp. 326, 331 (D.D.C. 1979). Thus any protection against "bureaucratic momentum" is already in place, meaning Plaintiffs cannot rely upon this alleged concern as a basis for proving imminent, irreparable injury.

B. Alleged Harms from Seismic Surveys Are Not Properly before the Court.

As explained in detail *supra*, there is no final agency action to challenge with respect to the seismic permit application. Thus, this Court lacks jurisdiction to enjoin approval of that permit and the alleged harms from it cannot support issuance of a preliminary injunction. To the extent Plaintiffs may assert that seismic-related harms somehow flow from the ROD, they are wrong.

*Gwich'in Steering Committee v. Bernhardt; et al.*　　　　Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION　　　　27

Case 3:20-cv-00205-SLG　Document 57　Filed 12/23/20　Page 37 of 67

In order to obtain a preliminary injunction, a plaintiff must demonstrate "a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint. This requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). Here, the final agency action challenged by Plaintiffs is the ROD. But the ROD made no decision to authorize any seismic activity. As part of the "reasonably foreseeable development scenario[s]," the agency considered possible future seismic exploration – and the effects of that possible future exploration – but it did not authorize any seismic exploration in the ROD. Nor is this analysis altered by the fact that the seismic application environmental assessment is tiered to the EIS. Plaintiffs have not and cannot today articulate a sufficient nexus between the ROD they challenge and any harm from seismic exploration that can only occur once authorized by the permit still under BLM consideration.

Plaintiffs cannot satisfy their burden of showing a likelihood of irreparable injury. The Court lacks jurisdiction to consider effects of a discrete seismic exploration permit that has not been issued. Indeed, a similar application was submitted in 2018, never granted, and ultimately withdrawn. Padgett Decl. ¶ 5. And the mere issuance of a lease cannot support a finding of imminent, irreparable harm. Given their inability to show a likelihood of irreparable injury, Plaintiffs' motions must be denied.

### III.    Plaintiffs Are Not Likely to Succeed on the Merits.

Plaintiffs must additionally establish a sufficient showing of likelihood of success on the merits.  Plaintiffs fail to do so.

A.    Defendants Properly Addressed Their Duties under the Refuge Act.

Plaintiffs contend that Defendants failed to make a compatibility determination required under the National Wildlife Refuge System Administration Act, 16 U.S.C. §§ 668dd–ee (Refuge Act) or to make the Program more consistent with Refuge purposes. *See* Pls.' Mot. for Prelim. Inj. 9-11, ECF 43 (Case No. 20-cv-205-SLG) ("Audubon Pls.' Mot."); Venetie Pls.' Mem. 24-27, ECF 36-1; Gwich'in Pls.' Mem. 14-18, ECF 47-1. But Plaintiffs overlook the fundamental fact that Congress directed the Secretary to establish and administer the Program.  There is neither a legal nor practical purpose to be served by determining the "compatibility" of effectuating Congress's exercise of its plenary authority.  Plaintiffs' consistency and compatibility determination arguments proceed from a flawed premise, and therefore must fail.

The Refuge Act provides, with certain exceptions, that no person shall "enter, use, or otherwise occupy" a Refuge area unless such activities are permitted under the requirements of subsection (d) of the Act. 16 U.S.C. § 668dd(c).  Subsection (d) of the Act stipulates that the Secretary may permit the use of any area within the Refuge System, if he determines that such uses are compatible with the major purposes for which the refuge was established.  *Id*. § (d)(1)(A).

The Refuge Act, however, exempts certain undertakings from a compatibility determination.  The exceptions include "activities . . . performed by persons authorized to

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                     29

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 39 of 67

manage such area[s]," or activities addressed "by express provision of law[.]" *Id*. § (c);

*See also* National Wildlife Refuge System Uses Compatibility, 603 FW § 2.10.B(1)

(Nov. 17, 2000), available at http://www.fws.gov/policy/603fw2.html, (last visited Dec.

23, 2020) (compatibility determination not required "where legal mandates supersede

those requiring compatibility"). Section 20001 of the Tax Act specifically repeals

Section 1003 of ANILCA which prohibited any oil and gas program within ANWR

absent Congressional authorization, and amends Section 303(2)(B) of ANILCA to state

that one of the purposes of ANWR is "to provide for an oil and gas program on the

Coastal Plain." Tax Act § 20001(b)(2)(B)(v). Further, Section 20001 of the Tax Act

directs that the oil and gas program be established and administered by the Secretary.

Because the oil and gas leasing program is Congressionally mandated, a compatibility

determination is neither logical nor required.

Available authority confirms the validity of the agency's interpretation. *See Fund

For Animals v. Clark*, 27 F. Supp. 2d 8, 11-12 (D.D.C. 1998); *see also Town of Superior

v. U.S. Fish & Wildlife Serv*., 913 F. Supp. 2d 1087, 1110 (D. Colo. 2012), *aff'd sub

nom*., *WildEarth Guardians v. U.S. Fish & Wildlife Serv*., 784 F.3d 677 (10th Cir. 2015).

In *Town of Superior*, the court found that "a compatibility determination is not required

for the acquisition of land" which was directed by statute. *Id*. at 1111. Section 20001 of

the Tax Act, which legally mandates the implementation of an oil and gas program on the

Coastal Plain, supersedes the requirements of Section (d) of the Refuge Act. The FWS

therefore has no obligation to prepare a compatibility determination. Indeed, if a

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION          30

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 40 of 67

hypothetical compatibility determination somehow concluded that oil and gas leasing was incompatible, the Secretary would still be required by statute to implement the Tax Act.

