Ryan P. Steen (Bar No. 0912084)
ryan.steen@stoel.com
Jason T. Morgan (Bar No. 1602010)
jason.morgan@stoel.com
Whitney A. Brown (Bar No. 1906363)
whitney.brown@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

Attorneys for Alaska Oil and Gas Association and American Petroleum Institute

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

| | |
|---|---|
| GWICH'IN STEERING COMMITTEE, et al., | No.: 3:20-cv-00204-SLG |
| Plaintiffs, | |
| v. | |
| DAVID L. BERNHARDT, in his official capacity as Secretary of the Interior, et al., | |
| Defendants, | |
| and | |
| NORTH SLOPE BOROUGH, et al., | |
| Intervenor-Defendants, | |
| and | |
| ALASKA OIL AND GAS ASSOCIATION et al., | |
| Intervenor-Defendants. | |
| NATIONAL AUDUBON SOCIETY, et al., | No.: 3:20-cv-00205-SLG |
| Plaintiffs, | |
| v. | |
| DAVID BERNHARDT, in his official capacity as Secretary of the Interior, et al., | |
| Defendants, | |

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

and

ALASKA OIL AND GAS ASSOCIATION et al.,

Intervenor-Defendants,

and

NORTH SLOPE BOROUGH, et al.,

Intervenor-Defendants.

NATIVE VILLAGE OF VENETIE TRIBAL GOVERNMENT, et al.,

Plaintiffs,

v.

DAVID L. BERNHARDT, in his official capacity as Secretary of the United States Department of the Interior, et al.,

Defendants,

and

ALASKA OIL AND GAS ASSOCIATION, et al.,

Intervenor-Defendants,

and

NORTH SLOPE BOROUGH, et al.,

Intervenor-Defendants.

No.: 3:20-cv-00223-SLG

**OPPOSITION TO MOTIONS FOR PRELIMINARY INJUNCTION BY ALASKA OIL AND GAS ASSOCIATION AND AMERICAN PETROLEUM INSTITUTE**

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

# TABLE OF CONTENTS

**STOEL RIVES LLP**

600 University Street, Suite 3600, Seattle, WA 98101

*Main (206) 624-0900 Fax (206) 386-7500*

Page

TABLE OF AUTHORITIES ........................................................................ii

I. INTRODUCTION ............................................................................... 1

II. BACKGROUND ................................................................................ 5

    A.    Congress Requires Development of a Leasing Program on the Coastal Plain. ................................................................................ 5

    B.    BLM Develops the Leasing Program. ........................................... 7

    C.    BLM's 2021 Planned Lease Sale Under the Leasing Program. ................... 8

III. ARGUMENT .................................................................................. 9

    A.    Preliminary Injunctive Relief Is an Extraordinary Remedy. ........................ 9

    B.    Plaintiffs Cannot Demonstrate an Imminent Threat of Irreparable Injury from a Lease Sale. ................................................................. 10

    C.    Plaintiffs Are Not Entitled to Preliminary Injunctive Relief Based on Kaktovic's Proposed Survey. ....................................................... 22

    D.    Plaintiffs Are Unlikely to Prevail on the Merits of Their Claims. ............. 26

        1.    Plaintiffs' Refuge Act Claims Are Legally and Factually Flawed. ....................................................................... 27

        2.    Plaintiffs Are Unlikely to Prevail on Their NEPA Claims. ............ 30

            a.    The Leasing EIS fully discloses and explains GHG effects. ................................................................. 30

            b.    BLM was not required to evaluate alternatives for seismic exploration. ..................................................... 34

            c.    BLM conservatively and rationally evaluated the potential impacts of development under the Tax Act's 2,000-acre provision. ................................................. 37

            d.    BLM took the requisite "hard look" at cultural resource impacts. ..................................................... 39

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

i

3.      BLM Complied with Section 810 of ANILCA...............................42

E.    The Balance of Hardships and Public Interest Weigh Against
      Injunctive Relief. .........................................................................................45

IV. CONCLUSION ...........................................................................................46

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska v. Bernhardt*,
Nos. 3:17-cv-00013-SLG & 3:17-cv-00014-SLG, 2020 WL 6702025
(D. Alaska Nov. 13, 2020) ........................................................................... 29

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
67 F.3d 723 (9th Cir. 1995) ......................................................................... 43

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ................................................................ 10, 11

*Am. Forest Res. Council v. Hammond*,
422 F. Supp. 3d 184 (D.D.C. 2019) ............................................................ 28

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ..................................................................................... 46

*Center for Biological Diversity v. Bernhardt*,
No. 18-73400, 2020 WL 7135484 (9th Cir. Dec. 7, 2020) .................. 30, 31, 33, 34

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ..................................................................... 11

*Ctr. for Biological Diversity v. Hays*,
No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739 (E.D. Cal. Oct. 8,
2015) ............................................................................................................ 19

*Ctr. for Food Safety v. Vilsack*,
636 F.3d 1166 (9th Cir. 2011) .............................................................. passim

*Defs. of Wildlife v. N.C. Dep't of Transp.*,
762 F.3d 374 (4th Cir. 2014) ....................................................................... 28

*Dep't of Fish & Game v. Fed. Subsistence Bd.*,
No. 3:20-CV-00195-SLG, 2020 WL 6786899 (D. Alaska Nov. 18,
2020) ...................................................................................................... 12, 19

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

iii

**TABLE OF AUTHORITIES**
**(continued)**

*Doe No. 1 v. Trump*,
  957 F.3d 1050 (9th Cir. 2020) ................................................. 15

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) ................................................. 11

*In re Excel Innovations, Inc.*,
  502 F.3d 1086 (9th Cir. 2007) ................................................. 11

*Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*,
  739 F.2d 466 (9th Cir. 1984) ................................................. 11, 20

*Hanlon v. Barton*,
  740 F. Supp. 1446 (D. Alaska 1988) ................................................. 43

*Haw. Cnty. Green Party v. Clinton*,
  124 F. Supp. 2d 1173 (D. Haw. 2000) ................................................. 4

*Holiday Inns of Am., Inc. v. B & B Corp.*,
  409 F.2d 614 (3d Cir. 1969) ................................................. 13

*In Def. of Animals v. U.S. Dep't of Interior*,
  737 F. Supp. 2d 1125 (E.D. Cal. 2010) ................................................. 19

*Indigenous Environmental Network v. U.S. Department of State*,
  347 F. Supp. 3d 561 (D. Mont. 2018) ................................................. 41

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) ................................................. 30

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991) ................................................. 26

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ................................................. 24

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) (per curiam) ................................................. 9

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

iv

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ..................................................................... 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ....................................................................... 27

*Munaf v. Geren*,
  553 U.S. 674 (2008) ................................................................... 5, 9

*N. Alaska Env't Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ................................................... 37, 38

*N. Cheyenne Tribe v. Hodel*,
  851 F.2d 1152 (9th Cir. 1988) ..................................................... 17

*Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*,
  432 F. Supp. 3d 1003 (D. Alaska 2020) ...................................... 25

*Nevada v. United States*,
  364 F. Supp. 3d 1146 (D. Nev. 2019) .......................................... 12

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*,
  No. 3:18-CV-00437-HZ, 2019 WL 2372591 (D. Or. June 5, 2019) ........................... 12

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012) (per curiam).................................. 10

*Pit River Tribe v. U.S. Forest Serv.*,
  615 F.3d 1069 (9th Cir. 2010) ..................................................... 17

*Presidio Golf Club v. Nat'l Park Serv.*,
  155 F.3d 1153 (9th Cir. 1998) ..................................................... 39

*Price v. City of Stockton*,
  390 F.3d 1105 (9th Cir. 2004) ..................................................... 26

*S.C. Coastal Conservation League v. Ross*,
  No. 2:18-CV-03326-RMG, 2019 WL 5872072 (D.S.C. Aug. 26, 2019) ................... 13

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

v

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) ................................................................. 33

*Sierra Club v. U.S. Dep't of Energy*,
   867 F.3d 189 (D.C. Cir. 2017) ................................................................... 32

*Sierra Forest Legacy v. Rey*,
   577 F.3d 1015 (9th Cir. 2009) ................................................................... 12

*Southeast Alaska Conservation Council v. U.S. Forest Service*,
   413 F. Supp. 3d 973 (D. Alaska 2019) ...................................................... 15

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
   608 F.3d 592 (9th Cir. 2010) ..................................................................... 41

*W. Watersheds Project v. Bureau of Land Mgmt.*,
   No. 3:11-CV-00053-HDM, 2011 WL 1630789 (D. Nev. Apr. 28, 2011). 13, 14, 21, 22

*WildEarth Guardians v. Bernhardt*,
   No. 1:19-cv-00505-RB-SCY, 2020 WL 6799068 (D.N.M. Nov. 19,
   2020) ........................................................................................................... 34

*WildEarth Guardians v. Bureau of Land Mgmt.*,
   8 F. Supp. 3d 17 (D.D.C. 2014) ................................................................. 34

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013) ................................................................... 34

*WildEarth Guardians v. Zinke*,
   368 F. Supp. 3d 41 (D.D.C. 2019) ............................................................. 33

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................... 1, 3, 10, 12

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ................................................................... 11

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

**Statutes**

16 U.S.C. § 668dd ................................................................................ 6, 27, 29

16 U.S.C. §§ 3101, 3111, 3112 ................................................................ passim

16 U.S.C. § 3120(a) ................................................................... 42, 43, 45

16 U.S.C. § 3142, *et seq.* ..................................................................... 6

16 U.S.C. § 3143 ................................................................................. 23

43 U.S.C. § 2601 ................................................................................. 28

Pub. L. No. 96-487, 94 Stat. 2371 (1980) ................................................ 6