Nor can Plaintiffs demonstrate that the ROD overlooks some prescribed allocation between Refuge (or Range) purposes. *See* Gwich'in Pls.' Mem. 14-18; ECF 47-1. Defendants have acted reasonably in reconciling the Program with other enumerated statutory purposes.[8] When evaluating an agency's interpretation of conflicting statutory purposes, "a reviewing court must determine both whether the interpretation is arguably consistent with the underlying statutory scheme in a substantive sense and whether "'the agency considered the matter in a detailed and reasoned fashion.'" *Gen. Elec. Uranium Mgmt. Corp. v. U.S. Dep't of Energy*, 764 F.2d 896, 905 (D.C. Cir. 1985) (quoting *Rettig v. Pension Benefit Guaranty Corp.*, 744 F.2d 133, 151 (D.C. Cir. 1984)). Congress sometimes "requires Interior to recognize competing values" and "[a] parcel of land cannot be both preserved in its natural character and mined." *Rocky Mountain Oil & Gas*

_____

8      *Gwich'in* plaintiffs in particular focus on an argument that Defendants "ignored" the original Range purposes (wilderness, wildlife, and recreation), which they assert still apply. That argument fails for multiple reasons. BLM's EIS analyzed all three resources. *See, e.g.* AR90332-443 (wildlife); AR90534, 90537, 90542-44 (wilderness); AR90526-34 (recreation). Plaintiffs' argument is further premised on their conclusory assertion that the recreation and wilderness purposes are not "inconsistent" with ANILCA and therefore still govern. 43 U.S.C. § 1601 (ANILCA § 305). That contention is clearly wrong as to the Coastal Plain and Wilderness, since ANILCA designated Wilderness in ANWR, but *not* in the Coastal Plain. Finally, the most reasonable interpretation is that ANILCA supersedes the statement of purposes for the Range, because wildlife protection was a Range purpose carried into ANILCA, while the other two purposes were not. This cannot be reconciled with a perceived Congressional intent that the Secretary would continue some obligation to address separate Range purposes.

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
Defs.' Opposition to ANWR Motions for Preliminary Injunction          31

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 41 of 67

*Ass'n v. Watt*, 696 F.2d 734, 738 n.4 (10th Cir. 1982). That is what Defendants have

done here, by responding to Congress's direction to establish an oil and gas program in

one small portion of ANWR, while addressing the other statutory purposes by developing

lease stipulations and required operating procedures designed to further conservation

objectives. AR205963-64. This reasoned interpretation is entitled to deference. *Town of*

*Superior*, 913 F. Supp. 2d at 1110-11.

Defendants reasonably addressed the statutorily-enumerated ANWR purposes,

particularly given the unique direction of the Tax Act.

B.     Defendants Complied with NEPA's Procedural Requirements.

Plaintiffs expend considerable effort targeting the Program under NEPA. None of

these attacks raise serious questions at this stage of the proceedings. In fact, Plaintiffs'

selection of NEPA claims further undermines their requested relief because the flaws

they allege have not materialized in a cognizable way. Any plausible impact to

Plaintiffs' interests will flow from site-specific activities that will undergo further

analysis at least months, and more likely years, into the future.

NEPA serves the dual purpose of informing agency decision-makers of the

significant environmental effects of proposed major federal actions and ensuring that

relevant information is made available to members of the public so that they "may also

play a role in both the decisionmaking process and the implementation of that decision."

*See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet

these dual purposes, NEPA requires that an agency prepare a comprehensive EIS for

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION          32

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 42 of 67

"major Federal actions significantly affecting the quality of the human environment[.]"
42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.[9]  NEPA imposes purely procedural
requirements, and "does not require that certain outcomes be reached as a result of the
evaluation." *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987).
"Other statutes may impose substantive environmental obligations on federal agencies,
but NEPA merely prohibits uninformed – rather that unwise – agency action."
*Robertson*, 490 U.S. at 351.  Rather, "[o]nce satisfied that a proposing agency has taken a
'hard look' at a decision's environmental consequences, the review is at an end."
*California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (citing *Kleppe v. Sierra Club*, 427
U.S. 390, 410 n.21 (1976)).

As the Court has noted, "agencies engaging in long-term planning [may] first
prepare a programmatic EIS that considers the broad, program-level effects of a
coordinated series of actions, and then conduct subsequent site-specific NEPA analysis
for each action as it occurs, tiering back to the programmatic EIS."  *Se. Alaska*, 443 F.
Supp. 3d at 1006 (citations omitted).  Under "this approach . . . '[t]he detail that NEPA
requires in an EIS depends on the nature and scope of the proposed action,'" and "'[t]he

---

9       The Council on Environmental Quality (CEQ) promulgated regulations
implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and a minor
substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25,
1986).  More recently, the Council published a new rule, effective September 14, 2020,
substantially revising the 1978 regulations.  The claims in this case arise under the 1978
regulations, as amended in 1986.  All citations to the Council's regulations in this brief
refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
Defs.' Opposition to ANWR Motions for Preliminary Injunction                                    33

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 43 of 67

critical inquiry in considering the adequacy of an EIS prepared for a large scale, multi-step project is not whether the project's site-specific impact should be evaluated in detail, but when such detailed evaluation should occur.'" *Id*. (quoting *Block*, 690 F.2d at 761). The CEQ Regulations similarly address the manner in which an agency may tier a more detailed analysis to a prior, broader NEPA analysis. *See* 40 C.F.R. §§ 1502.20, 1508.28. The validity of BLM's use of this approach in North Alaska is well settled. *See NAEC II*, 2018 WL 6424680, at *5 (upholding NEPA sufficiency of NPR-A 2017 lease sales, supported by analysis of 2012 Integrated Activity Plan/EIS).

This legal backdrop and BLM's substantial EIS reveal the flaws in each of Plaintiffs' NEPA claims.