Pub. L. No. 105-57, § 9(b), 111 Stat. 1252 (1997) ................................. 29

Public Law No. 115-97 (Tax Cuts and Jobs Act) (2017) ................... 6, 7, 23, 27

**Regulations**

40 C.F.R. § 1500.2 (2019) ................................................................ 36

40 C.F.R. § 1508.8(b) (2019) ....................................................... 36, 37

43 C.F.R. pt. 3130 ................................................................................ 8

43 C.F.R. pt. 3150, subpt. 3152 ................................................... 3, 23

43 C.F.R. § 3132.5 ............................................................................. 9

Public Land Order 2214, *Establishing the Arctic National Wildlife Range*
(Dec. 6, 1960) ................................................................................... 5

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ........................................... 15

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

11A C. Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed.
   1995) ................................................................................................................ 12

85 Fed. Reg. 73,292, 73,293 (Nov. 17, 2020) ...................................................... 8

85 Fed. Reg. 78,865 (Dec. 7. 2020) ...................................................................... 8

85 Fed. Reg. 79,082 (Dec. 8, 2020) ..................................................................... 24

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

# I. INTRODUCTION

Intervenor-Defendants Alaska Oil and Gas Association and American Petroleum Institute provide this consolidated opposition to the three motions for injunctive relief filed by the Gwich'in Steering Committee et al. ("Gwich'in Steering Committee"), the Native Village of Venetie et al. ("Venetie"), and the National Audubon Society et al. ("Audubon," and collectively "Plaintiffs") in the three above-captioned cases. All Plaintiffs seek the extraordinary remedy of preliminary injunctive relief against the Bureau of Land Management ("BLM"), asking the Court to (1) enjoin BLM from issuing leases under the Coastal Plain Oil and Gas Leasing Program (the "Leasing Program" or "Program") and (2) enjoin BLM from approving a yet-to-be-authorized permit for seismic exploration by the Kaktovik Iñupiat Corporation ("Kaktovik"). All three motions suffer from the same fatal flaws.

Principally, Plaintiffs are not entitled to an injunction prohibiting BLM from issuing leases because they have not demonstrated, and cannot demonstrate, that the future issuance of leases under the Leasing Program is likely to cause *imminent irreparable* injury. The purpose of a preliminary injunction is to prevent irreparable injury from occurring "before a decision on the merits can be rendered."[1] Plaintiffs suffer

---

[1] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal quotation marks and citation omitted).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

1

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

no irreparable injury from the mere issuance of a lease: "Under the leasing phase, there would be no impacts because a lease itself does not authorize any on the ground oil and gas activities."[2] Plaintiffs raise concerns about the impacts of *future* exploration and development of leases, but those concerns are not imminent. No leases have yet been issued under the Leasing Program (and may never issue), and if BLM issues one or more leases, leaseholders will not be able to conduct any on-the-ground exploration or development activities on those leases until they receive *additional* approvals from BLM (approvals they have yet to even apply for), including additional review under the National Environmental Policy Act ("NEPA"). Plaintiffs can suffer no irreparable injury from the issuance of leases until these future actions come to pass. There is thus ample time for the Court to review the merits of this case before those events happen (if they happen at all). This alone is a sufficient basis to deny the request for a preliminary injunction regarding the lease sale.

Not only are these future harms from leasing not imminent, but they are entirely speculative. Even since Plaintiffs filed their motions, BLM *already withdrew* 10 of the 32 parcels (475,000 acres) from the proposed lease sale.[3] Moreover, President-elect Joe Biden has announced his "Day One Unprecedented Actions" in which he "will use the

---

[2] Declaration of Jason Morgan Ex. A at 76 (AR90528).

[3] *Id.* Ex. B at 1.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
2

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

full authority of the executive branch" to make sweeping changes including "permanently protecting the Arctic National Wildlife Refuge and other areas impacted by President Trump's attack on federal lands and waters" and "banning new oil and gas permitting on public lands and waters."[4] Under these circumstances, Plaintiffs cannot credibly say that the issuance of leases (if that ever occurs) is *likely* to lead to exploration and development of those leases in the Coastal Plain, and certainly not before the Court is able to review the merits of this case. Because Plaintiffs cannot show that irreparable injury from a lease sale is *imminent*, an injunction precluding BLM from conducting the sale would be improper.[5]

Plaintiffs' request for an injunction regarding Kaktovik's planned seismic survey is equally flawed, but for a different reason. Plaintiffs presume that Kaktovik's proposed survey is part of the Leasing Program. That is not correct. The proposed seismic survey is not part of any leasing activity, and it will be approved through a separate BLM action under its regulations applicable to onshore geophysical oil and gas exploration in Alaska.[6] BLM's decision on the application will have its own record of decision, its own

---

[4] Morgan Decl. Ex. C at 11-12.

[5] *Winter*, 555 U.S. at 22 ("[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury[.]" (first brackets in original; internal quotation marks and citation omitted)).

[6] 43 C.F.R. pt. 3150, subpt. 3152 (Onshore Oil and Gas Geophysical Exploration, Exploration in Alaska).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

3

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

environmental assessment under NEPA, and its own findings related to the Alaska National Interest Lands Conservation Act ("ANILCA").[7] As of yet, BLM has not approved that application, and Plaintiffs have not filed a complaint challenging that (future) agency action or its compliance with NEPA or ANILCA. Without a final agency action to confer jurisdiction or a waiver of sovereign immunity against BLM, or a properly filed and served complaint challenging BLM's approval of the Kaktovic permit, any request for injunctive relief is entirely premature. In short, "Plaintiffs cannot have suffered an injury in fact when Defendants have not yet taken final action" and therefore do not even have standing at this time to challenge a seismic permit before it is issued.[8]

Under the circumstances, the appropriate course is to deny the motions for preliminary injunction, without prejudice. Plaintiffs can refile their motions in the unlikely and improbable event that the Court has not reached the merits of this case before some unidentified (and yet to be applied for) future on-the-ground lease activities are imminent. Likewise, *if* BLM issues a permit to Kaktovic for seismic exploration, Plaintiffs are free to pursue any appropriate relief in a lawsuit challenging that agency action. This approach is not only prudent, but compelled by controlling precedent.[9]

---

[7] Morgan Decl. Ex. D at 7-8, 31.

[8] *Haw. Cnty. Green Party v. Clinton*, 124 F. Supp. 2d 1173, 1201-02 (D. Haw. 2000).

[9] *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

4

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

Lastly, although the lack of imminent irreparable injury could be the end of the analysis,[10] Plaintiffs are also unlikely to succeed on the merits and have failed to demonstrate that the balance of the equities and public interest favor an injunction. For all of these reasons, and those discussed below, Plaintiffs' motions should be denied. The "'extraordinary and drastic remedy'" requested by Plaintiffs is not warranted.[11,12]

## II.  BACKGROUND

### A.    Congress Requires Development of a Leasing Program on the Coastal Plain.

In 1960, Public Land Order 2214 established the "Arctic National Wildlife Range."[13] In 1980, the enactment of ANILCA expanded the Range and renamed it the

---

[10] *Id.*

[11] *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted).

[12] Rather than file a motion for a preliminary injunction, the group of fifteen Lower 48 states (the "States") have elected to file the same amicus brief in each of the three cases in which preliminary injunction motions have been filed. The States' amicus brief adds nothing to the motions before the Court. In fact, the States' amicus brief only underscores the fact that no irreparable harm has been or can be demonstrated. The States complain about hypothetical harms to migratory birds if and when development ever occurs on the Coastal Plain. That clearly is not imminent irreparable injury. Moreover, the States' claim to represent the relevant public interest has little credibility given that Congress has said otherwise and that the positions of the State of Alaska, the North Slope Borough, and the Alaska Native village and corporation that are located in the Coastal Plain directly contradict the position of the States.

[13] Public Land Order 2214, Establishing the Arctic National Wildlife Range (Dec. 6, 1960).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
5

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Arctic National Wildlife Refuge ("ANWR").[14] Section 1002 of ANILCA expressly directs the Secretary of the Interior to carry out an oil and gas exploration program on ANWR's Coastal Plain (sometimes called the "1002 Area" or the "Coastal Plain").[15] ANILCA, as enacted, prohibits the leasing and development of oil and gas in the 1002 Area "until authorized by an Act of Congress."[16]

In 2017, Congress passed Public Law No. 115-97—the Tax Cuts and Jobs Act ("Tax Act")—which includes a stand-alone title expressly directing that the Secretary of the Interior "shall establish and administer a competitive oil and gas program for the leasing, development, production, and transportation of oil and gas in and from the Coastal Plain."[17] The Tax Act also removes the prohibition on oil and gas production in the 1002 Area and adds another express "purpose" to ANWR "to provide for an oil and gas program on the Coastal Plain."[18] The Tax Act further directs the Secretary to manage the program in a manner similar to the management of the National Petroleum Reserve–

---

[14] ANILCA, Pub. L. No. 96-487, 94 Stat. 2371 (1980). ANILCA is codified in various titles of the U.S. Code related to the subject matter or department addressed. The ANILCA sections pertinent to oil and gas leasing in the 1002 Area are sections 303 and 1002, *et seq.*, codified at 16 U.S.C. § 668dd (note) and 16 U.S.C. § 3142, *et seq.* respectively.

[15] ANILCA § 1002(c).

[16] *Id*. § 1003.

[17] Pub. L. No. 115-97, § 20001(b)(2)(A), 131 Stat. 2054 (2018).