### 1.    *The Tax Act 2,000-Acre Limitation*.

The first NEPA challenge contends BLM illegally modified its interpretation of the Tax Act's authorization of up to 2,000 surface acres to be covered by production and support facilities. *See* Gwich'in Pls.' Mem. 10-12, ECF 47-1. Plaintiffs scrutinize the ROD's discussion of this topic, concluding that BLM has advanced a "new interpretation open[ing] the door to far more than 2,000 acres of development." Plaintiffs are not likely to succeed on this argument.

This claim is not ripe for review. The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
Defs.' Opposition to ANWR Motions for Preliminary Injunction                              34

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 44 of 67

felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). A case is not "'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *see also Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

Even purely legal challenges to an agency policy or regulation are generally not ripe for review until claims are raised "in the context of a specific application" of the regulation or policy instead of a "generalized challenge." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163-64 (1967); *see also Nat'l Park Hosp. Ass'n*, 538 U.S. at 812 ("[W]e conclude that judicial resolution of the question presented here should await a concrete dispute about a particular concession contract."); *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 696 (9th Cir. 2007) (finding challenge to regulations not applied to any "specified project" are "not fit for judicial decision"), *aff'd in part, rev'd in part on other grounds*, *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009); *see also Truckers United for Safety v. Fed. Highway Admin.*, 139 F.3d 934, 938 (D.C. Cir. 1998). In considering whether an agency action is ripe for review, the Supreme Court has directed that courts consider three factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                              35

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 45 of 67

administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

These considerations can warrant judicial restraint in the oil and gas leasing context. *See S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1158 (10th Cir. 2013). There, the court withheld review, noting that "[a]ny harm to [plaintiff's] members' enjoyment of the lands at issue "'rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id*. at 1160 (quoting *Texas v. United States,* 523 U.S. 296, 300 (1998)). The court further concluded that "the validity of [plaintiff's] claims will be best adjudicated once the facts have been further developed and it becomes clear what type of oil and gas development [lessee] will ultimately be allowed to engage in, if any." *Id.*

Plaintiffs present a similar abstract disagreement over policy. Plaintiffs' concern could only become cognizable "[i]f a lessee discovers oil or gas, [and] seek[s] approval to develop the resources by submitting an application for a permit to drill that includes a drilling plan and a surface use plan of operations." AR205966. They do not articulate the gravity or scope of the extent to which their feared interpretation of the Tax Act's language might involve more (or less) than 2,000 acres within the 1.56 million acres of the Coastal Plain. Nor could they, for even under BLM's "hypothetical unconstrained scenario" no "development" is expected for roughly seven years. AR90780. The proper judicial role here would be to wait for such a potentiality to arise, and certainly not to

*Gwich'in Steering Committee v. Bernhardt; et al.*      Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION      36

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 46 of 67

wield the extraordinary power of preliminary injunctive relief now.

Even if ripe, plaintiffs' claim is flawed on the merits because an agency has flexibility to make reasonable modifications during the NEPA process, even after public comment. *See Russell Country Sportsmen v. United States Forest* Service, 668 F. 3d 1037, 1045 (9th Cir. 2011); *Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci*, 857 F.2d 505, 508-09 (9th Cir. 1988). The fundamental flaw in Plaintiffs' argument is that it ascribes a level of certainty to the analytical assumptions made in the EIS for purposes of analysis that simply do not exist. Both the EIS and the ROD make clear the extreme uncertainty associated with future development and the many interpretive assumptions made for the purposes of analysis. AR205967, 91207-11. Indeed, both make clear that the interpretation expressed in the EIS was an assumption made for the purpose of analysis. AR205967, 91211. Both also explain that those assumptions are likely to overstate development. AR205967, 91210. The ROD then simply declines to adopt those interpretive assumptions, explaining that (1) it was unnecessary and speculative to come to a definitive interpretation at this preliminary leasing stage, and (2) adopting and applying interpretive assumptions at this initial stage of the program would be premature. If leases are issued, if exploration takes place, and if lessees apply for BLM authorization of any production and support facilities, the types of facilities and technologies deployed may be very different than what is foreseeable today. AR205967-68. Simply put, as the FEIS and the ROD clearly explained, declining to adopt the interpretive assumptions in the EIS did not present a seriously different picture of the

*Gwich'in Steering Committee v. Bernhardt; et al.*     Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION     37

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 47 of 67

environmental consequences.  BLM considered the relevant factors at the program-level and reasonably addressed the 2,000 acre issue.

2.     *Failure to Consider an Alternative Closing Areas to Seismic Exploration.*

The Gwich'in Plaintiffs further complain that BLM violated NEPA by failing to consider an alternative that would have prohibited future seismic exploration activity on some portion of the Coastal Plain.  *See* Gwich'in Pls.' Mem. 13-14, ECF 47-1.  However, this argument must also fail.  The ROD does not authorize seismic exploration, but only allows for its possibility through future project-level decisions.  BLM acted well within its discretion in choosing to defer more targeted analysis of seismic exploration to such future processes rather than limiting those options in establishing the Program.

Rather than subjecting the agency's range of alternatives to the preferences of more than a million commenters, NEPA's implementing regulations prescribe that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (2109).  "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate."  *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (citation and quotation omitted).  But this requirement is not rigid.  Otherwise, "an agency could generate countless alternatives."  *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998) (citation omitted).  Instead, an agency's choice of alternatives is governed by a "rule of reason," under which an EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Westlands Water Dist.*, 376 F.3d at 868 (citation

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION          38

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 48 of 67

omitted).  An agency's consideration of alternatives is dictated by the "nature and scope of the proposed action." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997) (citation omitted).  An agency need not analyze alternatives that do not meet the agency's purpose and need.  *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1070-71 (9th Cir. 2012).  The "touchstone for [a court's] inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Morongo Band*, 161 F.3d at 575 (citation and quotations omitted).