[18] *Id*. § 20001(b)(1), (b)(2)(B).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

6

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Alaska (the "Petroleum Reserve"). Congress placed specific parameters on the establishment and administration of the leasing program, including offering at least two lease sales within 10 years, with each lease sale at least 400,000 acres area-wide and the first lease sale occurring not later than December 21, 2021.[19]

## B. BLM Develops the Leasing Program.

Pursuant to the requirements of the Tax Act, BLM proceeded to develop the Leasing Program. BLM issued a final environmental impact statement (the "Leasing EIS") pursuant to NEPA for the Leasing Program in September 2019.[20]

On August 17, 2020, BLM issued its record of decision ("ROD") approving the Leasing Program.[21] The Leasing Program makes approximately 1,563,500 acres available for oil and gas leasing, and consequently for potential future exploration, development, and transportation.[22] The Program adopted by the ROD also provides the stipulations and standard operating procedures that lease holders must comply with to ensure protections for surface resources and other uses.[23]

---

[19] *Id*. § 20001(c).

[20] Morgan Decl. Ex. A at 1 (AR90163).

[21] *Id*. Ex. E at 1 (AR205951).

[22] *Id*. Ex. E at 9 (AR205959).

[23] *Id*.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
7

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

The Leasing Program adopts and follows the leasing procedures and regulations for issuing oil and gas leases in the Petroleum Reserve.[24] Leases issued under the Program provide no immediate rights to conduct ground-disturbing activities, and future "on-the-ground activities" like exploration and development require additional BLM approvals and "further NEPA analysis."[25]

## C. BLM's 2021 Planned Lease Sale Under the Leasing Program.

On November 17, 2020, BLM issued a call for nominations for tracts that "may be offered for lease in the upcoming" oil and gas lease sale under the Leasing Program.[26] On December 7, 2020, BLM announced the dates of the upcoming lease sale under the Leasing Program.[27] BLM instructed that all bids must be received by December 31, 2020.[28] BLM will then "open" the bids on January 6, 2021, which is commonly referred to as the lease sale.[29]

---

[24] *Id*. Ex. E at 8 (AR205964); 43 C.F.R. pt. 3130.

[25] Morgan Decl. Ex.E at 24 (AR205974).

[26] Call for Nominations and Comments for the Coastal Plain Alaska Oil and Gas Lease Sale, 85 Fed. Reg. 73,292, 73,293 (Nov. 17, 2020).

[27] Notice of 2021 Coastal Plain Alaska Oil and Gas Lease Sale and Notice of Availability of the Detailed Statement of Sale, 85 Fed. Reg. 78,865 (Dec. 7, 2020).

[28] *Id*.

[29] *Id*.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
8

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

However, additional process is required before BLM issues actual leases. BLM has 90 days after the lease sale date to determine whether any of the bids it receives are acceptable; a failure to timely accept a bid results in automatic rejection.[30] If there is a tie on any bid, the bidders have until January 21, 2021 to submit additional bids.[31] BLM will then send bidders a notice of acceptance, which will require the bidders to execute the lease, and return it to BLM within 15 days.[32] BLM then has 15 days to execute the lease.[33]

## III. ARGUMENT

### A. Preliminary Injunctive Relief Is an Extraordinary Remedy.

Issuance of injunctive relief before the merits of a case have been decided is an "'extraordinary and drastic remedy.'"[34] A preliminary injunction can only issue on a "'clear showing'" and "substantial proof" that an injunction is warranted.[35] "A plaintiff seeking a preliminary injunction must establish (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips

---

[30] 43 C.F.R. § 3132.5(d).

[31] Morgan Decl. Ex. B at 5.

[32] 43 C.F.R. § 3132.5(e).

[33] *Id*. § 3132.5(h).

[34] *Munaf*, 553 U.S. at 689 (citation omitted).

[35] *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation and emphasis omitted).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

9

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

in the plaintiff's favor; and (4) that an injunction is in the public interest."[36] "Under the

'sliding scale' approach to preliminary injunctions . . . 'the elements of the preliminary

injunction test are balanced, so that a stronger showing of one element may offset a

weaker showing of another.'"[37] For example, "'serious questions going to the merits' and

a hardship balance that tips sharply toward the plaintiff can support issuance of an

injunction, assuming the other two elements . . . are also met."[38] However, a plaintiff

"must establish that irreparable harm is likely, not just possible," regardless of the

strength of plaintiff's showing on the other three elements.[39]

## B. Plaintiffs Cannot Demonstrate an Imminent Threat of Irreparable Injury from a Lease Sale.

Plaintiffs' request to enjoin BLM's planned lease sale should be denied because

Plaintiffs fail to demonstrate that they are likely to suffer irreparable injury before the

Court reviews the merits of this case. The *sine qua non* for obtaining injunctive relief is a

demonstration by the movant "that irreparable injury is 'likely' to occur" absent an

---

[36] *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (per curiam) (citing *Winter*, 555 U.S. at 20).

[37] *Id*. (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

[38] *All. for the Wild Rockies*, 632 F.3d at 1132.

[39] *Id*. at 1131 (emphasis omitted).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
10

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

injunction.[40] To warrant equitable relief, "plaintiffs must establish that irreparable harm is *likely*, not just possible."[41] A "[s]peculative injury does not constitute irreparable injury."[42] Likewise, "conclusory allegations are insufficient to establish irreparable harm."[43] This requirement holds with equal force where the alleged harms are environmental in nature,[44] and there is "no presumption of irreparable injury" in environmental cases.[45] The burden is on the movant to "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future."[46] *Id.* "[A]llegations of irreparable harm must be

---

[40] *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also All. for the Wild Rockies*, 632 F.3d at 1131.

[41] *All. for the Wild Rockies*, 632 F.3d at 1131.

[42] *Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).

[43] *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1099 (9th Cir. 2007).

[44] *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (alleged harm to woodpecker habitat from logging "at most, showed such a possibility, but no likelihood of irreparable harm").

[45] *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).

[46] *Wis. Gas Co.*, 758 F.2d at 674.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

11

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

supported with actual evidence, and not merely conclusory statements or unsupported allegations."[47]

The principal flaw with Plaintiffs' request to enjoin the lease sale is that the environmental injuries they identify with respect to leasing are either not imminent or entirely speculative, or both. "The sole purpose of a preliminary injunction is to 'preserve the status quo ante litem pending a determination of the action on the merits.'"[48] "At the preliminary-injunction stage, the relevant inquiry is 'whether the requested relief is necessary to avoid irreparable harm *during the interim period* that the relief is to be provided.'"[49] A plaintiff cannot meet that standard where their "alleged irreparable harms hinged on future [agency] decisions" that have not yet been made.[50] "The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a

---

[47] *Dep't of Fish & Game v. Fed. Subsistence Bd.*, No. 3:20-CV-00195-SLG, 2020 WL 6786899, at *17 (D. Alaska Nov. 18, 2020) (internal quotation marks and citation omitted) (quoting *Nevada v. United States*, 364 F. Supp. 3d 1146, 1151 (D. Nev. 2019)).

[48] *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009) (citation omitted).

[49] *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. 3:18-CV-00437-HZ, 2019 WL 2372591, at *7 (D. Or. June 5, 2019) (citation omitted); *see also Winter*, 555 U.S. at 22 (noting an "applicant must demonstrate that in the absence of a preliminary injunction, 'the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered'" (quoting 11A C. Wright et al., *Federal Practice and Procedure* § 2948.1, at 139 (2d ed. 1995))).

[50] *See Ctr. for Food Safety*, 636 F.3d at 1174.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

12

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

presently existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law."[51]

Accordingly, courts have not hesitated to deny a motion for preliminary injunction, without prejudice, when the identified harm appears to be limited to events that may occur at some future date. For example, the district court in *South Carolina Coastal Conservation League v. Ross* denied a motion for a preliminary injunction in a challenge to an incidental harassment authorization for offshore oil and gas exploration because the Bureau of Ocean Energy Management ("BOEM") had yet to issue necessary permits for that activity.[52] The court denied the motion because it "cannot determine whether the permits are imminent, which is a necessary precondition for the alleged irreparable harm here."[53] Similarly, in *Western Watersheds Project v. Bureau of Land Management*, the court denied a motion for a preliminary injunction against construction of a wind project where "the initial stages of development of the project pose no threat to

---

[51] *Holiday Inns of Am., Inc. v. B & B Corp.,* 409 F.2d 614, 618 (3d Cir. 1969).

[52] *S.C. Coastal Conservation League v. Ross*, No. 2:18-CV-03326-RMG, 2019 WL 5872072, at *1 (D.S.C. Aug. 26, 2019).

[53] *Id.*

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
13

the bats," and there is thus "no risk of irreparable harm to the bats before a decision on the merits of this case is determined." [54]

Similarly here, Plaintiffs demonstrate no imminent threat of irreparable injury from the issuance of leases or the holding of a lease sale. Assuming a lease is issued in the future, "a lease itself does not authorize any on the ground oil and gas activities."[55] Instead, lease holders (once leases are issued) have to seek additional BLM permits for any exploration and production activities, and BLM can only approve those permits after conducting additional NEPA analysis.[56] As the BLM's ROD succinctly states: "It is currently unknown whether any leases will ever be issued, it is unknown if any exploration will take place, and if so, it is unknown whether eventually any lessees will ever apply to the BLM for authorization of any production and support facilities."[57] Instead, "all aspects of a future oil and gas program are highly speculative and dependent on unpredictable circumstances that will play out over decades."[58] There is no *imminent*

---

[54] *W. Watersheds Project v. Bureau of Land Mgmt.*, No. 3:11-CV-00053-HDM-VPC, 2011 WL 1630789, at *5 (D. Nev. Apr. 28, 2011).

[55] Morgan Decl. Ex. A at 76 (AR90528); *id*. Ex. E at 24 (AR205974).