BLM's range of alternatives was appropriate here, and BLM was not required in approving the Program to adopt Plaintiffs' request to consider programmatic exclusion of areas to seismic exploration.  Plaintiffs did suggest that BLM should "consider whether additional areas should be closed to exploration activities, particularly in areas where seismic damage is likely to be exacerbated because of the topography or other concerns, or where those areas will be closed to leasing."  AR61175.  However, Plaintiffs fail to credit BLM's response, characterizing it as "only stat[ing] that it did not consider closing areas to exploration because seismic can be done across the entire Coastal Plain." Gwich'in Pls.' Mem. 11, ECF 47-1.  In actuality, BLM referred Plaintiffs to Appendix B of the EIS as providing more detail on possible future seismic exploration.  AR91970, 90779-82.  Most importantly, BLM explained that "[a] site-specific NEPA analysis would be done for any proposed seismic explorations." *Id*.

BLM reasonably declined Plaintiffs' version of a seismic-exclusion alternative at

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                                    39

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 49 of 67

this stage of the NEPA process. Alternatives D1 and D2 would achieve Plaintiffs' requested limitation, because by making substantial portions of the Coastal Plain off-limits to leasing, those alternatives provide no incentive to conduct seismic surveys. *See* AR 205971-72. BLM made clear that any seismic exploration will require future project-level analysis. While BLM might have chosen to restrict certain areas from future exploration, it was certainly not required to do so in a program-level range of alternatives when any future exploration is subject to BLM's ability to impose area and other restrictions more appropriately analyzed in project-specific analysis.

       3.    *Failure to Adequately Analyze Cultural Resource Impacts.*

The Venetie Plaintiffs argue that the cultural resources analysis in the EIS violates NEPA. Venetie Pls.' Mem. 21-24, ECF 36-1. Specifically, they claim that the EIS contained insufficient or stale data, and that BLM was required to present "[r]easonably up-to-date and comprehensive information" which was "essential to reasoned decision-making." *Id*. at 22. But again, these allegations fail to credit BLM's analysis, which for a programmatic decision amply satisfied NEPA requirements.

Plaintiffs' argument is built upon a district court decision that they contend supports the proposition that an agency may not rely on "incomplete or outdated information regarding potential cultural resources." *Id*. at 19-20 (citing *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 581 (D. Mont. 2018)). But this case is inapposite, for much the same reason that many of Plaintiffs' arguments must fail. Simply put, Plaintiffs again overlook the analysis required in a program-level EIS, and a

*Gwich'in Steering Committee v. Bernhardt; et al.*      Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION      40

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 50 of 67

later project-level analysis including ground disturbance of localized sites. *Indigenous Network* involved focused ground-disturbance associated with construction of a pipeline, and its holding turned on the finding that the existence of 1,038 "unsurveyed acres" along the project's geospatially precise course prevented the agency from sufficiently analyzing potential impacts to cultural resources. *Id*. at 580-81. Again, these concerns are premature when raised in a challenge to Coastal Plain development that has not yet been described with particularity, or even proposed over a 1.56 million acre expanse.

Contrary to Plaintiffs' assertions, BLM meaningfully analyzed cultural resource impacts given the programmatic level of analysis, the great geographic expanse in play, and the uncertainties of future development. AR90187. This analysis was appropriate given the underlying purpose of establishing the Program, and was summarized in Section 3.4.2 of the EIS. AR90447-59. That discussion observes the "Kaktovikmiut (i.e., Iñupiat of Kaktovik) are the current indigenous inhabitants of the program area" and, "[i]n essence, the Coastal Plain is the homeland of the Kaktovikmiut." AR90447-49. The EIS addresses available information on known resources in the area, focusing on Kaktovikmiut "sites primarily consist[ing] of house ruins (both collapsed sod and cabin structures), graves, and important hunting, fishing, camping, and lookout areas" existing largely "along coastal areas of the program area." AR90449. The information summarized in the EIS "demonstrates how integrally tied the Kaktovikmiut and their ancestors are to the Coastal Plain. The area has been the homeland of the Kaktovikmiut since time immemorial." *Id*. The analysis reflects meaningful discussion of the potential

impacts to cultural resources for each alternative. This includes disclosure of the number of known sites affected. AR90456. Additionally, the EIS analyzed impacts to the Gwich'in Sacred Place Where Life Begins. AR90452-57. For the purpose of establishing the Program, this was reasonable.

Defendants' analysis of cultural resources in the EIS was sufficient for the programmatic nature of the decisions made in the ROD. Again, Plaintiffs improperly seek to shoehorn their numerous concerns about on-the-ground seismic exploration activity into their argument against the ROD and FEIS. Plaintiffs will have ample opportunity to bring their challenges during any review, and subsequent approval, of site-specific projects.

### 4. *Greenhouse Gas Emissions Analysis.*

The Audubon Plaintiffs argue that BLM's analysis of greenhouse gas emissions (GHG) violated NEPA, because BLM relied on the "same core rationale and record" recently found lacking by the Ninth Circuit. Audubon Pls.' Mot. 6-9, ECF 43 (citing *Ctr. for Biological Diversity v. Bernhardt* (*CBD*), No. 18-73400, 2020 WL 7135484, at *5 (9th Cir. Dec. 7, 2020)). However, Plaintiffs' application of that decision to the Program's GHG emissions analysis is mistaken. BLM's decision to establish the Program is of course a different decision, based on a different record. Furthermore, here BLM conducted a lifecycle GHG emissions analysis as part of the Program EIS, and thoroughly explained the limitations of that analysis, which satisfies the requirements of *CBD*.