[56] *Id*. Ex. E at 24 (AR205974).

[57] *Id*. Ex. E at 17 (AR205967).

[58] *Id*.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
14

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

threat of irreparable harm from the proposed lease sales at this time and thus no basis for a preliminary injunction against issuing leases.

Plaintiffs try to manufacture injury by claiming that the issuance of a lease is an "irretrievable commitment of resources" by BLM.[59] Assuming that is true, Plaintiffs fail to explain why any "commitment" made by BLM causes *immediate* injury *to Plaintiffs*. Plaintiffs could suffer injury, if at all, from the issuance of a lease only *after* additional permits are sought and issued (with associated public notice, which would give Plaintiffs time to bring any concerns to this Court's attention), none of which are imminent. Equally important, Plaintiffs fail to explain why BLM's "commitment" cannot be undone by the Court following judicial review of the merits.[60] A commitment that can be undone on judicial review is not "irreparable" injury.[61]

---

[59] *See, e.g.*, Gwich'in Steering Committee Brief at 18.

[60] Plaintiffs' reliance on *Southeast Alaska Conservation Council v. U.S. Forest Service*, 413 F. Supp. 3d 973 (D. Alaska 2019), is misplaced. In that case, winning timber sale bidders could immediately begin road construction, causing irreparable injury. No such immediate development can occur under the Leasing Program, and no ground-disturbing activities can occur without additional permitting and public notice.

[61] *Doe No. 1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020) ("The harm of such a perceived institutional injury is not 'irreparable[.]'"); *Irreparable*, *Black's Law Dictionary* (11th ed. 2019) ("irreparable (i-**rep**-ə-rə-bəl) *adj.* (15c) Incapable of being rectified, restored, remedied, cured, regained, or repaired; that cannot be made right or good").

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

15

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Plaintiffs also try to manufacture injury with fears that once BLM issues a lease

sale, it will be difficult for the BLM to change course on remand (if Plaintiffs prevail on

the merits), citing cases raising concerns about a "bureaucratic steamroller" or

"bureaucratic momentum."[62] These arguments are not credible. President-elect Joe Biden

has promised to use "the full authority of the executive branch" to "permanently protect[]

the Arctic National Wildlife Refuge" and "ban[] new oil and gas permitting on public

lands and waters."[63] In his own words, he is "[t]otally opposed to it; completely, totally,

opposed to it," and he has stated that there will be "no more drilling on federal lands,

period. Period, period, period."[64] As one of Plaintiffs' attorneys recently told the *New

York Times*: "President-elect Biden has made it clear that 'protecting the Arctic refuge

from drilling is important to him," and "[w]e trust that means his administration will use

its executive authority to do just that."[65] Plaintiffs surely do not believe that the Biden

Administration will be caught in the "momentum" and forge ahead with permitting of

any exploration or development on leases during the pendency of litigation or on any

remand (assuming there are any such permit applications during that time).

---

[62] *See, e.g.,* Gwich'in Steering Committee Brief at 17 n.100.

[63] Morgan Decl. Ex. C at 11-12.

[64] *Id*. Ex. F at 1 (video at https://www.c-span.org/video/?c4856989/user-clip-joe-biden-arctic-refuge).

[65] *Id*. Ex. G at 1.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

16

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Indeed, even in the normal course, the Ninth Circuit has been unpersuaded that leasing decisions create a meaningful "steamroller" effect on subsequent agency decision-making. In *Northern Cheyenne Tribe v. Hodel*, the Ninth Circuit, in deciding whether to vacate or suspend leases on remand, explained "[b]ureaucratic rationalization and bureaucratic momentum are real dangers, to be anticipated and avoided by the Secretary," but "we assume the Secretary will comply with the law" on remand.[66] Likewise, the Ninth Circuit rejected similar leasing concerns in *Pit River Tribe v. U.S. Forest Service*, explaining "[w]hile bureaucratic inertia may be a risk, we presume that agencies will follow the law."[67] Here, these "inertia" concerns are not even plausible given the incoming administration's position on oil and gas development in ANWR.

In a creative attempt to avoid the force of controlling precedent, the Audubon plaintiffs cobble together some speculative theories about why they are supposedly irreparably injured by the mere issuance of a lease. For example, Audubon declarant Natalie Dawson speculates possible harm to recreation because "[e]ven a lease sale will impact these trips because a lease sale may require that some area on the Coastal Plain be off limits to visitors" and she fears that future leaseholders in ANWR may "threaten to

---

[66] *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988).

[67] *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1082 (9th Cir. 2010).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

17

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

sue us for trespassing."[68] This is pure speculation ("a lease sale may require") not likely irreparable injury, and this speculation is contradicted by the terms of the proposed leases, in which BLM "reserves the right to continue existing uses."[69] And while *future* exploration and development of the leases may curtail recreational access to specific areas (which are currently unknown), such harm is not credibly *imminent* at this time because there are "no impacts" to recreation at the leasing stage.[70]

Similarly, Audubon declarant Ana Liljedahl theorizes that "sale of new leases" could impact her ability to obtain grants for studies in the future because a lease would add "additional levels of bureaucracy, while also instilling a sense of insecurity among proposal reviewers as a new lease of the land may suddenly require the study to be halted."[71] Audubon cites no case for the proposition that added levels of "bureaucracy" is an irreparable injury (or even a cognizable injury under the APA), and this harm is both speculative ("may . . . require" not *likely* to require) and not credible given that BLM "reserves the right to continue existing uses."[72] Ms. Liljedahl does not even testify that she presently has a 2021 permit for research in the Coastal Plain that would be affected

---

[68] Case No. 3:20-cv-00205-SLG, Dkt. 43-13, ¶¶ 18, 20.

[69] Morgan Decl. Ex. B at 86 ("Lease Section 6").

[70] *Id*. Ex. A at 76 (AR90528).

[71] Case No. 3:20-cv-00205-SLG, Dkt. 43-17, ¶ 13.

[72] Morgan Decl. Ex. B at 86.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
18

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

(if a lease actually issues). Instead, she relies on her "plan to lead a new proposal" in 2021 and her concerns that the existence of a lease may impact her ability to obtain funding for that proposal. This is an attenuated chain, based on guessing the response of unidentified grant funders to a yet-to-be-made research proposal, in light of yet-to-be-issued leases, that may or may not overlap with the yet-to-be-made proposal. Ms. Liljedahl's statements are pure conjecture, not "actual evidence" of irreparable harm.[73] In any event, courts have rejected similar efforts to manufacture irreparable injury based on research interests.[74]

Next, Audubon declarant Michael Wald speculates that "[l]easing for industrial activity will have a negative effect" on his guide business "even if there is no immediate activity" because of "[p]erceptions about the wilderness."[75] This too is speculation and depends upon third parties perceiving a paper exercise (the issuance of a lease) as

---

[73] *Dep't of Fish & Game*, 2020 WL 6786899, at *17 (internal quotation marks and citation omitted).

[74] *Ctr. for Biological Diversity v. Hays*, No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739, at *10 (E.D. Cal. Oct. 8, 2015) (The "declaration fails to describe a substantial and immediate irreparable injury because [the declarant] fails to show that his research cannot be conducted in areas where logging will not be implemented."); *In Def. of Animals v. U.S. Dep't of Interior*, 737 F. Supp. 2d 1125, 1138 (E.D. Cal. 2010) (rejecting claim of irreparable injury based on plaintiffs' assertion "that their ability to study free-roaming animals in their natural habitat, and within their particular family bands, will be impacted").

[75] Case No. 3:20-cv-00205-SLG, Dkt. 43-20, ¶ 14.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
19

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

negatively impacting the environment, even though no impact to the environment will occur, and then making a consumer choice to cancel a planned trip to the area. Audubon provides no evidence that this speculative chain is likely or imminent, and it cannot do so. To the contrary, given Mr. Wald's recent nationwide exposure as providing tours in ANWR "Before the Drilling Begins," the potential for future development may actually increase interest in visiting ANWR in the near term, resulting in a boon for Mr. Wald.[76] Speculative injury to a business does "not constitute irreparable injury."[77]

Finally, Audubon declarant Kenneth Kreckel refers to a report that reviews "likely exploration activities that will occur after the initial lease sale," including seismic surveys and air surveys, and states this work is "likely to begin shortly after leases are purchased."[78] However, Mr. Kreckel does not explain what "shortly" means (other than that it could "entail several years"), does not dispute that future exploration activities would require permits (and public notice), and provides no evidence that any such activities are actually imminent. Moreover, Mr. Kreckel erroneously discusses a

---

[76] Morgan Decl. Ex. H at 4, 7 ("Exploring a Timeless Wilderness, Before the Drilling Begins."); *id*. Ex. I at 1 ("Last Chance Alaska: See ANWR While You Can").

[77] *Goldie's Bookstore*, 739 F.2d at 472 (loss of goodwill and "untold" customers speculative when not supported by facts).

[78] Case No. 3:20-cv-00205-SLG, Dkt. 43-10 at 10.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

20

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

"proposed" airborne survey by CGG,[79] failing to disclose that CGG subsequently

confirmed that there was "never an actual proposal" and that "[d]efinitely the company is

***not*** considering that kind of work" in ANWR.[80] In any event, if there is ever such a

proposal in the future, Plaintiffs have publicly taken the position that the aerial surveys

*require* an incidental harassment authorization from U.S. Fish and Wildlife Service

("FWS"), so there is no risk that such a yet-to-be-proposed survey is imminent or that it

will occur without future public notice.[81]

Under these circumstances, there is no immediate need for the Court to intervene

with extraordinary injunctive relief to prevent BLM from proceeding with a

congressionally mandated lease sale. Plaintiffs have not shown how proceeding with the

lease sale "would hinder, in any way, the court's ability to prevent irreparable injury at

the point it becomes imminent."[82] Even if BLM issues leases before the change in

presidential leadership on January 20, 2021, lessees would still have to apply for permits

to conduct any activity on those leases (which they have not yet done) and the new

administration would still have to approve those permits (which it said it would not do).