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION          42

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 52 of 67

Any NEPA analysis must be evaluated in light of the underlying purpose and need and other factors germane to the decision contemplated by the agency. The Coastal Plain ROD and EIS address the initial step of establishing an oil and gas leasing program in an area never before open to that use. The Circuit's decision in *CBD* considered the Bureau of Ocean Energy Management's (BOEM) approval of "the Liberty project" which contemplated construction of an offshore drilling and production facility in the Beaufort Sea outer Continental Shelf, off the coast of Alaska. *CBD*, 2020 WL 7135484, at *4-5. There are many grounds on which the two cases can be readily distinguished.

First, is the difference between their respective analyses of lifecycle GHG emissions. The court was clear that "BOEM's conclusion that *not* drilling will result in more carbon emissions than drilling is counterintuitive." *Id*. at *9. The panel rejected this proposition at a visceral level, finding "[a]n agency acts arbitrarily and capriciously when it reaches a decision that is 'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id*. (quoting *State Farm*, 463 U.S. at 43). BLM made no comparable conclusion in its Final EIS here. The agency never suggests that withholding leases would result in more carbon emissions. In fact, given the significant uncertainties in scope and extended timeframes inherent to the programmatic action at issue in this case, BLM has not yet attempted to make differentiated projections of foreign GHG emissions among alternatives. AR90245-46.

Further, BLM fully explained and supported the scope and limitations of its analysis of GHG emissions. The court in *CBD* emphasized that BOEM provided only a

*Gwich'in Steering Committee v. Bernhardt; et al.*        Nos. 3:20-cv-00204; -205; -223-SLG
Defs.' Opposition to ANWR Motions for Preliminary Injunction                    43

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 53 of 67

"two-page explanation" which "did not summarize existing research addressing foreign oil emissions nor attempt to estimate the magnitude of such emissions" and "ignore[d] basic economics principles and state[d]—without citations or discussion—that the impact of the Liberty project on foreign oil consumption will be negligible." *CBD*, 2020 WL 7135484, at *9. The panel rejected this approach, holding "the EIS 'should have either given a quantitative estimate of the downstream greenhouse gas emissions' that will result from consuming oil abroad, or 'explained more specifically why it could not have done so[.]'" *Id.* (quoting *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1374 (D.C. Cir. 2017)). BLM's analysis avoided these shortcomings and complied with the *CBD* standard.

The ROD explains why BLM could not provide a quantitative estimate of foreign downstream GHG emissions. *See* AR205992-94 (concluding "BLM simply lacks sufficient information to conduct credible modelling of foreign energy markets and emissions"). Further, rather than a two-page discussion or merely incorporating materials by reference (*CBD*, 2020 WL 7135484, at *7), BLM included Appendix R to the EIS, providing documentation of BLM's GHG modeling, including the application of the MarketSim model and relevant assumptions. AR91176-91. BLM's analysis was built upon BOEM's model, but was adapted and refined to address the Coastal Plain Program assumptions. AR91184.

BLM's analysis was further described and disclosed in its responses to comments. AR 92220-21, 92281-85, 92297-302. For example, BLM explained it "lacks reliable data

*Gwich'in Steering Committee v. Bernhardt; et al.*        Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION        44

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 54 of 67

for the oil substitutes available in other countries and those countries' substitution patterns (cross-price elasticities) and resulting energy mix of oil and the various substitutes" and that such uncertainties rendered an attempt to extrapolate effects of such changes upon foreign greenhouse gas emissions "simply 'too speculative' and infeasible to be required under NEPA[.]"  AR92297 (response to Trustees for Alaska comment).  BLM also acknowledged the Draft EIS "was short on details" in presenting MarketSim, *id.,* and provided supplemental information in the Final EIS main text and Appendix R to rectify that shortfall.  AR 90245-46.  These distinctions directly address the shortcomings identified in *CBD*.

Beyond BLM's explanation of its GHG analysis, the Proposed Action evaluated by BLM here differs from the Liberty Project in meaningful ways.  One major relevant distinction is with the level of uncertainty in the volume of production between a project-specific Liberty Development and Production Plan with a 25-year lifespan and the Program, which considers *potential* exploration, development, and production over an extended timeline of 70 or even 100 years.  The programmatic nature of BLM's analysis magnifies uncertainties in impacts of future post-lease activities on both domestic and foreign GHG emissions.  The ROD highlights this "tremendous uncertainty" at length. *See* AR205958.

Relatedly, an additional major distinction is in the relative timeframes of expected production, which adds further uncertainties in evaluating market impacts that inform analysis of any indirect GHG emissions.  The Program does not envision production to

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
Defs.' Opposition to ANWR Motions for Preliminary Injunction                    45

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 55 of 67

begin for 8 years (AR90780) and can last from 10 to 50 years before abandonment" (AR 90790), while BOEM assumed Liberty would be online in five years. BOEM, 2018, Environmental Impact Statement Liberty Development and Production Plan Beaufort Sea, Alaska. OCS EIS/EA BOEM 2018-050. Volume 1, p. 2-1. The Final EIS describes the hypothetical timeline, explaining "peak production" in the Coastal Plain would be expected roughly 20-50 years after the first least sale. AR90775.

Although the Ninth Circuit made clear that it believed BOEM could have quantified foreign GHG emissions produced as a result of fluctuations in foreign consumption related to the Liberty Project, it also acknowledged that "'in some cases quantification may not be feasible.'" *CBD*, 2020 WL 7135484, at *9 (quoting *Sierra Club*, 867 F.3d at 1374). BLM's lifecycle GHG analysis of the Program falls into this category, for the reasons stated above and in the EIS itself.