---

[79] *Id*. at 8.

[80] Morgan Decl. Ex. J at 1.

[81] *Id*. Ex. K at 3.

[82] *W. Watersheds Project*, 2011 WL 1630789, at *6.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

21

"Future injury or conjectural hypothetical injury months from now cannot form the basis of an injunction at this stage."[83] The Court has ample time to review the merits of the case without the need for injunctive relief, and Plaintiffs have made no showing that the issuance of leases would inalterably limit the ability of the Court to provide effective relief in this case. All three motions should therefore be denied, without prejudice.

## C. Plaintiffs Are Not Entitled to Preliminary Injunctive Relief Based on Kaktovic's Proposed Survey.

Without any immediate irreparable injury from the issuance of a lease, Plaintiffs latch on to the separate proposal by Kaktovic to conduct a non-lease-related seismic survey on the Coastal Plain this winter and seek an injunction against that yet-to-be-approved seismic permit. Plaintiffs ask the Court to enjoin BLM's future decision on Kaktovic's seismic application through these lawsuits—which contain no allegations related to that future decision—based on the false premise that the off-lease seismic permit is part of the Leasing Program. It is not. The Leasing Program "determin[es] *where and under what conditions* leasing will occur."[84] It does not authorize any seismic activity and certainly not any off-lease seismic activity like that proposed by Kaktovic.

---

[83] *Id.*

[84] Morgan Decl. Ex. E at 8 (AR205958).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

22

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

Instead, Kaktovic's project will be authorized (if at all) pursuant to BLM's regulations applicable to onshore geophysical exploration in Alaska.[85] The Tax Act paved the way for such exploration when it repealed the existing prohibition on the production of oil and gas, leasing, and "other development leading to the production of oil and gas."[86] Although the Tax Act further instructed BLM to proceed to develop the Leasing Program (which it has now done), the repeal of the prohibition in ANILCA also opened the 1002 Area to geophysical exploration under the BLM's then-existing regulations applicable to onshore locations in Alaska.

Consistent with that statutory change, and *prior to* the creation of the Leasing Program, SAExploration filed an application pursuant to BLM regulations to conduct off-lease geophysical exploration in the 1002 Area in 2018.[87] BLM did not approve that application, and Kaktovic has now filed a new application for a geophysical permit for a narrower survey than the one originally proposed by SAExploration.[88] Kaktovic has also

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

---

[85] *See* 43 C.F.R. pt. 3150, subpt. 3152.

[86] 16 U.S.C. § 3143; Pub. L. No. 115-97, § 20001(b)(1).

[87] Morgan Decl. Ex. O at 1.

[88] *Id*. Ex. L at 1.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

23

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

not yet received approval from BLM, nor has it received approval from the FWS for the incidental harassment authorization necessary to carry out that survey.[89]

Plaintiffs have no cause of action against BLM's future approval of a seismic permit until it issues a final agency action approving Kaktovic's application. The APA provides the Court jurisdiction over final agency actions.[90] BLM has not made a final decision on the Kaktovic permit, completed its review under NEPA, completed its analysis under ANILCA, responded to or addressed comments submitted by the public (and Plaintiffs) on those analyses, or issued a record of decision (or any decision at all). "Until such time as the agency decides whether and how to exercise its regulatory authority, however, the courts have no cause to intervene."[91] As the Ninth Circuit explained in *Center for Food Safety v. Vilsack*, "injunctive relief 'is not now needed to guard against any present or imminent risk of likely irreparable harm,'" when the "alleged irreparable harms hinge[] on future [agency] decisions, and nothing prevent[s] Plaintiffs from filing a new legal challenge if and when those decisions [a]re made."[92]

---

[89] *Id*. Ex. D; *see also* 85 Fed. Reg. 79,082 (Dec. 8, 2020) (notice of receipt of application and proposed incidental harassment authorization).

[90] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (under the general review provisions of the APA, "the 'agency action' in question must be 'final agency action.'").

[91] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 164 (2010).

[92] *Ctr. for Food Safety*, 636 F.3d at 1174 (citation omitted).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
24

Here, if Plaintiffs believe that BLM's future approval of a geophysical permit will cause them irreparable injury, Plaintiffs are free to "file a new legal challenge" to that decision, which the Court can then evaluate based on the administrative record for that action. But there is no basis to engage in "premature review of [BLM's] regulatory actions" through preliminary injunction proceedings.[93]

Plaintiffs argue that the seismic survey is related to the Leasing Program because the *draft* environmental assessment ("EA") for the seismic survey tiers to and incorporates the Leasing EIS and adopts some of the exploration-related stipulations from the Leasing Program. But that is unsurprising as BLM commonly tiers to and incorporates EISs that evaluate *different* or broader agency actions when the analysis or conditions are useful and informative.[94] It does not follow that a party in a lawsuit challenging a particular EIS (here the Leasing EIS) is entitled to a prophylactic injunction against every other federal action that *proposes* in a *draft* document to incorporate or rely on portions of the EIS. If BLM ultimately does decide to rely on the Leasing EIS or ROD stipulations when it issues its final decision after consideration of Plaintiffs' comments and public comments, and if Plaintiffs have reason to believe that such reliance was

---

[93] *Id.*

[94] *See Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 432 F. Supp. 3d 1003, 1014 (D. Alaska 2020).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

25

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

arbitrary and capricious, they can file "a new legal challenge if and when those decisions [a]re made."[95] Until then, their request for a preliminary injunction is premature.

Regardless, Plaintiffs cannot use their feared harms stemming from the *proposed seismic permit* as a basis for securing a preliminary injunction against BLM's *proposed lease sale.* Injunctive relief "must be tailored to remedy the specific harm alleged," and "[a]n overboard injunction is an abuse of discretion."[96] Plaintiffs have shown no irreparable harm from the issuance of leases, and enjoining the lease sales would thus not "remedy" harms allegedly related to the proposed Kaktovic seismic project. Any injunction based on the alleged harms from the future Kaktovic seismic project must be limited to that project, not lease sales that plainly have no imminent or foreseeable environmental injury.

## D.     Plaintiffs Are Unlikely to Prevail on the Merits of Their Claims.

To succeed on the merits of their claims, Plaintiffs must show that BLM "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter

---

[95] *Ctr. for Food Safety*, 636 F.3d at 1174.

[96] *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991); *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) ("[A]n injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law.'" (citation omitted)).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

26

to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[97] Plaintiffs are unlikely to prevail in demonstrating such errors because their arguments amount to nothing more than disagreements with Congress's decision to require the Leasing Program and BLM's reasonable conclusions that are supported by the agency's record.

### 1. Plaintiffs' Refuge Act Claims Are Legally and Factually Flawed.

Plaintiffs make various claims that the Leasing Program is inconsistent with purposes set forth in the Refuge Act[98] and ANILCA,[99] and argue that BLM failed to make findings that the Leasing Program is "compatible" with the purposes of ANWR. Plaintiffs are unlikely to prevail on this argument for two basic reasons.

*First*, Congress *mandated*, in the Tax Act, that BLM "shall" create the Leasing Program and amended the purpose of ANWR "to provide for an oil and gas program on the Coastal Plain."[100] BLM carried out that instruction. There is nothing in the Tax Act to suggest that Congress gave BLM the discretion to ignore the congressional mandate by

---

[97] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[98] 16 U.S.C. § 668dd.

[99] *Id.* §§ 3101, 3111, 3112.

[100] Pub. L. No. 115-97, § 20001(b)(2)(A), (b)(2)(B).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

rebalancing the other purposes of the ANWR.[101] As BLM reasonably explains in the

Record of Decision: "By adding an oil and gas program on the 1.56 million-acre Coastal

Plain as a purpose of the ANWR, Congress itself balanced the purposes of the 19.3

million-acre refuge, a balance which is now law."[102]

Plaintiffs may not agree with the balance struck by Congress in the Tax Act, but

BLM cannot contradict a "mandatory directive[] from Congress."[103] Congress balanced

competing interests and decided to require an oil and gas program on the Coastal Plain.[104]

Congress has thus already determined that an oil and gas leasing program is not only

---

[101] Congress knows how to provide such discretion and commonly does so. *See, e.g.*, *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 382 (4th Cir. 2014) (observing that when it created the Cape Hatteras National Seashore, Congress specified that "'no development of the project [Seashore] or plan for the convenience of visitors shall be undertaken which would be incompatible with the preservation of the unique flora and fauna' in the area" (brackets in original) (quoting Act of Aug. 17, 1937, Pub. L. No. 311, § 4, 50 Stat. 669, 670)).

[102] Morgan Decl. Ex. E at 13 (AR205963).

[103] *Am. Forest Res. Council v. Hammond*, 422 F. Supp. 3d 184, 190 (D.D.C. 2019) (concluding that the BLM violated two mandatory directives from Congress by excluding portions of timberland from sustained yield timber harvest when the relevant statute provided that the land "'*shall* be managed . . . for permanent forest production, and the timber thereon *shall* be sold, cut, and removed in conformity with the princip[le] of sustained yield'" (alterations in original) (quoting 43 U.S.C. § 2601)).

[104] Morgan Decl. Ex. E at 13 (AR205963) ("Although the ANWR has multiple purposes, Congress has mandated more specific management within particular areas. Just as Congress has mandated that 8 million acres of ANWR be managed as wilderness, it has mandated that the 1.56 million-acre Coastal Plain be managed for an oil and gas program.").