     5.    *Failure to Explain Compliance with Refuge Act and ANILCA*.

The Audubon Plaintiffs finally contend that BLM's purported failure to explain "how the Program would achieve the requirements of ANILCA and the Refuge Act" constituted a separate violation of NEPA. Audubon Pls.' Mot. 12-13, ECF 43. This novel claim is not supported by Plaintiffs' cited authority, and is particularly ill-suited as a foundation for the extraordinary remedy of a preliminary injunction.

Plaintiffs' claim purports to be based upon a provision in the 1978 CEQ Regulations addressing EIS "implementation." *Id*. at 12 (citing 40 C.F.R. § 1502.2(d)). Plaintiffs selectively quote the regulation to suggest that it allows a mechanism for

*Gwich'in Steering Committee v. Bernhardt; et al.*      Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION     46

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 56 of 67

judicial review of the extent to which EIS alternatives "will or will not achieve the requirements of . . . environmental laws and policies." *Id.* However, the ellipses in Plaintiffs' presentation conceal that subsection (d) seeks an analysis of achievement of the provisions of sections 101 and 102(1) of NEPA, not some ubiquitous array of other "environmental laws and policies." *See* 40 C.F.R. § 1502.2(d). Thus the language quoted from NEPA does nothing to advance Plaintiffs argument that BLM was required to chronicle achievement of the goals of ANILCA and the Refuge Act.

Plaintiffs' cited cases further demonstrate the fallacy of this claim. For starters, *League of Wilderness Defenders v. U.S. Forest Serv.*, 585 F. App'x 613, 614-15 (9th Cir. 2014) is a memorandum decision which cannot be cited as precedent under Ninth Circuit Rule 36-3. Nor does the discussion of the Forest Service's failure to consider intensity of motorized use in assessing wilderness character, which Plaintiffs emphasize, bear any relationship to this case. *See* Audubon Pls.' Mot. 12, ECF 43 (citing *Mont. Wilderness Ass'n v. McAllister*, 658 F. Supp. 2d 1249, 1255 (D. Mont. 2009)). The final case addresses the adequacy of an agency's response to comments, not the sweeping new duty Plaintiffs seek to impose. *See Am. Wild Horse Pres. Campaign v. Zinke*, No. 16-cv-001-EJL, 2017 WL 4349012, at *13 (D. Idaho Sept. 29, 2017).

Plaintiffs argue that "Defendants failed to include in their FEIS any explicit analysis of how they will or will not comply with their challenging ANILCA or Refuge Act obligations." Audubon Pls.' Mot. 12, ECF 43. This is nothing more than a repackaging of claims asserting noncompliance with those statutes, which Plaintiffs

*Gwich'in Steering Committee v. Bernhardt; et al.*    Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION    47

Case 3:20-cv-00205-SLG    Document 57    Filed 12/23/20    Page 57 of 67

separately assert.

In addition, compliance with those (and other) statutes cannot be distilled to an "explicit" statement, but is addressed in the EIS, including the BLM's view that, after ANILCA's amendment by the Tax Act, it must consider the Refuge purposes in 303(2)(B) of ANILCA when developing the Program. *See* AR90187, 90195, 90534-35. The ROD also explains, in detail, how the Department interprets its obligations under ANILCA after its amendment by the Tax Act. *See* AR205963-64. In particular, the ROD addresses how Congress itself performed the balance between refuge purposes by mandating an oil and gas program in only one small area of the refuge. The ROD also chronicles how the Department balanced the other conservation-oriented Refuge purposes against oil and gas development by applying lease stipulations and required operating procedures to protect resources. *Id*.[10]

Plaintiffs are not likely to succeed in a claim that demands an agency's NEPA documents provide an explicit analysis of how it will or will not comply with other laws. Plaintiffs have separately alleged those deficiencies in claims under the applicable

---

[10] On the substance of the Department's obligations after the Tax Act, Plaintiffs appear to argue that the Program itself – and all actions taken under it – must each "fulfill" every other Refuge purpose. That argument fails to take into account the sometimes-conflicting nature of the Refuge purposes and the fact that the conservation purposes apply to the entirety of the refuge, and the oil and gas program only applies to one small portion of it. AR 205963. Indeed, taken to its logical extreme, the agency would be unable to advance the conservation purposes in the Coastal Plain unless any such actions simultaneously fulfilled the oil and gas program purpose. Defendants' interpretation is clearly a permissible balancing of those conflicting purposes, particularly in light of Congress's explicit directive in the Tax Act.

statutes, and BLM's response, or failure to respond to Plaintiffs' satisfaction, does not give rise to some additional claim under NEPA.

C.      Defendants Properly Interpreted and Applied ANILCA.

The Venetie Plaintiffs contend that BLM violated its duties under ANILCA Section 810. Venetie Pls.' Mem. 17-21, ECF 36-1. Plaintiffs note that Section 810 includes both procedural and substantive elements. *Id*. at 17. However, they argue that BLM "unlawfully excluded Gwich'in Tribes from both phases of their ANILCA § 810 process[.]" *Id*. at 18. They conclude these allegedly deficient procedures "unlawfully tipped the scales against Gwich'in subsistence uses and in favor of oil and gas development." *Id*. at 21. Plaintiffs are not correct. BLM's interpretation of Section 810 was reasonable, and allowed for appropriate consideration of subsistence uses, including those of Gwich'in communities. *See* AR90849-50 (explaining that while the Section 810 evaluation focused on the four communities most dependent on Coastal Plain resources, including the Gwich'in communities of Arctic Village and Venetie, it also analyzed impacts more broadly on all 22 "caribou study communities" that rely upon the Porcupine and Central Arctic caribou herds).