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

28

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

"compatible" with the purpose of ANWR, but is absolutely *required*. BLM did not

violate the Refuge Act or ANILCA by following this instruction, and Plaintiffs are

therefore unlikely to prevail on this claim.

*Second*, to the extent BLM was required to expressly explain that the Leasing

Program mandated by Congress in ANWR was "compatible" with other ANWR

purposes, BLM did so. In the Record of Decision, BLM explains how it "takes into

account the other purposes of the ANWR" and developed lease stipulations and

conditions to protect those other purposes.[105] The Leasing EIS expressly acknowledges

these purposes and "describe [i]mpacts" of the Leasing Program "on Arctic Refuge

[p]urposes."[106] Plaintiffs' allegations that BLM failed to explain how the Leasing

---

[105] *Id*. Morgan Decl. Ex. E at 14 (AR205964). As this Court recently held, "in the event of a conflict between provisions in the [National Wildlife Refuge System] Improvement Act and ANILCA, 'the provision in [ANILCA] shall prevail.'" *Alaska v. Bernhardt*, Nos. 3:17-cv-00013-SLG & 3:17-cv-00014-SLG, 2020 WL 6702025, at *2 (D. Alaska Nov. 13, 2020) (second brackets in original) (quoting Pub. L. No. 105-57, § 9(b), 111 Stat. 1252 (1997) (statutory construction note regarding 16 U.S.C. § 668dd with respect to Alaska)). Accordingly, any claim that ANILCA's purposes are at odds with other Refuge purposes must fail.

[106] Morgan Decl. Ex. A at 77-87 (AR90534-544). The Audubon plaintiffs also assert that BLM violated NEPA by failing to explain how the Leasing Program would fulfill the purposes under other environmental laws. This argument founders for the same reason their Refuge Act claim fails. Despite "tremendous uncertainty regarding future potential exploration and development on the Coastal Plain," the Final EIS presented four alternatives that the agency analyzed in detail. *Id*. Ex. E at 19-22 (AR205969-972). BLM explained that "[a]t some future stage in the administration of the oil and gas program where impacts from proposed actions are actually reasonably foreseen, i.e., if and when the BLM is presented with proposals for exploration or development," its decisions

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

29

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Program was compatible with ANWR's purposes are thus demonstrably false. For this reason too, Plaintiffs are unlikely to prevail on the merits of this claim.[107]

## 2. Plaintiffs Are Unlikely to Prevail on Their NEPA Claims.

### a. The Leasing EIS fully discloses and explains GHG effects.

The Audubon plaintiffs argue that BLM unlawfully failed to consider the potential indirect effect of the Leasing Program on the foreign consumption of oil and gas. They rely solely upon the recent Ninth Circuit decision of *Center for Biological Diversity v. Bernhardt*, No. 18-73400, 2020 WL 7135484 (9th Cir. Dec. 7, 2020) ("*CBD*"), to support this claim. But there are at least three fatal problems with Plaintiffs' argument.

*First*, the lynchpin to the court's holding in *CBD* was BOEM's counterintuitive finding that *not* building the proposed offshore oil and gas project (the "Liberty project") would result in "25,370,000 *more* metric tons" of carbon dioxide emissions than if the

"would be subject to project-specific and site-specific analysis, including compliance with NEPA, the Marine Mammal Protection Act (MMPA), the Endangered Species Act (ESA), ANILCA, and other laws." *Id*. Ex.E at 8, 20-21 (AR_205958, 205970-71). Plaintiffs cannot reasonably argue that the agency failed to take a "hard look" at the Leasing Program's compliance with other environmental laws.

[107] *See John Doe No. 1 v. Reed*, 561 U.S. 186, 217 n.3 (2010) (Stevens, J., concurring in part and concurring in the judgment) ("There is no reason to think that our ordinary presumption that the political branches are better suited than courts to weigh a policy's benefits and burdens is inapplicable in this case.").

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
30

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

project was constructed.[108] CBD complained that this finding was caused by the

agency's failure to consider the indirect effect of increased foreign oil consumption

resulting from construction of the project.[109] The court agreed, holding:

> Even if the nature of BOEM's assumptions did not
> sufficiently demonstrate the need for further explanation, the
> result upon which the agency relied surely did. BOEM's
> conclusion that *not* drilling will result in more carbon
> emissions than drilling is counterintuitive. An agency acts
> arbitrarily and capriciously when it reaches a decision that is
> "so implausible that it could not be ascribed to a difference in
> view or the product of agency expertise." Without further
> explanation, we cannot ascribe the implausibility of the result
> to BOEM's expertise or rational decision-making.[110]

The Leasing EIS does not contain the same finding. Rather, BLM rationally concluded

that *not* developing the Coastal Plain would result in *less* downstream carbon

emissions.[111]

*Second*, also unlike BOEM in *CBD*, BLM comprehensively evaluated GHG

emissions and explained why it was unable to account for foreign consumption of oil in

---

[108] *CBD*, 2020 WL 7135484, at *6 (emphasis added).

[109] *Id*.

[110] *Id*. at *9 (citation omitted).

[111] *See* Morgan Decl. Ex. A at 58 (AR90246) (Table 3-4 showing the projected increase in downstream emissions of Coastal Plain development compared to no Coastal Plain development); *id*. at 137 (AR91615) ["[i]f the program is not approved, the net result of these fuel substitutions and changes in consumption would be an estimated net *decrease* in overall energy consumption" (emphasis added)]).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
31

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

its indirect effects analysis. In the Leasing EIS, BLM produced a 10-page section analyzing the direct and indirect effects associated with GHG emissions, which, in turn, is supported by an appendix specifically addressing "Market Substitutions and Greenhouse Gas Downstream Emissions."[112] BLM also provided a detailed explanation in response to comments about the foreign consumption issue.[113] And BLM provided *another* explanation on this specific issue in the ROD, which rationally concluded: "The slight reduction in global oil prices that could result from the Proposed Action and action alternatives—which the Final EIS acknowledged and the decision-maker is aware of—cannot reasonably be expected to increase foreign energy consumption and associated GHG emissions to an extent that fundamentally alters the results of the Final EIS's analysis."[114] In contrast, the Liberty EIS contains a two-page section addressing effects associated with GHG emissions, no appendix with a supporting analysis of downstream emissions, and a short response to public comments on the foreign consumption issue.[115]

---

[112] *See id.* Ex. A at 51-61, 130-145 (AR90239-49; AR91608-23).

[113] *See id.* Ex. A at 146-47 (AR92220-21).

[114] *Id.* Ex. E at 42-44 (AR205992-994); *see Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 198 (D.C. Cir. 2017) ("The Department offered a reasoned explanation as to why it believed the indirect effects pertaining to increased gas production were not reasonably foreseeable.").

[115] *See* Morgan Decl. Ex. M at 13-14, 22.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
32

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Third*, *CBD* involved BOEM's evaluation of a specific development project whereas the Leasing EIS evaluates a leasing program. BLM's action here does not include development, and it is uncertain when, if ever, development will occur in the Coastal Plain. The D.C. district court recently held that quantification of downstream emissions *is not even required* at the oil and gas leasing stage.[116] In so holding, the court rejected the plaintiffs' contention that "BLM should have quantified and forecasted downstream emissions in the same manner that it should have quantified and forecasted emissions from drilling itself."[117] The court instructed BLM on remand to "consider whether quantifying GHG emissions . . . is reasonably possible" and to provide an explanation if "quantification is not possible or helpful."[118] Here, in contrast, BLM went a step further, quantified the estimated downstream GHG emissions, and presented those

---

[116] *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 75 (D.D.C. 2019) (the court "will not *require* that BLM quantify downstream emissions" (citing *Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017) ("quantification of [GHG emissions] is [not] required *every* time those emissions are an indirect effect of an agency action," so long as the agency provides "a satisfactory explanation for why" quantification is not useful))).

[117] *Id*. at 74.

[118] *Id*. at 75.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
33

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

estimates in context—*i.e.*, as a percentage of overall emissions on the local, state, national, and global scales.[119] Multiple courts have held this approach to be sufficient.[120]

Accordingly, Plaintiffs are unlikely to succeed on this claim. The Leasing EIS makes a different finding regarding the no-action alternative, and the Leasing EIS and supporting documents also provide the supporting analyses that the court found to be missing in *CBD*.

### b. BLM was not required to evaluate alternatives for seismic exploration.

The Gwich'in Steering Committee plaintiffs argue that because "[a]ll the action alternatives *allowed* seismic across the entire Coastal Plain[,] BLM failed to consider an alternative that would close any areas to seismic."[121] This argument is based on a false premise and misunderstands the Leasing EIS.

The Leasing EIS does not "allow" seismic exploration and neither does the Leasing Program. Rather, the express purpose of the Leasing EIS is to "implement *the*

---

[119] *See* Morgan Decl. Ex. A at 58-59 (AR90246-47).

[120] *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 310 (D.C. Cir. 2013) (holding BLM's coal leasing evaluation of "GHG emissions as a percentage of state— and nation-wide emissions" to be sufficient); *WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp. 3d 17, 35 (D.D.C. 2014) (same); *WildEarth Guardians v. Bernhardt*, No. 1:19-cv-00505-RB-SCY, 2020 WL 6799068, at *9-10 (D.N.M. Nov. 19, 2020) (same for oil and gas leases).