Title VIII of ANILCA addresses subsistence management and use, advancing a policy that "the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands[.]" 16 U.S.C. § 3112(1). Section 810 of ANILCA:

> imposes procedural requirements upon federal decisionmakers; pursuant to its terms, an agency proposing an action resulting in the "use, occupancy,

x

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                                    49

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 59 of 67

or disposition of public lands" must evaluate that action's effects on "subsistence uses and needs," the availability of other lands for the same purpose, and "other alternatives" that would reduce the impacts to subsistence uses.

*Se. Alaska*, 443 F. Supp. 3d at 1015 (quoting 16 U.S.C. § 3120(a)). As a threshold matter, described by Plaintiffs as Tier 1, the agency must determine whether "the action 'would significantly restrict subsistence uses[.]'" *Id*. If so, before proceeding with the relevant "withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands" the agency conducts what Plaintiffs call Tier 2, and must:

> provide notice to the affected communities, hold public hearings, and make three findings: "[T]hat (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions."

*Se. Alaska*, 443 F. Supp. 3d at 1015 (quoting 16 U.S.C. § 3120(a)(1)-(3)); *see also Kunaknana v. Clark*, 742 F.2d 1145, 1151 (9th Cir. 1984) ("Congress intended a two-step process: first, the agency determines whether the contemplated action may significantly restrict subsistence use; if it may, the agency must comply with the notice and hearing procedures."). As a result of the "similarities between the procedural requirements of NEPA and ANILCA, courts have evaluated the two statutes under similar standards." *Se. Alaska*, 443 F. Supp. 3d at 1016-17.

Defendants closely followed *Kunaknana* to comply with Section 810 in establishing the Program. At the outset, this template addresses Plaintiffs' suggestion

*Gwich'in Steering Committee v. Bernhardt; et al.*     Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION     50

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 60 of 67

that any Federally qualified user harvesting Porcupine Herd caribou would be presumptively "significantly restrict[ed]" in their subsistence use. Rather than Plaintiffs' expansive reading, the Ninth Circuit advised that, "when the first sentence of section 810(a) is read in light of 42 U.S.C. § [6506a], it requires the agency to evaluate the effects upon subsistence needs of leasing the particular tracts tentatively selected and to compare the relative desirability of leasing other tracts within the NPR–A. This leaves to the agency's discretion the particular details concerning when, where, and how leasing within the NPR–A shall occur." *Kunaknana*, 742 F.2d at 1151. The Secretary followed this guidance in the ROD. AR205957-58

Defendants reasonably addressed their Tier 1 duties by tracking the definition of "significant restriction upon subsistence uses" that the Ninth Circuit found reasonable in *Kunaknana*. In this case, plaintiffs alleged that BLM "adopted an overly restrictive definition of the term[.]" 742 F.2d at 1152. But the Ninth Circuit disagreed, upholding the agency's definition of "significant restriction upon subsistence uses" as "(1) a reduction in the availability of harvestable resources caused by decline in the population of subsistence resources; (2) a reduction in the availability of resources, caused by an alteration in their distribution or location throughout the NPR–A; and (3) the limitation of access for subsistence harvesters." *Id*. Defendants tracked this approach, as updated by BLM Instruction Memorandum No. AK-2011-008 (BLM 2011), to address the abundance, availability and access factors approved by the Circuit. AR90848. In light of these principles, Defendants summarized the Tier 1 inquiry as follows:

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION          51

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 61 of 67

An alternative would be considered to significantly restrict subsistence uses if, after consideration of protection measures, such as lease stipulations or required operating procedures, it can be expected to substantially reduce the opportunity to use subsistence resources (BLM 2011). Substantial reductions are generally caused by large reductions in resource abundance, a major redistribution of resources, extensive interference with access, or major increases in the use of those resources by non - subsistence users.

*Id.* In addition, Section 3.4.3 of the EIS contains a substantial discussion and analysis of subsistence resources, which informed the Section 810 Evaluation. *See* AR90459-487, 90850. This included discussion of comments and potential impacts to fish (AR90852), marine mammals (AR90852-53) and caribou (AR90853-57). Appendix M reflects data on subsistence uses further considered in the analysis. AR91040-77. The ROD explains that the "aggressive development scenario," including "the cumulative case" that would entail development of production facilities and pipelines, "will not result in a significant restriction to subsistence uses for the communities of Arctic Village, Nuiqsut, and Venetie[.]" AR205980-81. "[H]owever, the effects of the cumulative case exceed the 'may significantly restrict' threshold for the community of Kaktovik, and thus a positive ANILCA Section 810 determination was made" for that community. AR205981. This finding complies with *Kunaknana* and was supported by the record.

Defendants' Tier 2 analysis similarly tracked *Kunaknana* and complied with the law. The ROD summarized and explained the agency's determination on each of the three statutory inquiries. AR205981-83. The ROD presentation reflects the more detailed consideration of these factors in the Section 810 Evaluation (AR90868-69) and the EIS (AR90480). In particular, the ROD detailed measures taken to minimize impacts

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION          52

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 62 of 67

to subsistence uses, including "development of strict mitigation measures similar to those used on BLM-administered lands in the NPR-A."  AR 205982; *see Kunaknana*, 742 F.2d at 1151 (noting "protective lease conditions and stipulations in order to preclude *future* restrictions on subsistence uses that might be caused by activity permitted by the NPR–A leasing program").  As in *Kunaknana*, "the agency examined the relevant factors and did not err in its judgment" and "articulated rational connection between the facts found [by the agency] and the choice made."  742 F.2d at 1151 (bracketing in original).