[121] Gwich'in Steering Committee Brief at 10 (emphasis added).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

34

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

*leasing program* consistent with PL 115-97,"[122] and the Leasing Program "determin[es] *where and under what terms and conditions* leasing will occur."[123] The Leasing EIS therefore "considers and analyzes the environmental impact of various *leasing* alternatives, including the areas to offer for sale, and the indirect impacts that could result, in consideration of the hypothetical development scenario."[124] As BLM explained in section 1.3 of the Leasing EIS describing the ("Decisions To Be Made"):

> The BLM's decisions will include which tracts of land will be offered for lease and the terms and conditions to be applied to such leases and subsequent authorizations for oil and gas activities. The decisions evaluated in this Leasing EIS and its ROD would not authorize any on-the-ground activity associated with the exploration or development of oil and gas resources in the Coastal Plain.[125]

By the express terms of the Leasing EIS, BLM evaluated *leasing decisions* in the EIS, not decisions involving whether, how, or when to authorize seismic surveying.

Accordingly, the alternatives considered in the Leasing EIS included different scenarios for the amount and location of *leasing* as well as different stipulations,

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

---

[122] Morgan Decl. Ex. A at 5 (AR90188) (emphasis added).

[123] *Id*. Ex. E at 8 (AR205958).

[124] *Id*. Ex. A at 5 (AR90188) (emphasis added).

[125] *Id*.; *see id*. Ex. A at 8 (AR90195) (Leasing EIS "respond[s] to the purpose and need for action, including the legislative requirement to establish and administer a competitive oil and gas program in the Coastal Plain in the Arctic Refuge.").

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
35

required operating procedures, and notices that would be included *in the leases*.[126] The

Leasing EIS necessarily evaluates the potential impacts of future hypothetical "seismic

and drilling exploration, development, and transportation of oil and gas in and from the

Coastal Plain" because these are the "potential *indirect impacts* of leasing."[127] Thus,

when the Leasing EIS states that "[s]eismic exploration *could occur* across the entire

program area," it is not "allowing" or authorizing seismic exploration to occur; it is

simply describing a conservatively assumed indirect effect included within the

hypothetical development scenario.[128] Whether, when, and how such seismic exploration

actually occurs depends on future agency actions that will be separately evaluated under

NEPA and other relevant laws, and separately authorized (or denied).[129]

    In sum, by arguing for *seismic exploration* alternatives, the Gwich'in Steering

Committee plaintiffs confuse the *indirect impacts* of the action with the action itself.

---

[126] *Id*. Ex. A 8-50 (AR90195-96; AR90197-237); 40 C.F.R. § 1500.2 (2019) (agencies must "assess the reasonable alternatives to proposed actions"); *id*. § 1502.14 (2019) (an EIS presents "the environmental impacts of the proposed action and the alternatives in comparative form").

[127] Morgan Decl. Ex. A at 3 (AR90183 (emphasis added)); 40 C.F.R. § 1508.8(b) (2019) (BLM must evaluate indirect impacts of proposed action). BLM constructed a "hypothetical development scenario" to evaluate these indirect impacts of the leasing decisions evaluated in the Leasing EIS. *See* Morgan Decl. Ex. A at 51, 92-127 (AR90239; AR91196-231).

[128] Morgan Decl. Ex. A at 49 (AR90326) (cited by Plaintiffs).

[129] *Id*. Ex. A at 5 (AR90188).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

BLM is not required to propose alternatives to indirect impacts. *Compare* 40 C.F.R. §

1502.14 (2019) *with id*. § 1508.8(b) (2019). This claim is therefore unlikely to succeed

on the merits.

        **c.**     **BLM conservatively and rationally evaluated the potential impacts of development under the Tax Act's 2,000-acre provision.**

BLM evaluated the environmental impacts of the Leasing Program based on a

hypothetical development scenario, as previously approved by the Ninth Circuit in

*Northern Alaska Environmental Center v. Kempthorne*.[130] In crafting the development

hypothetical, the Leasing EIS made some "interpretive assumptions" about how it would

classify future development proposals with respect to the Tax Act's 2,000-acre

"production and support facility" requirement.[131] BLM then assumed a maximum

development scenario where 2,000 acres would be covered by production and support

facilities, including production facilities, roads, pads, airstrips, gravel pits, and gravel

stockpiles.[132] This "likely overstated" environmental impacts and safely minimized the

chance that the EIS underestimated impacts of future development.[133] BLM thus fully

---

     [130] *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 976 (9th Cir. 2006); Morgan Decl. Ex. E at 8 (AR205958) (all future development scenarios are "highly speculative").

     [131] Morgan Decl. Ex. E at 17 (AR205967); *id*. Ex. A (AR90192-93).

     [132] *Id*. Ex. A at 3 (AR90183); *id*. Ex. E at 8 (AR205958).

     [133] *Id*. Ex. E at 8 (AR205958).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

37

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

complied with its obligation to take a hard look under NEPA by evaluating this hypothetical development scenario.[134]

The Gwich'in Steering Committee plaintiffs do not really question this hypothetical analysis, but complain that the ROD "expressly rejected" the interpretive assumptions in the EIS and issued a "new interpretation" that "opens the door to far more than 2,000 acres of development," and that BLM never took a hard look at the effects of this interpretation. This argument is unavailing for two reasons.

*First*, the ROD does not "reject" the interpretive assumptions in the Leasing EIS or "open[] the door" to additional development. Rather, in the ROD, BLM explains that it "does not need to adopt" the interpretive assumptions as the agency's final word on statutory interpretation, and that those "illustrative" assumptions were made "merely . . . to provide an understanding of the hypothetical impacts."[135] The Leasing Program does not authorize any actual development, and there is no development proposal before BLM, so BLM determined that it was premature to give a final position on what constitutes "production and support facilities" until presented with a concrete proposal.[136] This was entirely reasonable.

_____

[134] *Kempthorne*, 457 F.3d at 976.

[135] Morgan Decl. Ex. E at 17-18 (AR205967-68).

[136] *Id*.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
38

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Second*, and more fundamentally, the Gwich'in Steering Committee plaintiffs are unlikely to prevail because, regardless of BLM's interpretation, they have not shown that the hypothetical development scenario in the Leasing EIS is arbitrary or otherwise unreasonable. The Leasing Program does not authorize any development activities. Development is an "indirect effect" and agencies "must consider only those indirect effects that are 'reasonably foreseeable,'" and "need not consider potential effects that are highly speculative or indefinite."[137] The EIS already "likely overstated" the actual development that will take place, and it is far from "reasonably foreseeable" that future administrations will authorize development in ANWR that exceeds the level discussed in the EIS. BLM thus took the requisite hard look required by NEPA, and the Gwich'in Steering Committee plaintiffs are unlikely to succeed on this claim.

### d. BLM took the requisite "hard look" at cultural resource impacts.

The Venetie plaintiffs argue that BLM failed to sufficiently evaluate cultural resource impacts because it failed to conduct detailed surveys of the entire Coastal Plain.[138] This argument misconstrues BLM's phased approach to cultural resources review under the Leasing Program.

---

[137] *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1163 (9th Cir. 1998) (internal quotations and citation omitted).

[138] Venetie Brief at 19-22.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
39

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

The Leasing EIS contains a detailed assessment of potential impacts to cultural resources.[139] Contrary to the Venetie plaintiffs' characterizations, BLM did not primarily rely on a single "outdated" survey. Rather, BLM considered "10 literature reviews, 12 reconnaissance surveys, and one intensive survey" and identified "89 [Alaska Historic Registry Service] sites recorded in the program area, including sites of prehistoric and post-contact origin."[140] In the Leasing EIS, BLM evaluated all of the best available information, and none of the Plaintiffs argue otherwise or take issue with BLM's analysis of that information.

For future exploration and development activities, BLM explains that "[n]o potential adverse effects on documented specific cultural resource sites would be expected in areas where adequate investigation, such as surveys, consultation, and interviews, has occurred prior to development and where appropriate avoidance, minimization, or mitigation measures are implemented."[141] BLM further explains that the "Section 106 process for addressing effects on historic properties . . . will include the development of a programmatic agreement to address the process for identifying historic properties and resolving potential adverse effects through avoidance, minimization, or

_____

[139] Morgan Decl. Ex. A at 63-75 (AR90447-59).

[140] *Id*. Ex. A at 65 (AR90449).

[141] *Id*. Ex. A at 71 (AR90455).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

mitigation."[142] And indeed, the final programmatic agreement requires a detailed process for surveying, identifying, investigating, and protecting sites of archaeological, ethnographic, historic, or socio-cultural significance.[143] Any and all lease holders will have to comply with these requirements.[144]

The Ninth Circuit has approved this same approach to cultural resources review for phased projects.[145] BLM's approach—*i.e.*, analyzing all available information at the program stage and requiring detailed site surveys and assessments for future exploration

[142] *Id.*

[143] *See* Morgan Decl. Ex. N at 1-21 (AR28654-74).

[144] *See id.* Ex. N at 1 (AR28656) ("BLM shall ensure that this [programmatic agreement] is attached and incorporated into any lease BLM issues for the Program and will ensure that all lessees are aware that they must comply with the terms of this [programmatic agreement] during activities on their leases."); Morgan Decl. Ex. A at 148 (AR92350) (response to public comments explaining that "[t]he process for conducting cultural resource surveys associated with the Coastal Plain program area is being developed as part of the Section 106 programmatic agreement [and] [t]he EIS presents the best available summary of known sites and resources").

[145] *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 601 (9th Cir. 2010) (upholding NEPA analysis of cultural resources when agency "provide[d] for phased assessment of areas not yet surveyed for cultural resources"). *Indigenous Environmental Network v. U.S. Department of State*, 347 F. Supp. 3d 561, 580 (D. Mont. 2018), cited by Plaintiffs, is inapt. That case addressed a faulty analysis of an actual *development* project. And, even then, the court merely held that BLM must supplement the existing EIS with information about the status of pending surveys for that development. *Id.* at 580-81.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
41

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

and development—is rational and lawful. The Venetie plaintiffs are therefore unlikely to succeed on this claim.