Finally, BLM's Section 810 compliance in the ROD and EIS is appropriate at the program-level.  With any proposal for future project-level activities:

> BLM will consider alternatives to avoid adverse effects and incompatible development to subsistence resources and uses and subsistence access before any on-the-ground activities are approved.  This will be done through subsequent NEPA analysis, which will be conducted before any construction or operation permits or approvals are issued.

AR205983 (ROD), *see also* AR90239 (EIS).

Defendants' ANILCA Section 810 analysis carefully followed the approved model of the NPR-A.  Defendants' conclusions were reasonable and based upon substantial evidence.  These efforts amply satisfy Section 810 for a program-level decision, and will be updated in project-level analyses of any future ground-disturbing activities.  Plaintiffs have not shown they are likely to succeed on their Section 810 claims.

### IV.    The Public Interest and Balance of Equities Favor Defendants.

Plaintiffs' must further prove that a preliminary injunction would serve the public interest.  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  When the

government is a party, the analyses of the public interest and balance of equities merge,

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted).

Absent the necessary showing on the first two elements a court "need not dwell on the

final two factors" and, "when considered alongside the [movant's] failure to show

irreparable harm, the final two factors do not weigh in favor of a stay." *E. Bay Sanctuary*

*Covenant v. Trump*, 932 F.3d 742, 778-79 (9th Cir. 2018).  The strong public interests

supporting the establishment of the Program outweigh Plaintiffs' anticipatory and

speculative allegations of irreparable harm.

Plaintiffs rest on the principle that asserted environmental injury should always

override other considerations on these factors of the preliminary injunction standard.

Gwich'in Pls.' Mem. 22, ECF 47-1; Venetie Pls.' Mem 40, ECF 36-1; Audubon Pls.'

Mot. 21, ECF 43.  They argue that economic benefit is the only countervailing interest,

which cannot outweigh environmental injury.  This statement is not universally true.  *See*

*N. Slope Borough*, 486 F. Supp. at 331-32.  More importantly, Plaintiffs contradict

themselves, for in downplaying the perceived equities of Defendants and Intervenors they

acknowledge that the Program involves "a new, largely unexplored region with uncertain

oil and gas reserves and highly challenging terrain and weather conditions that will make

any future development slow and arduous."  Venetie Pls.' Mem 40, ECF 36-1; *see also*

Audubon Pls.' Mot. 21, ECF 43 ("the actual production of oil and gas on leased lands

likely will not begin until many years after the leases are issued").  Plaintiffs cannot

simply rest on speculative assertions of future environmental injury, or even an allegedly

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                                54

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 64 of 67

defective procedural course, when such injury is not likely to occur until far into the future. And even if the Court determines that some form of relief is appropriate to restrain seismic activity, that determination should in no way affect the analysis of lease issuance, which Plaintiffs cannot show is likely to cause any imminent environmental injury.

On the present record, there are substantial interests which offset Plaintiffs' assertions of future harm. Intervenor-Defendants detail their interests, which include state and local governmental interests, as well as the unique perspective of the inhabitants of the Coastal Plain. Furthermore, Defendants are responding to specific Congressional direction to establish and administer the Program. The Court in these circumstances can properly vindicate the interests of NEPA and ANILCA through final relief on the merits, while a preliminary injunction will unnecessarily "hinder[ ] the admittedly conflicting public interest in development of [Coastal Plain] resources set forth in the [Tax] Act." *N. Slope Borough*, 486 F. Supp. at 332.

The balance of equities and public interest must be evaluated in the temporal context of Plaintiffs' motion, i.e., before January 6, 2021. Viewed properly, these factors militate in favor of allowing Defendants to continue establishment of the Program in accordance with the ROD. Under expedited consideration at this early stage of the proceedings, Plaintiffs have not shown that the balance of harms or public interest tip sharply in favor of issuing a preliminary injunction.

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION          55

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 65 of 67

## CONCLUSION

For the foregoing reasons, the Court should deny each of Plaintiffs' motions for

temporary restraining order or preliminary injunction.

Respectfully submitted,

DATED:  December 23, 2020.

JEAN E. WILLIAMS
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

MARK ARTHUR BROWN
Florida Bar No. 0999504
Senior Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611 Washington, D.C. 20044
(202) 305-0204 || 202-305-0275 (fax)
mark.brown@usdoj.gov

PAUL E. SALAMANCA
Deputy Assistant Attorney General

*/s/ Paul A. Turcke*
PAUL A. TURCKE
Idaho Bar No. 4759
Trial Attorney
Natural Resources Section
P.O. Box 7611 Washington, D.C. 20044
202-353-1389 || 202-305-0506 (fax)
paul.turcke@usdoj.gov

*Counsel for Defendants*

Of Counsel:

MIKE GIERYIC
Office of the Regional Solicitor
U.S. Department of the Interior
4230 University Drive, Suite 300
Anchorage, AK 99508

*Gwich'in Steering Committee v. Bernhardt; et al.*          Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION          56

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 66 of 67

907-271-1420
mike.gieryic@sol.doi.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I hereby certify that this memorandum complies with the type-volume limitation of Local Civil Rule 7.4(a)(2), as requested in ECF 57 (Case No. 3:20-cv-204), because this memorandum contains 14,867 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4). This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 13-point font, and I obtained the word count using Microsoft Word 2016 (16.0.5044.1000) MSO (16.0.5032.1000) 32-bit.

*/s/ Paul A. Turcke*
Paul A. Turcke

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2020, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Paul A. Turcke*
Paul A. Turcke

*Gwich'in Steering Committee v. Bernhardt; et al.*        Nos. 3:20-cv-00204; -205; -223-SLG
DEFS.' OPPOSITION TO ANWR MOTIONS FOR PRELIMINARY INJUNCTION                57

Case 3:20-cv-00205-SLG   Document 57   Filed 12/23/20   Page 67 of 67