### 3. BLM Complied with Section 810 of ANILCA.

The Venetie plaintiffs assert that BLM unlawfully excluded Gwich'in Tribes from the ANILCA § 810 process. This argument is meritless for two reasons. First, BLM expressly considered Gwich'in communities, including Venetie, in tier I of the ANILCA evaluation. Second, nothing in the statute required the agency to hold Section 810 hearings or make formal findings with respect to any Gwich'in village at tier II because the agency determined that the Leasing Program would not significantly restrict subsistence uses with respect to any Gwich'in community.

An ANILCA § 810 analysis proceeds in two tiers. In tier I, "[i]n determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions," the agency head with primary jurisdiction over such lands "shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."[146] In tier II, the statute specifies that no "withdrawal, reservation, lease,

---

[146] 16 U.S.C. § 3120(a).

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
42

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

permit, or other use, occupancy or disposition of [public] lands *which would significantly restrict subsistence uses* shall be effected" unless the agency head:

> (1) gives notice to the appropriate State agency and the appropriate local committees and regional councils established pursuant to section 3115 of this title;
>
> (2) gives notice of, and holds, a hearing in the vicinity of the area involved; and
>
> (3) determines that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.[147]

Thus, by its very terms, Section 810's tier II notice and hearing requirement applies only where an agency has made a positive determination that subsistence uses would be significantly restricted.[148]

---

[147] *Id.* (emphasis added).

[148] *See Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 725 (9th Cir. 1995) ("Where the use would 'significantly restrict subsistence uses,' the agency must also follow notice and hearing procedures and determine whether 'such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of public lands.'" (quoting 16 U.S.C. § 3120(a)(1)-(3))); *Hanlon v. Barton*, 740 F. Supp. 1446, 1448 (D. Alaska 1988) ("If the agency concludes its tier-I evaluation with a finding of no significant restriction (FONSR), however, the tier-II obligations do not apply.").

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Here, BLM unequivocally considered Gwich'in communities in tier I. The EIS "summarize[d] the relevant subsistence activities of communities that use the program area or the resources that migrate through the program area and are harvested elsewhere."[149] The evaluation focused on subsistence impacts to the four communities—Kaktovik, Nuiqsut, Arctic Village, and Venetie—that "are the closest to the program area and have subsistence uses in or near the program area or rely heavily on resources that use the program area."[150] But, contrary to the Venetie plaintiffs' assertions, the agency did not stop there. Because of "the importance of the program area to caribou – particularly the [Porcupine Caribou Herd] and [Central Arctic Herd] – *relevant data on subsistence uses of caribou by 22 Alaskan communities*, including the four subsistence study communities listed above[,] *is also included in the EIS*."[151] These communities include the Gwich'in communities of Fort Yukon, Beaver, Chalkyitsik, Birch Creek, and

---

[149] Morgan Decl. Ex. A at 128 (AR91281).

[150] *Id*. Ex. A at 128-29 (AR91281-82). BLM therefore did not impose a more stringent "exclusionary threshold" at the outset of its ANILCA § 810 analysis as Plaintiffs contend. *Cf.* Venetie Brief at 12. The agency instead considered communities that have subsistence uses, as ANILCA requires.

[151] Morgan Decl. Ex. A at 129 (AR91282) (emphasis added); *see id.* ("These 22 communities, referred to in the EIS as the caribou study communities, could be affected by impacts on caribou abundance and availability, and were therefore included in Chapter 3.").

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

44

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Circle.[152] The Venetie plaintiffs' contention that Gwich'in communities were entirely

excluded from the ANILCA § 810 analysis is therefore false.

In tier II, BLM concluded that the alternative adopted (Alternative B) "will not

result in a significant restriction to subsistence uses" with respect to any Gwich'in

community, including Venetie.[153] Accordingly, the agency was not required to hold a

hearing under 16 U.S.C. § 3120(a)(2) or make the findings required by § 3120(a)(3).[154]

Because BLM did not act arbitrarily or capriciously by not conducting hearings it was not

required to conduct or by declining to make formal findings it was not required to make,

the Venetie plaintiffs cannot show they are likely to succeed on the merits of their

ANILCA § 810 claim.

**E.      The Balance of Hardships and Public Interest Weigh Against Injunctive
         Relief.**

The balance of hardships and public interest do not support an injunction for the

simple reason, as set forth above, that Plaintiffs face no present "hardship" at all from the

---

[152] *See id*. Ex. A at 88 (AR90736).

[153] *Id*. Ex. E at 30 (AR205980); *see also id*. Ex. A at 91 (AR 90858). The Venetie plaintiffs assert that the agency applied the wrong standard when it made this determination, but the agency plainly applied the language of ANILCA § 810. *See id*. Ex. A at 91 (AR90858) ("Alternative B will not result in a significant restriction to subsistence uses.").

[154] *See id*. Ex. E at 30 (AR205980) (because the adopted alternative would not significantly restrict subsistence uses, "[a] positive determination pursuant to ANILCA Section 810 is not required").

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
45

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Leasing Program. The Tax Act expressly requires BLM to develop the Leasing Program in the Coastal Plain and hold its first sale no later than December 2021 in an effort to help meet our nation's future energy needs. The Leasing Program carries out that congressional mandate. There is no imminent environmental injury from the Leasing Program and thus nothing that could tip the equitable scales in favor of delaying this congressional mandate.[155]

## IV.  CONCLUSION

For the reasons set forth above, all of the Plaintiffs' motions should be denied because they have not satisfied *any* of the four required elements for the extraordinary preliminary injunctive relief they seek.[156]

DATED: December 23, 2020.

<div style="margin-left: 40%;">

STOEL RIVES LLP

By:  /s/ Jason T. Morgan
    Ryan P. Steen (Bar No. 0912084)
    Jason T. Morgan (Bar No. 1602010)
    Whitney A. Brown (Bar No. 1906363)

    Attorneys for Alaska Oil and Gas
    Association and American Petroleum
    Institute

</div>

---

[155] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (balance of equities does not favor injunction where environmental injury "was not at all probable").

[156] Intervenor-Defendants' counsel certifies that this brief is 10,868 words, which is under the 11,000 limit that has been granted by the Court.

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Case 3:20-cv-00205-SLG   Document 59   Filed 12/23/20   Page 56 of 58

# CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2020, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:20-cv-00204-SLG; Case No. 3:20-cv-00205-SLG; and Case No. 3:20-cv-00223-SLG who are registered CM/ECF users will be served by the CM/ECF system.

### Case No. 3:20-cv-00204-SLG

| | |
|---|---|
| Brook Brisson | bbrisson@trustees.org |
| Suzanne Bostrom | sbostrom@trustees.org |
| Bridget Psarianos | bpsarianos@trustees.org |
| Brian Litmans | blitmans@trustees.org |
| Karimah Schoenhut | karimah.schoenhut@sierraclub.org |
| Mark Arthur Brown | mark.brown@usdoj.gov |
| Paul A. Turcke | paul.turcke@usdoj.gov |
| Tyson C. Kade | tck@vnf.com |
| Jonathan David Simon | jxs@vnf.com |
| Melinda Louise Meade Meyers | mmeademeyers@vnf.com |
| Jeanie A. Nelson | anne.nelson@alaska.gov |
| Ronald W. Opsahl | ron.opsahl@alaska.gov |
| Aurora R. Janke | aurora.janke@atg.wa.gov |

### Case No. 3:20-cv-00205-SLG

| | |
|---|---|
| Mark Arthur Brown | mark.brown@usdoj.gov |
| Paul A. Turcke | paul.turcke@usdoj.gov |
| Katharine S. Glover | kglover@earthjustice.org |
| Erik Clifford Grafe | egrafe@earthjustice.org |
| Jared Eldridge Knicley | jknicley@nrdc.org |
| Nathaniel S.W. Lawrence | nlawrence@nrdc.org |
| Garett Robert Rose | Grose@nrdc.org |
| Eric P. Jorgensen | ejorgensen@earthjustice.org |
| Tyson C. Kade | tck@vnf.com |
| Jonathan David Simon | jxs@vnf.com |
| Melinda Louise Meade Meyers | mmeademeyers@vnf.com |

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
47

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

Jeanie A. Nelson          anne.nelson@alaska.gov
Ronald W. Opsahl          ron.opsahl@alaska.gov
Aurora R. Janke          aurora.janke@atg.wa.gov

**Case No. 3:20-cv-00223-SLG**
Matthew N. Newman         mnewman@narf.org
Wesley James Furlong      wfurlong@narf.org
Megan R. Condon           mcondon@narf.org
Teresa B. Clemmer         teresa@bvt-law.com
Peter H. Van Tuyn         peter@bvt-law.com
Karen E. Schmidt          karen@bvt-law.com
Paul Turcke               paul.turcke@usdoj.gov
Tyson C. Kade             tck@vnf.com
Jonathan David Simon      jxs@vnf.com
Melinda Louise Meade Meyers  mmeademeyers@vnf.com
Jeanie A. Nelson          anne.nelson@alaska.gov
Ronald W. Opsahl          ron.opsahl@alaska.gov
Aurora R. Janke          aurora.janke@atg.wa.gov

                         */s/ Jason T. Morgan*
                         Jason T. Morgan

109085403.4 0010627-00051

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA  98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Gwich'in Steering Committee, et al. v. Bernhardt, et al.*
Case Nos. 3:20-cv-00204-SLG; 3:20-cv-00205-SLG; 3:20-cv-00223-SLG
48